UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

ROOFERS LOCAL NO. 149 PENSION
FUND, on Behalf of Itself and All Others
Similarly Situated,

                      Plaintiff,

     vs.

AMGEN INC., ROBERT A. BRADWAY, and
PETER H. GRIFFITH,

                    Defendants.

————————————————————— x

Civil Action No.   1:23-cv-02138

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Roofers Local No. 149 Pension Fund ("plaintiff"), on behalf of itself and all others similarly situated, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Amgen Inc. ("Amgen" or the "Company"), Company press releases, conference call transcripts, and media reports about the Company.  Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Amgen common stock between July 29, 2020 and April 27, 2022, inclusive (the "Class Period"), against Amgen and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.  The Company's common stock trades in this District on The NASDAQ Stock Market LLC ("Nasdaq").

---

[1]      Emphasis has been added unless stated otherwise.

- 1 -

4.      In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Roofers Local No. 149 Pension Fund, as set forth in the accompanying certification, which is incorporated by reference herein, purchased and acquired Amgen common stock during the Class Period and was damaged thereby.

6.      Defendant Amgen is one of the world's largest independent biopharmaceutical companies.   Headquartered in Thousand Oaks, California, Amgen sells a vast array of biopharmaceutical products across the United States and globally.  Amgen common stock trades in New York City on the Nasdaq under the ticker symbol "AMGN."

7.      Defendant Robert A. Bradway ("Bradway") served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Amgen (the "Board") throughout the Class Period.

8.      Defendant Peter H. Griffith ("Griffith") served as Chief Financial Officer ("CFO") of Amgen throughout the Class Period.

9.      Defendants Bradway and Griffith are collectively referred to herein as the "Individual Defendants."   Amgen and the Individual Defendants are collectively referred to herein as "defendants."

10.      Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, sales, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and

information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

**Background**

13.     Established in Thousand Oaks, California in 1980, Amgen has grown to become one of the largest independent biopharmaceutical companies in the world.  For the Company's most recent fiscal year, ended December 31, 2022, Amgen achieved over $26 billion in revenues. Approximately 70% of Amgen's 2022 revenues were derived from product sales in the United States, while the remainder were derived from sales in approximately 100 other countries around the world.

14.     Amgen boasts a large and varied patented drug portfolio, with numerous additional drug candidates under development.  Amgen maintains an internal manufacturing network to supply its commercial production capabilities for bulk drug manufacturing, formulation, fill, finish, tableting, and device assembly.  These activities are performed within the United States and its territories in the Company's Puerto Rico, Rhode Island, and California facilities as well as internationally in the Company's Ireland, the Netherlands, and Singapore facilities.  In addition, Amgen uses third-party contract manufacturers to supplement the capacity or capability of its commercial manufacturing network.  The Company also operates distribution centers in Puerto Rico, Kentucky, California, and the Netherlands for worldwide distribution of the majority of its commercial and clinical products, with supplemental distribution provided by third-party distributors.

15.     Amgen purports to perform a substantial majority of its commercial manufacturing activities at its Puerto Rico facility, while performing a substantial majority of its clinical manufacturing activities at its Thousand Oaks facility.

16.     Amgen has long claimed that it was properly taking advantage of substantial favorable tax benefits provided by its Puerto Rico operations, which was treated as a foreign

jurisdiction for U.S. tax purposes, including a lower income tax, tax incentive grants available to the Company through 2035, and undistributed foreign earnings for which no U.S. income taxes or foreign withholding taxes were provided because such earnings would purportedly be invested indefinitely outside the United States.

17.    In large part because of its reliance on the tax implications of its Puerto Rico operations, Amgen has historically claimed an extremely low effective tax rate.  For example, Amgen claimed an effective tax rate of just 3.5%, 7.6%, and 13% for its 2013, 2014, and 2015 fiscal years, respectively.  As explained in an article entitled "3 Drugmakers That Probably Have Lower Tax Rates Than You Do," posted on the investor forum *The Motley Fool*: "Amgen generated one-fifth of its total revenue in 2015 outside the U.S."  The article continued: "While it paid the standard U.S. corporate tax rate of 35% on the rest of its revenue, the biotech deliberately invested its international sales elsewhere rather than bring them into the U.S." and "Amgen also received some help due to an excise tax credit in Puerto Rico."

18.    Following an Internal Revenue Service ("IRS") audit, in early 2017 Amgen received Notices of Proposed Adjustment ("NOPAs") for tax years 2010, 2011, and 2012.  The proposed adjustments related primarily to the allocation of profits between Amgen's U.S. and Puerto Rico facilities.  On April 12, 2017, Amgen received a Revenue Agent's Report ("RAR") from the IRS for the years 2010, 2011, and 2012 that included the proposed adjustments, which was followed by receipt of a modified RAR in November 2017 for the same tax years.  Similarly, in April 2020, Amgen received NOPAs proposing similar profit allocation adjustments for tax years 2013, 2014, and 2015, which were followed by receipt of an RAR for these same tax years in May 2020. Unbeknownst to investors, the various RARs stated that Amgen had improperly skirted U.S. tax

laws for several years, was relying on a profit allocation system that ran afoul of the U.S. tax code, and was on the hook for billions of dollars in back taxes.

19.     Following the receipt of the RARs, Amgen spent months advocating behind the scenes for the IRS to change its position regarding the Company's tax accounting and to lower the Company's tax bill.  Ultimately, all of these appeals failed and Amgen exhausted internal IRS dispute mechanisms, making it substantially likely that Amgen would have to pay billions of dollars in back taxes and penalties.

20.     In accordance with GAAP[2], Amgen was required to not only disclose the existence of the tax dispute, but also to provide investors with a reasonable estimate of the amount in dispute (over $8 billion), to disclose the likely impact to other tax years which had been assessed using the same tax treatment and to disclose anticipated penalties (resulting in billions of dollars of additional liability), and to take appropriate accruals.  The tax dispute represented a known loss contingency under GAAP, namely Accounting Standards Codification Topic 450, *Contingencies* ("ASC 450"). ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . . to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[3]

---

[2]     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles*.  *FASB Accounting Standards Codification* ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.

[3]     Under ASC 450, loss contingencies include "actual or possible claims and assessments," and "pending or threatened litigation."

21.     ASC 450 requires that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: (i) information available before the financial statements are issued indicates that it is probable that a liability had been incurred at the date of the financial statements; and (ii) the amount of loss can be reasonably estimated.  ASC 450 defines "probable" as "[t]he future event or events are likely to occur."  ASC 450 further states that when no accrual is made, either because the loss is not "probable" or because the amount of loss cannot be "reasonably estimated," the loss contingency nonetheless must be disclosed if there is at least a reasonable possibility that a loss may have been incurred.  ASC 450 defines "reasonably possible" as the chance of occurrence being "more than remote but less than likely."  When disclosure is required under ASC 450, the issuer must include both the "nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

22.     By the start of the Class Period, and after years of Amgen's failed attempts to avoid receiving notices of deficiency which would ultimately put the Company on the hook for over $10 billion in taxes and penalties, ASC 450 and other legal requirements compelled defendants to make substantial disclosures regarding the Company's outstanding tax liabilities to investors.  Rather than disclose these adverse facts, however, defendants failed to take any meaningful accrual or otherwise reveal the staggering amount of back taxes and penalties claimed by the U.S. government.  These material omissions caused the price of Amgen stock to trade at artificially inflated prices throughout the Class Period, ultimately causing investors to suffer hundreds of millions of dollars in losses when the truth was belatedly revealed.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

23.     The Class Period begins on July 29, 2020.  On that date, Amgen filed with the SEC

its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 Form 10-Q").  The

2Q20 Form 10-Q was signed by defendant Griffith, and both Individual Defendants provided signed

certifications that the report was materially accurate, complete, and free from fraud.  The 2Q20 Form

10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's

ongoing tax dispute with the U.S. government, and instead stated existing accruals were

"appropriate."  The 2Q20 Form 10-Q further stated regarding the RARs, in pertinent part, as follows:

> As previously disclosed, we received an RAR from the IRS for the years
> 2010, 2011 and 2012.  The RAR proposes to make significant adjustments that relate
> primarily to the allocation of profits between certain of our entities in the United
> States and the U.S. territory of Puerto Rico.  In November 2017, we received a
> modified RAR that revised the IRS's calculations but continued to propose
> substantial adjustments.  ***We disagree with the proposed adjustments and
> calculations and are pursuing resolution with the IRS administrative appeals
> office, which currently has jurisdiction over the matter.  If we are unable to reach
> resolution, we will vigorously contest the proposed adjustments through the
> judicial process***.  In addition, as previously reported, in April 2020, we received draft
> NOPAs and subsequently in May 2020, we received an RAR from the IRS for the
> years 2013, 2014 and 2015, which are similar to the proposed adjustments for the
> years 2010, 2011 and 2012 that relate primarily to the allocation of profits between
> certain of our entities in the United States and the U.S. territory of Puerto Rico.  ***We
> disagree with the proposed adjustments and calculations and will pursue resolution
> with the IRS administrative appeals office***.  Final resolution of these complex
> matters is not likely within the next 12 months and could have a material impact on
> our condensed consolidated financial statements.  ***We believe our accrual for income
> tax liabilities is appropriate based on past experience, interpretations of tax law
> and judgments about potential actions by tax authorities***; however, due to the
> complexity of the provision for income taxes, the ultimate resolution of any tax
> matters may result in payments substantially greater or less than amounts accrued.

24.     On October 29, 2020, Amgen filed with the SEC its quarterly report on Form 10-Q

for the period ended September 30, 2020 (the "3Q20 Form 10-Q").  The 3Q20 Form 10-Q was

signed by defendant Griffith, and both Individual Defendants provided signed certifications that the

report was materially accurate, complete, and free from fraud.  The 3Q20 Form 10-Q did not

disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 3Q20 Form 10-Q made substantially the same representations regarding the RARs provided in the 2Q20 Form 10-Q detailed above. In addition, the 3Q20 Form 10-Q stated that, in September 2020, Amgen had "received a revised RAR that continues to propose substantial adjustments for the years 2013, 2014 and 2015," but that Amgen "disagree[d] with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office."

25.    On February 9, 2021, Amgen filed with the SEC its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 Form 10-K"). The 2020 Form 10-K was signed by both Individual Defendants, who also provided signed certifications that the report was materially accurate, complete, and free from fraud. The 2020 Form 10-K did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 2020 Form 10-K made substantially the same representations regarding the RARs provided in the 3Q20 Form 10-Q detailed above. In addition, the 2020 Form 10-K stated that Amgen had "been unable to reach resolution at the administrative appeals level, and we anticipate that we will receive a Notice of Deficiency which we would expect to vigorously contest through the judicial process."

26.    On April 28, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Form 10-Q"). The 1Q21 Form 10-Q was signed by defendant Griffith, and both Individual Defendants provided signed certifications that the report was materially accurate, complete, and free from fraud. The 1Q21 Form 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 1Q21 Form 10-Q

made substantially the same representations regarding the RARs provided in the 2020 Form 10-K detailed above.

27.    The statements referenced above in ¶¶23-26 were materially false and misleading because they failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, as follows:

(a)    that the U.S. government claimed Amgen owed more than $3 billion in back taxes for tax years 2010, 2011, and 2012;

(b)    that the U.S. government claimed Amgen owed more than $5 billion in back taxes for tax years 2013, 2014, and 2015;

(c)    that the U.S. government would likely claim Amgen owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which the Company had used the same profit allocation treatment between its U.S. and Puerto Rico operations;

(d)    that Amgen had not taken sufficient accruals to account for its outstanding tax liabilities;

(e)    that Amgen had failed to comply with ASC 450 and other rules and regulations regarding the preparation of its periodic SEC filings; and

(f)    that Amgen's refusal to pay taxes claimed by the U.S. government exposed the Company to a substantial risk of severe financial penalties imposed by the IRS.

28.    Then, on August 3, 2021, Amgen issued an earnings release for its second fiscal quarter of 2021, which, for the first time, disclosed the massive outstanding tax liabilities sought by the IRS.  The release stated that Amgen had received a Notice of Deficiency from the IRS in July 2021 which sought *$3.6 billion* in back taxes, plus interest, for tax years 2010, 2011, and 2012.  This

amount was substantially higher than investors had been led to believe by defendants. The release also stated that Amgen had filed a petition in the U.S. Tax Court to contest the Notice of Deficiency.

29.    Also on August 3, 2021, Amgen held a quarterly earnings call with analysts and investors, hosted by the Individual Defendants. During the call, defendants downplayed the extent of Amgen's tax liabilities. When asked by an analyst whether similar Notices of Deficiency were likely for subsequent tax years, defendant Griffith responded by stating that "the IRS' position is without merit" and that Amgen had "appropriate tax reserves." Defendant Griffith also defended the Company's position by pointing to the scope of its Puerto Rico operations, stating in pertinent part as follows:

> And on your question around the IRS matter, the dispute, look, these notices are related to a transfer pricing dispute with the IRS regarding the allocation of the profits between the U.S. and the territory of Puerto Rico. *So you can see we have a difference of opinion on the value of the significant risks and the complexity we undertake with activities performed at our Puerto Rico facility. We strongly believe the IRS' position is without merit, and we have appropriate tax reserves, and this dispute will take several years to resolve*.
>
> *I would like to note, Salim, that Puerto Rico is our flagship manufacturing facility, responsible for the majority of Amgen's global manufacturing*. We're proud of our Puerto Rico operations, very proud of them and our colleagues there. We've had a major manufacturing presence in Puerto Rico for about 30 years. We have more than 2,200 highly skilled colleagues in Puerto Rico and who produce very sophisticated biologic medicines for patients all over the world with serious diseases. We've invested nearly $4 billion to expand and modernize those facilities in Puerto Rico, and we're proud to be consistently recognized as one of the island's best and most responsible employers.

30.    Later in the call, when defendants were again asked about potential impacts of the IRS decision to subsequent tax years, defendant Griffith again claimed that Amgen had "adequate reserves" for ongoing audits relating to tax years 2016 through 2018, even though the IRS was likely to take similar positions with respect to those years.

31.    On August 4, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Form 10-Q"). The 2Q21 Form 10-Q was signed by

defendant Griffith, and both Individual Defendants provided signed certifications that the report was materially accurate, complete, and free from fraud. The 2Q21 Form 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 2Q21 Form 10-Q further stated regarding the RARs, in pertinent part, as follows:

> In 2017, we received a Revenue Agent Report (RAR) and a modified RAR from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012 proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. We disagreed with the proposed adjustments and calculations and pursued a resolution with the IRS administrative appeals office. As previously reported, we were unable to reach resolution with the IRS appeals office. In July 2021, we filed a petition in the U.S. Tax Court to contest two duplicate Statutory Notices of Deficiency (Notices) for 2010, 2011 and 2012 that we received in May and July 2021. The duplicate Notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest. ***Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings. In any event, we firmly believe that the IRS's positions in the Notices are without merit and we will vigorously contest the Notices through the judicial process***.
>
> In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. ***We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office***. We are currently under examination by the IRS for the years 2016, 2017 and 2018.

32.    In response to this news, the price of Amgen common stock closed down $15.77 per share, or 6.5%, on August 4, 2021 on abnormally high trading volume of more than 6.9 million shares traded. However, because defendants failed to disclose the full truth, the price of Amgen stock remained artificially inflated. In addition, and as detailed below, defendants continued to make materially false and misleading statements regarding the extent and likely outcome of Amgen's outstanding tax liabilities.

33.     On November 3, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Form 10-Q").  The 3Q21 Form 10-Q was signed by defendant Griffith, and both Individual Defendants provided signed certifications that the report was materially accurate, complete, and free from fraud.  The 3Q21 Form 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate."  The 3Q21 Form 10-Q made substantially the same representations regarding the RARs provided in the 2Q21 Form 10-Q detailed above.  In addition, the 3Q21 Form 10-Q stated:

> As a consequence of the Tax Court litigation for the 2010-2012 period, the IRS administrative appeals office recently informed us that it does not plan to engage in discussions at this time regarding the allocation of profits between our entities in the United States and the U.S. territory of Puerto Rico for the 2013-2015 period.

34.     On February 16, 2022, Amgen filed with the SEC its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 Form 10-K").  The 2021 Form 10-K was signed by both Individual Defendants, who also provided signed certifications that the report was materially accurate, complete, and free from fraud.  The 2021 Form 10-K did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate."  The 2021 Form 10-K made substantially the same representations regarding the RARs provided in the 3Q21 Form 10-Q detailed above.  In addition, the 2021 Form 10-K stated that Amgen had been "unable to reach resolution at the administrative appeals level," and "anticipate[d] that [it] will receive a statutory notice of deficiency for these years as well."

35.     The statements referenced above in ¶¶28-34 were materially false and misleading because they failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, as follows:

(a)    that the U.S. government claimed Amgen owed more than $5 billion in back taxes for tax years 2013, 2014, and 2015;

(b)    that the U.S. government would likely claim Amgen owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which the Company had used the same profit allocation treatment between its U.S. and Puerto Rico operations;

(c)    that Amgen had not taken sufficient accruals to account for its outstanding tax liabilities;

(d)    that Amgen had failed to comply with ASC 450 and other rules and regulations regarding the preparation of its periodic SEC filings; and

(e)    that Amgen's refusal to pay taxes claimed by the U.S. government exposed the Company to a substantial risk of severe financial penalties imposed by the IRS.

36.    In addition, throughout the Class Period Amgen's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Amgen common stock] speculative or risky" and an explanation of "how [the] risk affect[ed] [Amgen]."  Amgen's periodic financial filings failed to disclose known trends and uncertainties and the true risks arising out of the Company's receipt of the RARs and failure to dissuade the IRS from its positions adverse to the Company in violation of Item 303 and Item 105.  Indeed, the purported risk disclosures provided in Amgen's periodic financial filings were themselves materially misleading

because they created the false and misleading impression that Amgen's outstanding tax liabilities were far lower than in fact was the case.

37.    Then, on April 27, 2022, Amgen issued an earnings release for its first fiscal quarter of 2022, which disclosed that the Company had received a Notice of Deficiency from the IRS in April 2022 which sought $5.1 billion in back taxes, plus interest, for tax years 2013, 2014, and 2015, and proposed a $2 billion penalty as a result of Amgen's improper tax avoidance strategies.  Thus, the collective amount that the IRS claimed was owed by the Company to the U.S. government totaled *more than $10 billion* – far higher than investors had been led to believe – with likely additional exorbitant back taxes owed for subsequent tax years for which Amgen had applied the same profit allocation treatment between its U.S. and Puerto Rico operations.  The release also stated that Amgen intended to file a petition in the U.S. Tax Court to contest the Notice of Deficiency, which it would seek to consolidate with its pending petition for earlier tax years.

38.    In response to this news, the price of Amgen common stock closed down $10.66 per share, or 4.3%, on April 28, 2022 on abnormally high trading volume of more than 6.6 million shares traded.  The share price continued to fall in subsequent days as the market digested the news, reaching a low of just $227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022.

39.    Amgen has additionally disclosed that it is under examination by the IRS for the years 2016 to 2018 for similar issues as the prior Notices of Deficiency for years 2010 to 2015, as well examination by various state and foreign tax jurisdictions.  Amgen has also admitted that "the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse effect on the results of our operations."

40.     As a result of defendants' wrongful acts and omissions, and the declines in the market value of Amgen common stock, plaintiff and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

41.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.

42.     The Individual Defendants, because of their positions with Amgen, controlled the contents of Amgen's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of Amgen's corporate statements and is, therefore, responsible and liable for the representations contained therein.

## NO SAFE HARBOR

43.     The "Safe Harbor" warnings accompanying Amgen's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and approved by an executive officer of Amgen who knew the FLS was false.  None of the historic or

present tense statements made by defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made; nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

44.    Plaintiff and the Class (defined below) are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

45.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Amgen common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Amgen common stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)    Amgen regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Amgen was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

46.    As a result of the foregoing, the market for Amgen common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of Amgen common stock. Under these circumstances, all those who transacted in Amgen common stock during the Class Period suffered similar injury through their transactions in Amgen common stock at artificially inflated prices, and a presumption of reliance applies.

47.    Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Amgen common stock between the time defendants misrepresented and failed to disclose material facts and the time the facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Amgen common stock and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

48.    During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Amgen common stock by misrepresenting the value of the Company's business and prospects by concealing the likelihood and extent of Amgen's massive tax liability. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Amgen common stock fell precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Amgen common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

49.    The market for Amgen common stock was open, well developed, and efficient at all relevant times. Throughout the Class Period, Amgen common stock traded at artificially inflated prices as a direct result of defendants' materially misleading statements and omissions of material

fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiff and other members of the Class purchased or otherwise acquired Amgen common stock, relying upon the integrity of the market price for Amgen common stock and market information relating to Amgen, and they have been damaged thereby.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of Amgen common stock during the Class Period (the "Class"). Excluded from the Class are defendants and members of their immediate families; the officers and directors of the Company at all relevant times and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amgen common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Amgen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations, and management of Amgen;

(c)     whether defendants acted with scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

56.     Plaintiff incorporates all of the preceding paragraphs by reference.

57.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or

omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Amgen common stock during the Class Period.

59.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Amgen common stock. Plaintiff and the Class would not have purchased Amgen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

60.     Plaintiff incorporates all of the preceding paragraphs by reference.

61.     The Individual Defendants acted as controlling persons of Amgen within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Amgen to engage in the wrongful conduct complained of herein and were culpable participants in the fraudulent scheme, as alleged herein. Amgen controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

- 21 -

B.      Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.      Awarding such equitable and injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 13, 2023                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN


                                         *s/ Samuel H. Rudman*
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         BRIAN E. COCHRAN
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         bcochran@rgrdlaw.com

- 22 -

ASHERKELLY
MICHAEL J. ASHER
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
masher@asherkellylaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Roofers Local No. 149 Pension Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14 day of February 2023.

Roofers Local No. 149 Pension Fund

By: _____
Brian Moore, Chairman

AMGEN

W2620199.pdf

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/12/2020 | 523 | $240.87 |
| 12/23/2020 | 160 | $222.94 |
| 03/18/2021 | 2,985 | $245.93 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 04/15/2021 | 340 | $255.15 |
| 06/30/2021 | 554 | $243.46 |
| 07/14/2021 | 256 | $244.39 |
| 07/16/2021 | 89 | $248.23 |
| 07/28/2021 | 98 | $244.73 |
| 08/09/2021 | 160 | $228.36 |
| 08/10/2021 | 130 | $226.89 |
| 08/12/2021 | 160 | $227.61 |
| 08/16/2021 | 122 | $230.15 |
| 08/18/2021 | 167 | $228.55 |
| 08/19/2021 | 269 | $225.29 |
| 08/20/2021 | 846 | $224.08 |
| 10/13/2021 | 1,011 | $203.97 |
| 10/14/2021 | 347 | $205.50 |

Prices listed are rounded up to two decimal places.

*Opening position of 3,866 shares.