UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

ROOFERS LOCAL NO. 149 PENSION
FUND, on Behalf of Itself and All Others
Similarly Situated,

                    Plaintiff,

    vs.

AMGEN INC., ROBERT A. BRADWAY, and
PETER H. GRIFFITH,

                  Defendants.

———————————————————————— x

:   Civil Action No. 1:23-cv-02138-JPC
:
:   <u>CLASS ACTION</u>
:
:   AMENDED COMPLAINT FOR
:   VIOLATIONS OF THE FEDERAL
:   SECURITIES LAWS
:
:
:
:   <u>DEMAND FOR JURY TRIAL</u>
:

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................4

BASIS OF ALLEGATIONS ...............................................................................................5

THE PARTIES......................................................................................................................5

CLASS ACTION ALLEGATIONS ...................................................................................7

SUBSTANTIVE ALLEGATIONS ....................................................................................9

    The Company and Its Business......................................................................................9

    Amgen Sought to Reduce Corporate Income Taxes – and Thereby Increase
    Profitability – by Utilizing a Transfer Pricing Methodology.................................9

    Background of Key Terms Concerning IRS Audits and Amgen's Financial
    Disclosure Obligations Relevant to Plaintiff's Claims ......................................12

    The IRS Transfer Pricing Examination Process ...................................................13

    The IRS Conducts Lengthy and Detailed  Transfer Pricing Audits of Amgen ................17

    The IRS Seeks from Amgen More than  $10 Billion in Back Taxes and Penalties ..........18

    Amgen's Financial Reporting Violated GAAP and Relevant Accounting
    Standards During the Class Period ........................................................................21

    Amgen's Materially False and Misleading Financial Reporting During the Class
    Period .........................................................................................................................28

    Amgen's Financial Reporting Was Materially Misstated...................................33

    Amgen's Contravention of GAAP Violated SEC Regulations..........................34

    Amgen's Disclosure Controls and Internal Control over Financial Reporting Were
    Materially False and Misleading.............................................................................35

    Amgen's Contingent Tax Liability Was  Material to Its Financial Condition .................37

    Defendants' Failure to Publicly Disclose the Amount of Amgen's Potential
    Financial Exposure to the IRS Enabled It to Raise Billions of Dollars in Debt
    Offerings ....................................................................................................................38

Page

Amgen Reveals the IRS Was Seeking a Massive Amount of Back Taxes and Penalties ...........................................................................................................40

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ...........................................................50

Amgen's Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Could Reasonably Impact the Company's Financial Results...............81

Amgen's Class Period SEC Filings Omitted Significant Risk Factors Required to Be Disclosed Therein ........................................................................................83

Any Purported Risk Warnings in Amgen's Class Period Forms 10-Q and 10-K Were Inadequate ...............................................................................................85

ADDITIONAL SCIENTER ALLEGATIONS...........................................................85

LOSS CAUSATION/ECONOMIC LOSS ................................................................90

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ..................................................................................................92

APPLICABILITY OF PRESUMPTION OF RELIANCE: AFFILIATED UTE DOCTRINE ..................................................................................................93

NO SAFE HARBOR .........................................................................................94

COUNT I .......................................................................................................94

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ..................................................................................................94

COUNT II ......................................................................................................96

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ..................................................................................................96

PRAYER FOR RELIEF ....................................................................................98

DEMAND FOR TRIAL BY JURY .....................................................................98

Lead Plaintiff Asbestos Workers Philadelphia Pension Fund ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, on behalf of itself and the class it seeks to represent, for its Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), alleges the following upon knowledge as to its own acts, and upon the investigation conducted by Plaintiff's counsel as detailed below.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons, other than Defendants (defined below), who purchased or otherwise acquired the common stock of Amgen Inc. ("Amgen" or the "Company") between July 29, 2020 and April 27, 2022, inclusive (the "Class Period"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

2.      Amgen is an independent large biopharmaceutical company that discovers, develops, manufacturers, and markets medicines for grievous illnesses.  Amgen is headquartered in Thousand Oaks, California, and has a presence in approximately 100 countries and regions worldwide.  Amgen claims to perform a substantial amount of its commercial manufacturing activities at its facility in Puerto Rico.

3.      Prior to and during the Class Period, Amgen sought to reduce the amount of its U.S. income taxes by shifting income from the U.S. to Puerto Rico, which has a lower corporate income tax rate than the U.S., utilizing an accounting practice known as "transfer pricing."  Transfer pricing refers to the process of pricing transactions within and between enterprises under common ownership or control.  Multinational corporations use transfer pricing as a method of shifting profits to subsidiaries in low tax jurisdiction in order to minimize the aggregate tax liability of the consolidated entity.  Amgen's use of transfer pricing enabled the consolidated entity to benefit from

an extremely low effective tax rate, which dramatically increased the Company's net income prior to and during the Class Period.

4.    Amgen's aggressive transfer pricing practices caused the U.S. Internal Revenue Service ("IRS") to conduct multiple in-depth examinations of its transfer pricing methodologies. The IRS initially audited Amgen's 2010-12 tax years and then, after discovering improprieties, audited Amgen's 2013-15 tax years.  The IRS found that, in total, Amgen underpaid approximately ***$8.65 billion***[1] in U.S. income taxes during its 2010 through 2015 tax years.

5.    Prior to the beginning of the Class Period, the IRS had engaged in on-going communications with Amgen putting the Company on notice that its transfer pricing practices improperly allocated billions of dollars in income from the U.S. to Puerto Rico.  Thereafter, the IRS issued to Amgen Notices of Proposed Adjustments ("NOPAs") and Revenue Agent's Reports ("RARs") which explained and importantly, quantified, Amgen's understatement of U.S. income taxes.

6.    As detailed below, the federal securities laws and accounting rules governing the preparation of Amgen's financial statements required the Company to disclose to investors during the Class Period it was contingently liable for approximately $10.7 billion in back taxes and penalties.  Instead of disclosing these huge contingent liabilities, which arguably could jeopardize the ability of Amgen to continue as a going-concern, Defendants improperly concealed the amounts the IRS stated were owed to the U.S. government, minimized the magnitude of the amounts sought, and misled investors by stating, "the ultimate outcome of any tax matters ***may*** result in payments substantially greater than amounts accrued and ***could*** have a material adverse effect on the results of

---

[1]    Emphasis is added unless otherwise indicated herein.

our operations." Defendants also repeatedly contended Amgen did absolutely nothing wrong. Amgen's statements conveyed to investors, "there's nothing to see here."

7.     Amgen was motivated to engage in this improper financial reporting practice to facilitate, and procure on favorable terms, approximately $9 billion in debt financing during the Class Period. On August 3, 2021, when Amgen disclosed to the market the IRS was seeking approximately $3.6 billion, plus interest, in back taxes for Amgen's 2010-12 tax years, its common stock declined $15.77 per share, or 6.5%, from $244.08 per share on August 3, 2021 to $228.31 per share on August 4, 2021, on very high trading volume.

8.     Thereafter, on April 27, 2022, when Amgen disclosed to the market the IRS was seeking approximately $5.1 billion in back taxes, plus interest, as well as approximately $2 billion in penalties for Amgen's 2013-15 tax years, its common stock declined $10.66 per share, or 4.3%, from $248.79 per share on April 27, 2022 to $238.13 per share on April 28, 2022, on very high trading volume. The price of Amgen stock continued to fall over the next several days as the market digested the news, reaching a low of just $227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022.

9.     The below graphic depicts key events alleged herein, including that by the start of the Class Period the IRS informed Amgen it was seeking more than $10 billion in back taxes and penalties for its 2010-15 tax years:



## JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. §78a(a)] and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events or omissions giving rise to the claims asserted herein occurred in substantial part in this District.  Amgen common stock trades in this District on the NASDAQ Stock Market ("Nasdaq").

13.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of the national securities markets.

- 4 -

## BASIS OF ALLEGATIONS

14.    The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiff's counsel, which included interviewing former Amgen employees and reviewing and analyzing information from numerous public and proprietary sources (such as LexisNexis, Dow Jones and Bloomberg, Inc.), including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Amgen, publicly available annual reports, press releases, published interviews, news articles and other media reports, and reports of securities analysts.  In addition, Plaintiff's counsel reviewed certain documents filed in the U.S. Tax Court concerning Amgen's litigations with the IRS.[2]  Additionally, Plaintiff's counsel consulted with experts who have extensive knowledge and experience associated with the IRS's audits of U.S. companies which engage in transfer pricing practices.

15.    Many of the facts involving Defendants' wrongful conduct as alleged herein are solely in the possession of Defendants and Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## THE PARTIES

16.    Lead Plaintiff Asbestos Workers Philadelphia Pension Fund acquired the common stock of Amgen during the Class Period and was damaged thereby, as set forth in its certification previously filed with the Court and incorporated by reference herein (ECF No. 22-2).

17.    Defendant Amgen is an independent biotechnology medicines company that discovers, develops, manufactures, and markets medicines for grievous illnesses.  The Company focuses on human therapeutics and concentrates on innovating novel medicines based on cellular and molecular biology.  Headquartered in Thousand Oaks, California, Amgen maintains offices and sells

---

[2]    Many of the documents listed on the U.S. Tax Court dockets have been filed under seal and are unavailable to Plaintiff's counsel.

a vast array of biopharmaceutical products across the United States and globally.  Amgen common stock trades on the Nasdaq under the ticker symbol "AMGN."

18.     Defendant Robert A. Bradway ("Bradway") served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Amgen (the "Board") throughout the Class Period.  Defendant Bradway has been the Company's President since 2010 and CEO since 2012.  From 2010 to 2012, Defendant Bradway served as the Company's President and Chief Operating Officer.  Defendant Bradway also served as Executive Vice President and Chief Financial Officer from 2007 to 2010.

19.     Defendant Peter H. Griffith ("Griffith") served as Chief Financial Officer ("CFO") of Amgen throughout the Class Period.  Defendant Griffith joined the Company in 2019 as Executive Vice President of Finance.  Prior to joining Amgen, from 1997 to 2019, Defendant Griffith was a partner at EY (formerly Ernst & Young) and served in a variety of senior leadership roles, with his last position being Global Vice Chair, Corporate Development.

20.     Defendants Bradway and Griffith are collectively referred to herein as the "Individual Defendants."   Amgen and the Individual Defendants are collectively referred to herein as "Defendants."

21.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, taxes, services, competition, sales, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading

statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Amgen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Amgen's business, financial condition, contingent liabilities and the intrinsic value of Amgen common stock; and (ii) caused Plaintiff and other members of the Class to purchase Amgen common stock at artificially inflated prices.

**CLASS ACTION ALLEGATIONS**

23.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all purchasers or acquirers of Amgen common stock between July 29, 2020 and April 27, 2022, inclusive, who were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amgen common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from information and records maintained by Amgen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and contingent liabilities of Amgen;

- whether Defendants caused Amgen to issue false and misleading financial statements during the Class Period;

- whether the Individual Defendants and the Company acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Amgen common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

29.     Amgen is a biotechnology company that seeks to develop, manufacture, and deliver biologic medicines to patients suffering from serious illness.  Approximately 70% of Amgen's 2022 revenues were derived from product sales in the United States, while the remainder were derived from sales in approximately 100 other countries around the world.

30.     Amgen maintains an internal manufacturing network to supply its commercial production capabilities for bulk drug manufacturing, formulation, fill, finish, tableting, and device assembly.  These activities are performed in Amgen's Rhode Island, California, and Puerto Rico facilities as well as internationally in Amgen's Ireland, Netherlands and Singapore facilities.  Amgen uses third-party contract manufacturers to supplement the capacity or capability of its commercial manufacturing network.  The Company also operates distribution centers in Kentucky, California, Puerto Rico, and the Netherlands for worldwide distribution of most of its commercial and clinical products, with supplemental distribution provided by third-party distributors.

31.     Amgen claims to perform a substantial amount of its commercial manufacturing activities at its facility in Puerto Rico.  According to Amgen, Puerto Rico is the site of the Company's manufacturing complex responsible for the majority of Amgen's global manufacturing and the Company's Puerto Rico subsidiary produces biologic medicines Amgen uses for its customers.

### Amgen Sought to Reduce Corporate Income Taxes – and Thereby Increase Profitability – by Utilizing a Transfer Pricing Methodology

32.     Prior to and during the Class Period, Amgen sought to reduce the amount it paid in taxes in the U.S. by utilizing a tax accounting methodology referred to as "transfer pricing."  The transfer pricing mechanism is a way companies attempt to shift tax liabilities to low-cost tax

jurisdictions.  At all relevant times herein (*i.e.*, 2010 to 2015), the corporate tax rate was lower in Puerto Rico than in the U.S. and Amgen utilized transfer pricing to shift a substantial amount of its taxable income from the U.S. to Puerto Rico.

33.    Transfer pricing is an accounting practice that represents the price one division in a company charges another division for goods and services provided.  Transfer pricing allows for the establishment of prices for the goods and services exchanged between subsidiaries, affiliates, or commonly controlled companies that are part of the same larger enterprise.  Multinational corporations, such as Amgen, use the transfer pricing method to allocate earnings among their subsidiary and affiliate companies that are part of the parent organization.

34.    For example, if a company has subsidiaries A and B, with subsidiary A located in a higher tax country than subsidiary B, the company may save on taxes by making subsidiary A less profitable and subsidiary B more profitable.  Pursuant to a strategy in which subsidiary A charges lower prices to subsidiary B, a company may increase subsidiary B's profit margin and overall profit through a lower cost of goods sold and, as a result, subsidiary B's increased profits will be taxed at a lower rate, thus reducing the company's overall tax burden.

35.    Amgen calculated its U.S. taxable income based on a complex set of transactions between its subsidiaries on the U.S. mainland and Puerto Rico.  Specifically, in or around 2002, Amgen, and later its wholly-owned subsidiary Immunex Corporation ("Immunex"), began licensing intellectual-property rights to its Puerto Rican unit primarily responsible for manufacturing Amgen's drug portfolio, named Amgen Manufacturing Ltd. ("AML"), to manufacture and sell its drugs in exchange for royalties.  AML, in turn, agreed to pay a guaranteed profit to a separate Amgen subsidiary to sell the drugs on the mainland.

36.     Amgen's use of transfer pricing had an extremely positive impact on the Company's financial results.  According to an August 1, 2022 article in The Wall Street Journal ("WSJ") entitled *Amgen Fights IRS Over $10.7 Billion Tax Bill*, Amgen has claimed one of the lowest tax rates in the pharmaceutical industry, reporting a median effective tax rate of just 12.5% over the past decade, compared with an 18% median rate across the 10 largest U.S. drug companies.  Its 2013-15 tax years were especially aggressive with Amgen claiming an effective tax rate of just 3.5%, 7.6%, and 13%, respectively.

37.     Even though transfer pricing can make a company such as Amgen appear more profitable, it also exposed the Company to challenges by the IRS.  As noted by Investopedia, companies can "misuse" transfer pricing by altering their taxable income and even though "[t]ransfer pricing can lead to tax savings for corporations . . . tax authorities may contest their claims."  Indeed, as alleged herein, the IRS conducted detailed and extensive audits into Amgen's transfer pricing practices and determined Amgen misused transfer pricing and therefore owed the U.S. Federal Government more than $10 billion in back taxes and penalties.

38.     According to the August 1, 2022 WSJ article, Brian Skorney, an analyst with Robert W. Baird & Co., stated Amgen's low tax rate "has long been admired by investors because it helped the [C]ompany to reliably beat analysts' quarterly earnings estimates."  Skorney also commented, "[a]t the time, shareholders were like, 'Oh my God, they're so good at tax accounting[.]'"  In hindsight, however, "that was a pretty negative signal that the IRS was probably going to come knocking[.]"

**Background of Key Terms Concerning IRS Audits and
Amgen's Financial Disclosure Obligations Relevant to Plaintiff's Claims**

39.    An IRS audit of a public company such as Amgen is a review/examination of the organization's accounts and financial information to ensure information is reported according to the tax laws and to verify the reported amount of tax is correct.  The IRS has established formalized processes and procedures when auditing large corporations such as Amgen and provides written communications to taxpayers detailing the IRS's audit findings.

40.    According to the IRS's Internal Revenue Manual for Large Business and International ("LB&I") examinations (the "Internal Revenue Manual"), a NOPA is issued by the IRS when it has reached determination in connection with a particular audit.  According the Internal Revenue Manual, "[t]he issue team must discuss the issues with the taxpayer before issuing a NOPA."  This includes conveying the "government's position and an explanation of the law applied in making each determination."

41.    With respect to LB&I audits, all IRS proposed adjustments are set forth on Form 5701, *Notice of Proposed Adjustment*, which is generally accompanied by Form 886-A, *Explanation of Items*.  Form 5701 provides a summary of the proposed adjustments and Form 886-A provides a detailed explanation of the basis for each adjustment.

42.    An IRS manager has the responsibility to review each NOPA for accuracy, organization and completeness, and approve it by signing the Form 5701 before issuing the NOPA to the taxpayer.  NOPAs meeting certain dollar thresholds or on specific issues may require senior manager approval.

43.    Similarly, IRS's Internal Revenue Manual for LB&I examinations notes an RAR is a detailed document that contains "all the information necessary to ensure a clear understanding of the adjustments and how the tax liability was computed."  An RAR is generally set forth on IRS Form

4549, *Income Tax Examination Changes* and is also generally accompanied by Form 886-A, *Explanation of Items*. Form 4549 shows the changes the IRS has made to the income, credits, and deductions on the taxpayer's income tax return, as well as the income tax due, and penalties and interest.

### The IRS Transfer Pricing Examination Process

44.     The IRS's audits of Amgen for its 2010-15 tax years were subject to guidelines of best practices and processes the IRS developed for transfer pricing audits. The guidelines, referred to as the Transfer Pricing Examination Process ("TPEP"), were created to assist with the "planning, execution and resolution of transfer pricing examinations" and are expected to be "shared with taxpayers at the start of a transfer pricing examination, so they understand the process and can work effectively with the examination team." Even though the TPEP acknowledges "teams should exercise their judgment on how to best apply" the TPEP, upon information and belief, the IRS followed the best practices described in the TPEP during its audits of Amgen.

45.     The IRS transfer pricing examination process is customarily broken down into three phases: (i) planning; (ii) execution; and (iii) resolution.

46.     <u>The Planning Phase</u>: During the planning phase, the IRS issue team (which customarily includes a revenue agent, senior revenue agent, economist, and tax law specialist) obtains an in-depth understanding of the taxpayer's history, background, overall core business operations, and profit drivers. The planning phase also includes Internal Revenue Code (IRC) Section 6662(e) Documentation Requests and an opening conference between the issue team and the taxpayer. During the opening conference, the IRS issue team meets with the taxpayer and, among other things, identifies employees responsible for the accounting records and "identif[ies] the taxpayer personnel that will work with the issue team."

47.    <u>The Execution Phase</u>:  During the execution phase, the IRS issue team determines the relevant facts, applies the law to the facts, and seeks to understand the various tax implications of the issues.    The IRS issue team reviews the relevant, economically significant, intercompany transactions of the entity under examination, conducts a functional analysis, and formulates a conclusion about the entity's transfer pricing related activities.

48.    The IRS obtains from the taxpayer accounting records, geographic, tax and legal organizational charts, worldwide geographic and segmented accounting data, and financial statements necessary for a transfer pricing related review.  The TPEP states, "for the issue team to fully understand the taxpayer's transaction, request a transfer pricing/supply chain orientation from the taxpayer."

49.    The issue team will also "request any additional information not obtained during the Planning Phase."   The TPEP stresses, "open communication between the taxpayer and the examination team throughout the process is critical," and suggests "weekly or bi-weekly discussions between the examination team and the taxpayer to support communication and ensure common expectations regarding audit progress, IDRs, and timelines."   In fact, the TPEP contains a section titled "Taxpayer Meetings" which states the "issue team should meet periodically with the taxpayer to confirm all relevant facts developed during the examination."  A "Best Practice" is for a written agenda to be prepared for every taxpayer meeting and shared with the taxpayer in advance.

50.    The TPEP discusses "Penalties" during the execution phase, stating, "[p]enalties should be considered whenever adjustments are made to a tax return."  It states, the "determination whether to assert penalties, identify the appropriate penalties, and calculate the penalty amount accurately is primarily the issue team's responsibility and should take place throughout the examination process."  As a "Best Practice," the issue team "should discuss the imposition of

penalties at the same time as the primary adjustment.  Do not wait until the end of the examination process."

51.    Reports are drafted during the execution phase, including the building of the "Economist Report and NOPA."  The TPEP states the Economist Report should include:

- Executive Summary

- Factual Background and Functional Analysis of the Taxpayer and the Transaction(s) at Issue

- Summary of Taxpayer's Proposed Economic Analysis for the Transaction at Issue

- Critique Taxpayer's Methodology and Analysis for the Transaction at Issue

- IRS Economist's Determination of Arm's Length Price based Upon Economic Analysis

- Summary and Conclusion

52.    The TPEP directs the "issue team should utilize Transfer Pricing NOPA Best Practices" and should include:

- Adjustment Table

- Issue Statement

- Executive Summary of Issue

- Facts

- Law

- Taxpayer's Position

- Analysis – Government's Position

- Conclusion

53.    <u>The Resolution Phase</u>:  The TPEP instructs the "goal of the resolution phase is to reach agreement, if possible, on the tax treatment of each issue examined and, if necessary, issue a

Revenue Agent Report (RAR) to the taxpayer." It stresses, "[s]tarting with the development of the issue and continuing through resolution, early and frequent discussions with the taxpayer are crucial for a complete understanding of the respective merits of an issue."

54.    During the resolution phase, the IRS will meet with the taxpayer to discuss the results of the audit and the "issue team should meet with the taxpayer to discuss results of all issues prior to finalizing the NOPA and the Economist Report." During that meeting, taxpayer discussions should be focused on various items, including, "[d]etermine whether the taxpayer agrees with the facts as presented," "[e]valuate the taxpayer's position," and "[c]ompute any offsetting/correlative adjustments, changes to foreign tax credit, net operating losses, etc."

55.    If resolution with the taxpayer is not reached, the issue team will finalize the NOPA, Economist Report, and secure final approvals. At this time, the IRS prepares and issues the RAR and closes the case. A taxpayer has the option to appeal the IRS's findings and determinations. After an appeal, the issue team meets with the appeals personnel to understand the rationale for the outcome of the appeal.

56.    If an IRS administrative appeal is decided against the taxpayer, it may file a petition with the U.S. Tax Court against the IRS. There is a very high legal standard against the taxpayer in U.S. Tax Court for transfer pricing issues such as those faced by Amgen. To prevail in U.S. Tax Court, Amgen would need to prove the IRS's allocations of income between the U.S. and Puerto Rico were arbitrary, capricious, or unreasonable. The IRS's allocations must be sustained absent a showing of abuse of discretion.

### The IRS Conducts Lengthy and Detailed
### Transfer Pricing Audits of Amgen

57.     Prior to the start of the Class Period, the IRS audited Amgen for its 2010-12 and 2013-15 tax years in connection with its transfer pricing practices (among other items).  The IRS began its examination of Amgen's federal income tax returns for its 2010-11 tax years in 2013. Thereafter, the audit was expanded to include Amgen's income tax return for the 2012 tax year.  On February 14, 2018, the IRS requested Amgen's documentation for Amgen's transfer pricing practices for its 2013-15 tax years and opened an audit into its 2013-15 tax years on or before that date.  Amgen represented in a petition it filed with the U.S. Tax Court in 2022 (the "2022 Tax Court Petition") that it provided the IRS with all of the requested transfer pricing documentation on March 14, 2018.

58.     As Amgen acknowledges in its 2022 Tax Court Petition, the IRS audits (including prior years) were factually and resource intensive, resulted in the exchange of a considerable amount of information, and involved tours, site visits, and meetings.  Specifically, the audits involved the review and analysis of transfer pricing documentation, hundreds of information document requests, multiple tours of Amgen's Puerto Rico subsidiary, and dozens of employee interviews.

59.     The IRS was in direct and regular contact with Amgen during its audits of Amgen's 2010-12 and 2013-15 tax years.  Amgen assigned employees to interact and communicate with the IRS in connection with those audits.  John Cise ("Cise"), who served during the Class Period as Senior Tax Counsel and Director, Tax Audits and Transfer Pricing (from January 2020 to February 2021), Senior Tax Counsel and Director, Transfer Pricing and Tax Reporting (February 2021 to August 2021), and Executive Director, Global Tax Planning and Controversy (August 2021 to July 2023), was an Amgen executive who was directly involved with the IRS's audits of Amgen's transfer pricing for its 2010-15 tax years.  As a result, Cise, among other Amgen employees,

communicated directly with the IRS concerning its audits, the facts underlying Amgen's transfer pricing practices, and the IRS's and Amgen's respective positions in connection with the Audits. Cise reported to Jacqueline Samuels, Amgen's Vice President, Tax during the Class Period.

60.    Peter Price ("Price"), Amgen's Senior Tax Counsel and Director, Tax Audits, was also directly involved with the IRS's audits of Amgen's transfer pricing practices for its 2010-15 tax years.  Price's LinkedIn profile describes his role during the Class Period as follows:

> I lead the company's U.S. income tax audit group which is responsible for defending the company in tax controversies in the audit, appeals and litigation stages. I manage the company's IRS income tax audits with a significant focus on transfer pricing, as well as state, local, and foreign income tax audits. I provide strategic leadership for the audits, including management of external advisors, while providing oversight and leadership of the team members responsible for day-today audit management.

61.    Cise, Price and other Amgen employees were knowledgeable about facts communicated by the IRS in the NOPAs and RARs sent to Amgen, including that the IRS determined Amgen owed approximately $3.6 billion in back taxes for its 2010-12 tax years and approximately $5.1 billion in back taxes and $2 billion in penalties for its 2013-15 tax years.

62.    Cise and Price were each listed as counsel for Amgen (in addition to Amgen's outside counsel) on Amgen's petitions in the Tax Court disputing Amgen's tax liabilities for its 2010-15 tax years.

### The IRS Seeks from Amgen More than
### $10 Billion in Back Taxes and Penalties

63.    Prior to the start of the Class Period, the IRS notified Amgen it owed approximately $3.6 billion in back taxes for its 2010-12 tax years, at least approximately $5.1 billion in back taxes for its 2013-15 tax years, and approximately $2 billion in penalties for its 2013-15 tax years.

64.    Below is a breakdown of the amounts the IRS claimed Amgen owed in back taxes and penalties for its 2010 to 2015 tax years:

- 18 -

| Year | Increased Taxable Income | Increased Income Tax (Net) | Penalties or Additions to Tax per 26 CFR 6662(a) | Penalties or Additions to Tax per 26 CFR 6662(h) |
|------|--------------------------|----------------------------|--------------------------------------------------|--------------------------------------------------|
| **2010** | $3,105,656,321 | $1,090,155,925 | | |
| **2011** | $3,452,751,867 | $1,202,347,206 | | |
| **2012** | $3,410,385,067 | $1,281,480,982 | | |
| **2013** | $4,434,535,210 | $1,445,699,169 | $5,401,959 | $577,923,821 |
| **2014** | $4,697,142,415 | $1,609,897,130 | $8,187,857 | $624,106,657 |
| **2015** | $5,696,608,732 | $2,019,767,583 | $5,775,797 | $766,915,510 |
| **Total**: | **$24,797,079,612** | **$8,649,347,995** | **$19,365,613** | **$1,968,945,988** |

65.    Between January and March 2017, Amgen received NOPAs from the IRS for its 2010-12 tax years informing Amgen it owed at approximately $3.6 billion in back taxes, plus interest. The proposed adjustments related primarily to the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities and allocated additional profits to the U.S.

66.    On April 12, 2017, Amgen received an RAR from the IRS for its 2010-12 tax years which included the proposed adjustments. On November 29, 2017, Amgen received a modified RAR for the 2010-12 tax years that revised the IRS's calculation but continued to propose substantial adjustments.

67.    In April 2020, Amgen received NOPAs proposing similar profit allocation adjustments for its 2013-15 tax years, informing Amgen it owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years. The NOPAs were similar to the proposed adjustments for its 2010-12 tax years since they related primarily to the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities.

- 19 -

68.    In May 2020, Amgen received an RAR for its 2013-15 tax years which included the proposed adjustments.  In September 2020, Amgen received a revised RAR which continued to propose substantial adjustments for its 2013-15 tax years.  By this time, the IRS had informed Amgen it was seeking approximately $10.7 billion in back taxes for its 2010-15 tax years and penalties for its 2013-15 tax years.

69.    Even though the IRS notified Amgen it owed approximately $3.6 billion in back taxes, plus interest, for Amgen's 2010-12 tax years, at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years, Defendants failed to disclose these important facts to investors.  Instead, Defendants provided partial and incomplete information about the IRS audits and minimized their impact on the Company.

70.    As alleged below, Amgen's failure to disclose the amount of its contingent financial exposure to the IRS rendered its statements about the audits materially false and misleading and violated Amgen's financial reporting requirements.

71.    On or about February 9, 2021, Amgen disclosed in its Form 10-K for the fiscal year ended 2020 it had been unable to reach resolution at the administrative appeals level and anticipated it will receive a Notice of Deficiency regarding its 2010-12 tax years.

72.    In May 2021, Amgen received a Notice of Deficiency from the IRS (dated April 27, 2021) which sought $3.6 billion in back taxes, plus interest, for its 2010-12 tax years.  The Notice of Deficiency was address to Amgen's outside counsel at the law firm Baker & McKenzie LLP, which was listed as Amgen's "Person to contact" based on "the provisions of [a] power of attorney or other authorization" the IRS had on file.  Therefore, the IRS's audits had caused Amgen to retain outside counsel for its administrative appeal of the RAR for its 2010-12 tax years, if not earlier.  And in July 2021, Amgen received a duplicate Notice of Deficiency for its 2010-12 tax years.

**Amgen's Financial Reporting Violated GAAP and
Relevant Accounting Standards During the Class Period**

73.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  The SEC has adopted the accounting standards codified by the Financial Accounting Standards Board in its Accounting Standards Codification ("ASC") as the "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. §210.4-01(a)(1).  Interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

74.     At issue in this case are the Company's false and misleading financial statements for each of the quarters ended June 30, 2020, September 30, 2020, March 31, 2021, June 30, 2021, September 30, 2021 and the years ended December 31, 2020 and 2021 (collectively the "Class Period financial statements"), as well as Defendants' statements related thereto.

75.     Defendants caused Amgen to repeatedly issue financial statements to investors during the Class Period that were falsely represented to have been prepared in conformity with GAAP.  In doing so, the Class Period financial statements contained materially false and misleading statements of fact.  In addition, the representations issued by Defendants to investors about Amgen's Internal Control over Financial Reporting and its Disclosure Controls, as well as Defendant Bradway's and Griffith's certifications thereon pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), were each known by Defendants to be materially false and misleading.

76.     Specifically, the Class Period financial statements violated GAAP by failing to quantify Amgen's exposure to ***billions*** of dollars in contingent income tax related liabilities. Defendants knew of Amgen's exposure to such contingent liabilities as the Company has been

engaged in an on-going, multi-year dispute with the IRS over the billions of dollars in taxes the IRS has assessed the Company.

77.    The accounting and disclosure requirements for contingent liabilities is set forth in ASC Topic 450, *Contingencies*.  ASC Topic 450 mandates when a "loss contingency" must be accrued as a liability and/or when financial statements must provide disclosure about contingent liabilities, as well as what the financial statements must disclose.  GAAP defines a loss contingency as an "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC Topic 450-20-20.

78.    Specifically, ASC Topic 450 provides that an estimated loss from a loss contingency is to be accrued as a liability, which results in a charge against income, if the contingent loss is probable, *i.e.*, likely, and reasonably estimable.  When no liability accrual is made, either because the contingent loss is not "probable" or because the amount of the contingent loss cannot be "reasonably estimated," the loss contingency ***nonetheless must be disclosed*** if there is at least a "reasonably possible" chance that a loss, or an additional loss, may have been incurred and ***either*** of the following conditions exists:

(a)    an accrual is not made for a loss contingency because it is not probable or cannot be reasonably estimated; or

(b)    an exposure to loss exists in excess of the amount accrued.  *See, e.g.*, ASC Topic 450-20-50-3.

79.    GAAP defines reasonably possible as a ***more than a slight***, but less than likely, chance a future event will occur.  ASC Topic 450-20.

80.    When disclosure of a loss contingency is required, the disclosure must describe the "nature of the contingency" and provide "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."  ASC Topic 450-20-50-4.

81.    ASC Topic 450 also provides specific guidance with respect to contingent liabilities associated with pending or threatened litigation.  ASC Topic 450-20-55 provides that the accrual of a liability may be appropriate for litigation, claims, or assessments whose underlying cause is an event occurring on or before the date of an entity's financial statements even if the entity does not become aware of the existence or possibility of the lawsuit, claim, or assessment until after the date of the financial statements when it is probable that the loss contingency will occur and the amount of loss contingency can be reasonably estimated.  When the accrual of a loss contingency is inappropriate, because the contingent loss is either not deemed to be probable or cannot be reasonably estimated, disclosure is nonetheless "***required***" if an unfavorable outcome is reasonably possible, *i.e.*, there is more than "slight" chance of occurrence.

82.    ASC Topic 450-20-55 illustrates the above guidance in the following example:

55-18  An entity may be litigating a dispute with another party.  In preparation for the trial, it may determine that, based on recent developments involving one aspect of the litigation, it is probable that it will have to pay $2 million to settle the litigation. Another aspect of the litigation may, however, be open to considerable interpretation, and depending on the interpretation by the court the entity may have to pay an additional $8 million over and above the $2 million.

55-19  In that case, paragraph 450-20-25-2 requires accrual of the $2 million if that is considered a reasonable estimate of the loss.

55-20  Paragraphs 450-20-50-1 through 50-2 require disclosure of the nature of the accrual, and depending on the circumstances, ***may require disclosure of the $2 million that was accrued***.

55-21  Paragraphs 450-20-50-3 through 50-8 ***require disclosure of the additional exposure to loss if there is a reasonable possibility that the additional amounts will be paid***.

83.    In its Form 10-Q for the quarter ended March 31, 2017 (the "1Q17 Form 10-Q"), Amgen disclosed it received Notices of Proposed Adjustment from the IRS for the years 2010, 2011, and 2012 (the first NOPAs) and a Revenue Agent's Report from the IRS for the same years on April 12, 2017 (the first RAR).

84.    As noted above, a NOPA for domestic and foreign businesses whose assets equal to or exceeding $10 million is set forth on Form 5701, *Notice of Proposed Adjustment*.  Form 5701 provides taxpayers with a summary of the audit adjustments proposed by the IRS.

85.    Similarly, an RAR is set forth on IRS Form 4549, *Income Tax Examination Changes*. Form 4549 shows the changes the IRS has made to the income, credits, and deductions on the taxpayer's income tax return, as well as the income tax due, and penalties and interest.

86.    NOPAs and RARs are generally accompanied by Form 886-A, *Explanation of Items*, which provides a detailed explanation of the audit adjustments and contains the following information:

(c)    the case related facts, *e.g.*, the activity or non-activity the organization or plan has engaged in or started;

(d)    the law, applicable code and regulation sections, and Rev. Rulings, Revenue Procedures, etc., that supports the IRS's position;

(e)    the Government's position, which states why the application of the law to the facts supports the conclusion reached by the examination team;

(f)    the taxpayer's position and authority the taxpayer is relying upon (as opposed to the IRS's conclusions); and

(g)    the IRS's conclusion, setting forth the taxpayer's correct income tax liability after consideration of all of the above.

- 24 -

87.    The first NOPA and first RAR issued by the IRS associated with Amgen's 2010-12 tax years largely resulted from intercompany pricing adjustments (transfer pricing adjustments) associated with Amgen's, and later Immunex's, licensing of certain intellectual property to Amgen Manufacturing Limited, a subsidiary of Amgen which operates in the U.S. territory of Puerto Rico.[3] AML is primarily responsible for manufacturing of Amgen's drug portfolio.

88.    As noted above, Amgen disclosed in the 1Q17 Form 10-Q that it received the first NOPAs from the IRS during the quarter ended March 31, 2017 and the first RAR on April 12, 2017.

89.    The 1Q17 Form 10-Q disclosed that Amgen disagreed with the IRS's proposed adjustments, planned to initiate an administrative appeals process, and that the final resolution of the IRS audit could have a material impact on the Company's results of operations and cash flows if not resolved favorably.  The 1Q17 Form 10-Q also noted Amgen "believe[s its] income tax reserves are appropriately provided for all open tax years."

90.    The financial statement disclosure in the 1Q17 Form 10-Q, and any related disclosures by Defendants associated with Amgen's contingent income tax liabilities, were materially false and misleading because they failed to quantify in accordance with GAAP Amgen's exposure to more than ***$3 billion dollars*** in contingent income tax liabilities.

91.    ***First***, there was a greater than slight chance that Amgen would be obligated to pay more than $3 billion in additional income taxes because the IRS does not issue a NOPA or RAR until it has concluded an extensive transfer pricing examination supported by a thorough analysis of the underlying facts of the matter, which includes the determinations of legal and economic experts assigned to the case.

---

[3]    According to documents filed with the Tax Court for its 2010-12 tax years, transfer pricing adjustments by the IRS accounted for approximately 99%, 89% and 98% of the increase in Amgen's income tax liabilities, respectively.

92.     Prior to the issuance of a NOPA and RAR, the taxpayer generally receives correspondence from the IRS explaining what is being audited.  During its fact finding investigation, the IRS generally obtains from the taxpayer the accounting records, geographic, tax and legal organizational charts, worldwide geographic and segmented accounting data, and financial statements necessary for a transfer pricing related review.  In addition, the IRS generally conducts interviews of numerous employees, site visits, and tours manufacturing plants.

93.     Throughout the audit process, the IRS corresponds with the taxpayer pursuant to Information Document Requests ("IDRs"), which allows the taxpayer to provide the IRS with information and documentation that supports the values reported on the taxpayer's income tax return.  Thereafter, taxpayers are given a chance to respond to the IRS's proposed audit adjustments prior to the issuance of a NOPA and RAR.

94.     These numerous tasks are customarily performed by a team of IRS employees which may include: (i) a revenue agent; (ii) a senior revenue agent; (iii) an economist; and (iv) a tax law specialist.  This investigative team reviews the relevant, economically significant, intercompany transactions of the entity under examination and formulates a conclusion about the entity's transfer pricing related activities.

95.     Accordingly, only after the conclusion of an extensive transfer pricing examination supported by a thorough analysis of the underlying facts, the conclusions of legal and economic experts, and the completion of numerous tasks that have been vetted by personnel within its various departments, does the IRS issue a NOPA and RAR.  Here, based on the foregoing customary IRS practices and guidelines and the facts contained in Amgen's Tax Court Petitions, and upon information and belief, the IRS's audit of Amgen proceeded in the customary manner.

96.     Given the extensive resources the IRS devoted to the examination of Amgen's transfer pricing activities prior to the issuance of the first NOPAs and first RAR, there was a greater than slight chance that Amgen would be obligated to pay the U.S. government more than $3 billion in additional income taxes.

97.     **Second**, the first RAR issued by the IRS explicitly quantified and provided Amgen with "an estimate of the possible loss or range of loss" associated with the Company's transfer pricing activities.

98.     **Finally**, Defendant knew, or recklessly ignored, that there was a greater than slight chance that Amgen would be obligated to pay more than $3 billion in additional income taxes because prior to the issuance of the NOPAs and RARs, the IRS periodically met with senior Amgen officials to confirm all relevant facts developed during its examination.  Moreover, the IRS's findings were known to Defendants because Amgen was provided with the opportunity to respond to, and indeed engaged in discussions with, and an ongoing legal dispute over, the IRS's proposed audit adjustments prior to the issuance of a NOPA and RAR.  In addition, the Individual Defendants signed Amgen's filings with the SEC that contained disclosure about the IRS's transfer pricing related audit.

99.     Accordingly, Defendants knew, but misleadingly failed to quantify in accordance with GAAP, Amgen's exposure to more than $3 billion in contingent income tax liabilities. in the 1Q17 Form 10-Q.

100.    These false and misleading representations and/or omissions of material fact remained alive and uncorrected by Defendants until August 4, 2021.

**Amgen's Materially False and Misleading Financial Reporting
During the Class Period**

101.    On July 29, 2020, the first day of the Class Period, Amgen filed with the SEC its

Form 10-Q for the quarter ended June 30, 2020 (the "2Q20 Form 10-Q").  The financial statements

in the 2Q20 Form 10-Q, state, in pertinent part, as follows:

> As previously disclosed, we received an RAR from the IRS for the years 2010, 2011
> and 2012.  The RAR proposes to make significant adjustments that relate primarily to
> the allocation of profits between certain of our entities in the United States and the
> U.S. territory of Puerto Rico.  *In November 2017, we received a modified RAR that*
> *revised the IRS's calculations but continued to propose substantial adjustments.*
> We disagree with the proposed adjustments and calculations and are pursuing
> resolution with the IRS administrative appeals office, which currently has
> jurisdiction over the matter.  If we are unable to reach resolution, we will vigorously
> contest the proposed adjustments through the judicial process.  *In addition, as*
> *previously reported, in April 2020, we received draft NOPAs and subsequently in*
> *May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015,*
> *which are similar to the proposed adjustments for the years 2010, 2011 and 2012*
> *that relate primarily to the allocation of profits between certain of our entities in*
> *the United States and the U.S. territory of Puerto Rico.*  We disagree with the
> proposed adjustments and calculations and will pursue resolution with the IRS
> administrative appeals office.  Final resolution of these complex matters is not likely
> within the next 12 months and could have a material impact on our condensed
> consolidated financial statements.  We believe *our accrual for income tax liabilities*
> *is appropriate* based on past experience, interpretations of tax law and judgments
> about potential actions by tax authorities; **however**, due to the complexity of the
> provision for income taxes, *the ultimate resolution of any tax matters may result in*
> *payments substantially greater or less than amounts accrued*.

102.    In violation of GAAP, the 2Q20 Form 10-Q misleadingly failed to quantify Amgen's

exposure to more than $3 billion in contingent income tax liabilities set forth in the first NOPAs and

first RAR.  In addition, in April 2020 Amgen received from the IRS draft NOPAs (the "second

NOPAs") and an RAR in May 2020 (the "second RAR") for its 2013-15 tax years.  The second

NOPA and second RAR resulted from, in large part, transfer pricing adjustments similar to those set forth in the IRS's first NOPAs and first RAR.[4]

103.    The proposed audit adjustments in the second NOPAs and second RAR subjected Amgen to **more than $5 billion in *additional*** contingent income tax liabilities and approximately **$2 billion** in tax related penalties.

104.    For the reasons set forth in ¶¶91-98 above, the financial statement disclosure in the 2Q20 Form 10-Q, and any related disclosures by Defendants associated with Amgen's contingent income tax related liabilities, were materially false and misleading and presented in violation of GAAP because Defendants failed to disclose Amgen's aggregate contingent liabilities associated with the IRS's transfer pricing adjustments, *i.e.*, income tax, and related penalties, then totaled more than *$10 billion*.

105.    Thereafter, Amgen issued to investors, and filed with the SEC, financial statements for the quarters ended September 30, 2020 and March 31, 2021 and the year-end December 31, 2020 that repeated, in all in material respects, the false and misleading disclosures associated with Amgen's contingent income tax liabilities set forth in the 2Q20 Form 10-Q.

106.    Amgen's financial statements for the quarters ended September 30, 2020 and March 31, 2021 and year-end December 31, 2020 were materially false and misleading and presented in violation of GAAP for reasons set forth in ¶¶91-98 above.

107.    On April 27, 2021, Amgen received from the IRS a statutory Notice of Deficiency associated with the first NOPAs and first RAR for Amgen's 2010-12 tax years ("SNOD 1").

---

[4]    According to documents filed with the Tax Court for its 2013-15 tax years, transfer pricing adjustments by the IRS accounted for approximately 97%, 95% and 96% of the increase in Amgen's income tax liabilities, respectively.

108.   A statutory Notice of Deficiency or, "90-day letter," is, according to the IRS, a "***legal determination that is presumptively correct***":

> . . . a legal notice in which the Commissioner determines the taxpayer's tax deficiency.  IRC 6212 and IRC 6213 require that the IRS issue a notice of deficiency before assessing additional income tax, estate tax, gift tax, generation-skipping transfer tax and certain excise taxes unless the taxpayer agrees to the additional assessment.  The notice of deficiency ***is a legal determination that is presumptively correct*** and consists of the following:

> - A letter explaining the purpose of the notice, the amount of the deficiency, and the taxpayer's options.

> - A waiver to allow the taxpayer to agree to the additional tax liability.

> - A statement showing how the deficiency was computed.

> - An explanation of the adjustments.

109.   SNOD 1, which was submitted to Amgen's outside legal counsel on or about May 1, 2021, reported that, based on the first NOPAs and the first RAR, the IRS had respectively increased Amgen's taxable income by 115% from $2.7 billion to $5.8 billion for fiscal year 2010; 140% from $2.5 billion to $6.0 billion for fiscal year 2011 and 155% from $2.2 billion to $5.6 billion for fiscal year 2011.

110.   After the market closed on August 3, 2021, Amgen issued a press release announcing its financial results for the quarter ended June 30, 2021 and for the first time disclosed Amgen's contingent income tax liabilities associated with the first NOPA and first RAR approximated $3.6 billion, plus interest.

111.   On the announcement of this news, the price of Amgen stock fell 6.5% to close at $228.31 per share on August 4, 2021 on heavy trading volume.

112.   On August 4, 2021, Amgen filed with the SEC its Form 10-Q for the quarter ended June 30, 2021 (the "2Q21 Form 10-Q").  The financial statements in the 2Q21 Form 10-Q reiterated

Amgen's approximate $3.6 billion contingent income tax liabilities associated with the first NOPA and first RAR as set forth in the Company's August 3, 2021 press release.

113.    Defendants, however, continued to mislead the market by failing to disclose material facts then known to them.  Specifically, the financial statements Amgen issued to investors and filed with the SEC in the 2Q21 Form 10-Q, as well Class Period financial statements it issued to investors and filed with the SEC during the remainder of the Class Period, failed to disclose Amgen's aggregate contingent liabilities associated with the IRS's transfer pricing adjustments set forth in the second NOPA and the second RAR totaled approximately ***$7 billion***.

114.    The financial statements in the 2Q21 Form 10-Q, state, in pertinent part, as follows:

In 2017, we received a Revenue Agent Report (RAR) and a modified RAR from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012 proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico.  We disagreed with the proposed adjustments and calculations and pursued a resolution with the IRS administrative appeals office.  As previously reported, we were unable to reach resolution with the IRS appeals office.  In July 2021, we filed a petition in the U.S. Tax Court to contest two duplicate Statutory Notices of Deficiency (Notices) for 2010, 2011 and 2012 that we received in May and July 2021.  ***The duplicate Notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest***.  Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings.  In any event, we firmly believe that the IRS's positions in the Notices are without merit and we will vigorously contest the Notices through the judicial process.

***In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments*** that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012.  We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office.  We are currently under examination by the IRS for the years 2016, 2017 and 2018.  We are also currently under examination by a number of other state and foreign tax jurisdictions.

Final resolution of these complex matters is not likely within the next 12 months. ***We believe our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the***

- 31 -

***complexity of the provision for income taxes and uncertain resolution of these matters, the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements***. We are no longer subject to U.S. federal income tax examinations for the years ended on or before December 31, 2009.

115.    Amgen's financial statements in the 2Q21 Form 10-Q were materially false and misleading and presented in violation of GAAP for reasons set forth in ¶¶91-98 above.

116.    Thereafter, Amgen issued to investors, and filed with the SEC, financial statements for the quarter ended September 30, 2021 and the year-end December 31, 2021 that repeated, in all material respects, the disclosure associated with Amgen's contingent income tax liabilities set forth in the 2Q21 Form 10-Q.

117.    Amgen's financial statements for the quarter ended September 30, 2021 and year-end December 31, 2021 were materially false and misleading and presented in violation of GAAP for reasons set forth in ¶¶91-98 above.

118.    After the market closed on April 27, 2022, Amgen announced its financial results for the first quarter of fiscal 2022. Along with the announcement of its financial results, the Company disclosed that on April 18, 2022, it received from the IRS a Statutory Notice of Deficiency associated with the second NOPAs and second RAR for Amgen's 2013-2015 tax years ("SNOD 2"). Amgen disclosed that SNOD 2 seeks to increase its U.S. taxable income for its 2013-2015 tax years by an aggregate amount of approximately $5.1 billion, plus interest and proposes penalties of approximately $2 billion.

119.    On the announcement of this news, the price of Amgen stock fell 4.3% to close at $238.13 per share on April 28, 2022 on heavy trading volume.

**Amgen's Financial Reporting Was Materially Misstated**

120.    Amgen's failure to quantify its aggregate contingent liabilities associated with the IRS's transfer pricing determinations are both quantitatively and qualitatively material, thereby causing the Company's financial reporting during the Class Period to be materially misleading.

121.    In describing the concept of materiality, FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information*, indicates that materiality determinations are based on whether "***it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item***."

122.    Here, there can be no question that a reasonable person would consider Amgen's exposure to more than $10 billion in contingent tax liabilities quantitatively material.

123.    As noted herein, the IRS had respectively increased Amgen's taxable income by 115% from $2.7 billion to $5.8 billion for fiscal year 2010, 140% from $2.5 billion to $6.0 billion for fiscal year 2011, and 155% from $2.2 billion to $5.6 billion for fiscal year 2012.

124.    In addition, as of December 31, 2020, Amgen's total cash and cash equivalents, total assets, and total stockholders' equity totaled $8.0 billion, $61.2 billion and $6.7 billion, respectively. Accordingly, Amgen's more than $10 billion in aggregate contingent tax liabilities was quantitatively material to even the broadest of its financial metrics.  Indeed, having to satisfy a $10 billion tax related obligation would call into question the Company's ability to continue as a going concern.

125.    Accordingly, Amgen's failure to disclose its exposure to contingent tax liabilities was quantitatively material to a reasonable investor.

126.    In addition, GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M"), provides that materiality in the context of a financial misstatement not only includes an assessment of the magnitude of the misstatement in percentage

terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

127.    Thus, CSAB Topic 1M provides: "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

128.    For example, CSAB Topic 1M notes that even quantitatively small financial misstatements may be material if management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP.  Accordingly, CSAB Topic 1M cautions that SEC registrants "***should not assume that even small intentional misstatements in financial statements***" are immaterial.  Here, Defendants knew, but intentionally chose not to quantify in accordance with GAAP Amgen's exposure to contingent income tax related liabilities.

129.    In addition, CSAB Topic 1M provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When Amgen disclosed its exposure to more than $3.6 billion in income tax related liabilities, the price of its common stock declined 6.5% and when it disclosed a collective $10 billion in income tax related liabilities, the price of its common stock declined more than 4.3%.

### Amgen's Contravention of GAAP Violated SEC Regulations

130.    By failing to file financial statements with the SEC that complied with GAAP as alleged herein, Amgen disseminated financial statements that were presumptively misleading and inaccurate according to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)).  In addition, Amgen violated the dictates of Section 13 of the Exchange Act, which provides:

Every issuer which has a class of securities registered pursuant to section [12] of this title and every issuer which is required to file reports pursuant to section [15(d)] of this title shall –

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

 i.    transactions are executed in accordance with management's general or specific authorization;

 ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

 iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

 iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

131.    The Company's Form 10-Ks and 10-Qs filed with the SEC during the Class Period were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity and income from continuing operations, pursuant to Item 303 of Regulation S-K as alleged herein.

**Amgen's Disclosure Controls and Internal Control over Financial Reporting Were Materially False and Misleading**

132.    Item 9A of Form 10-K and Item 4 of Form 10-Q required Amgen to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures* and Item 308 of Regulation S-K [17 C.F.R. §229.308], *Internal Control over Financial Reporting* during the Class Period.

133.    Item 307 of Regulation S-K required Amgen's Forms 10-K and 10-Q during the Class Period to disclose Defendant Bradway's and Griffith's conclusions about the effectiveness of Amgen's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

134.    During the Class Period, Amgen falsely and misleadingly represented in it Forms 10-K and 10-Q that its disclosure controls were operating effectively when Amgen improperly failed to quantify Amgen's income tax related contingent liabilities in accordance with GAAP.  These false and misleading representations were then fraudulently certified by Defendants Bradway and Griffith, as set forth herein.

135.    Item 308 of Regulation S-K required Amgen's Forms 10-K and 10-Q during the Class Period to disclose, among other things, Defendant Bradway's and Griffith's conclusions about the effectiveness of the Company's internal control over financial reporting, defined by relevant regulation as:

> the process designed by, or under the supervision of, . . . ***principal executive and principal financial officers***, or persons performing similar functions, and effected by the company's board of directors, management and other personnel, ***to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the [issuer];
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit ***preparation of financial statements in accordance with generally accepted accounting principles***, and that receipts and expenditures of the [issuer] are being made only in accordance with authorizations of management and directors of the [issuer]; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the [issuer's] assets that could have a material effect on the financial statements.

136.    During the Class Period, Amgen falsely and misleadingly represented in it Forms 10-K and 10-Q that its internal control over financial reporting was operating effectively when they were materially deficient and improperly failed to quantify Amgen's income tax related contingent liabilities in accordance with GAAP. These false and misleading representations were then fraudulently certified by Defendants Bradway and Griffith, as set forth herein.

**Amgen's Contingent Tax Liability Was
Material to Its Financial Condition**

137.    Amgen's nearly $10.7 billion potential liability to the IRS for back taxes and penalties for its 2010-15 tax years was substantial relative to numerous metrics of Amgen's business and financial condition. During 2021 and 2022, the nearly $10.7 billion the IRS sought in back taxes and penalties amounted to approximately: (i) 132% to 139% of cash and cash equivalents; (ii) 158% to 290% of stockholders' equity; (iii) 111% to 139.3% of operating income; (iv) 162% to 180% of net income; (v) 40% of revenues; and (vi) 16% to 17% of assets. The table below reflects the $10.63 billion claimed by the IRS as a percentage against Amgen's key metrics during 2021 and 2022:

| Year | Cash and Cash Equivalents | Stockholders' Equity | Operating Income | Net Income | Revenues | Assets |
|---|---|---|---|---|---|---|
| **2021** | $8.0 billion | $6.7 billion | $7.6 billion | $5.9 billion | $26.0 billion | $61.2 billion |
| 2010-15 Tax Liabilities as Percentage | **132.4%** | **158.8%** | **139.3%** | **180.5%** | **40.9%** | **17.4%** |
| **2022** | $7.6 billion | $3.7 billion | $9.6 billion | $6.6 billion | $26.3 billion | $65.1 billion |
| 2010-15 Tax Liabilities as Percentage | **139.4%** | **290.6%** | **111.2%** | **162.4%** | **40.4%** | **16.3%** |

138.    Since the amount claimed by the IRS was so large relative to Amgen's financial condition, a reasonable investor would have wanted to know the full extent of Amgen's contingent liability.  In fact, requiring Amgen to pay the amount in full during 2021 or 2022 would have negatively impacted Amgen's credit rating and could have called into question the Company's ability to continue as a going concern.

**Defendants' Failure to Publicly Disclose the Amount of Amgen's Potential Financial Exposure to the IRS Enabled It to Raise Billions of Dollars in Debt Offerings**

139.    Amgen's failure to quantify and publicly disclose the IRS was seeking more than $10 billion in back taxes and penalties misrepresented Amgen's financial condition and enabled it to appear more solvent than it potentially was.  This false picture of Amgen's financial condition smoothed the way for Amgen to raise billions of dollars from investors through multiple debt offerings.

140.    On February 10, 2020, Amgen filed with the SEC a registration statement on Form S-3ASR, which was utilized for billions of dollars in debt offerings in August 2021 and February 2022. The Form S-3ASR was filed as an "automatic shelf registration statement" pursuant to SEC Rule 405, whereby Amgen would be allowed to offer and sell an indeterminate amount of securities at indeterminate prices to the public at later dates utilizing a prospectus that incorporated by reference the filings the Company made with the SEC after the automatic shelf registration statement was filed, but before the completion of the offerings.

141.    On or about August 6, 2021, Amgen filed with the SEC a prospectus on Form 424(b)(2) in connection with its August 2021 debt offerings.  The August 6, 2021 prospectus incorporated by reference certain documents Amgen filed with the SEC, including (i) the Company's annual report on Form 10-K for the year ended December 31, 2020 (as filed on February 9, 2021) and (ii) the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 2021 (as

filed on April 28, 2021) and June 30, 2021 (as filed on August 4, 2021). The August 6, 2021 Form 424(b)(2), Form S-3ASR, and the SEC filings incorporated by reference, formed the offering materials in connection with Amgen's August 2021 debt offering (collectively, the "August 2021 Debt Offering Documents").

142.    On or about August 9, 2021, Amgen sold approximately $5 billion in notes pursuant to the August 2021 Debt Offering Documents as follows: (i) $1.25 billion in senior notes due in 2028 with the CUSIP 031162DB3; (ii) $1.25 billion in senior notes due in 2032 with the CUSIP 031162CZ1; (iii) $1.15 billion in senior notes due in 2041 with the CUSIP 031162DA5; and (iv) $1.35 billion in senior notes due in 2052 with the CUSIP 031162DC1 (collectively, the "August 2021 Notes").

143.    On or about February 18, 2022, Amgen filed with the SEC a prospectus on Form 424(b)(2) in connection with its February 2022 debt offerings. The prospectus incorporated by reference certain documents Amgen filed with the SEC, including the Company's annual report on Form 10-K for the year ended December 31, 2021 (as filed on February 16, 2022). The February 18, 2022 Form 424(b)(2), Form S-3ASR, and the SEC filings incorporated by reference, formed the offering materials in connection with Amgen's February 2022 debt offering referenced herein (collectively, the "February 2022 Debt Offering Documents").

144.    On or about February 22, 2022, Amgen sold approximately $4 billion in notes pursuant to the February 2022 Debt Offering Documents as follows: (i) $750 million in senior notes due in 2029 with the CUSIP 031162DD9; (ii) $1 billion in senior notes due in 2032 with the CUSIP 031162DE7; (iii) $1 billion in senior notes due in 2052 with the CUSIP 031162DF4; and (iv) $1.25 billion in senior notes due 2062 with the CUSIP 031162DG2 (collectively, the "February 2022 Notes").

145.    Amgen's August 2021 and February 2022 debt offerings are reflected in the table below:

| Issue Date | Issue Amount | Maturity Date |
|---|---|---|
| 8/9/2021 | $1,250,000,000 | 8/15/2028 |
| 8/9/2021 | $1,250,000,000 | 1/15/2032 |
| 8/9/2021 | $1,150,000,000 | 8/15/2041 |
| 8/9/2021 | $1,350,000,000 | 1/15/2052 |
| 2/22/2022 | $750,000,000 | 2/22/2029 |
| 2/22/2022 | $1,000,000,000 | 2/22/2032 |
| 2/22/2022 | $1,000,000,000 | 2/22/2052 |
| 2/22/2022 | $1,250,000,000 | 2/22/2062 |
| **Total**: | $9,000,000,000 | |

146.    The Offering Documents for the August 2021 and February 2022 debt offerings failed to disclose the IRS sought payment from Amgen of more than $7 billion in back taxes and penalties for its 2013-15 tax years.  Had Defendants disclosed the full extent of Amgen's potential exposure to the IRS, it would have negatively impacted Amgen's creditworthiness and the terms of its debt offerings, and hampered Amgen's ability to raise funds on the terms as set forth in those offerings or at all.

### Amgen Reveals the IRS Was Seeking a Massive Amount of Back Taxes and Penalties

147.    On July 26, 2021, Amgen filed a petition in the U.S. Tax Court to dispute the claims by the IRS that Amgen owed approximately $3.6 billion in back taxes for its 2010-12 tax years.  In connection with that tax filing, Amgen attached and was required to publicly disclose the contents of the Notice of Deficiency for its 2010-12 tax years.  According to the U.S. Tax Court's guidance for petitioners starting a case, petitioners are supposed to "attach to the petition a complete copy of the notice of deficiency . . . including the explanation of adjustments or IRS Appeals Officer's report . . . received with the notice of deficiency[.]"

148.    On August 3, 2021, Amgen issued a press release announcing its financial results for the second fiscal quarter of 2021 which, for the first time, quantified its outstanding tax liabilities to the IRS for its 2010-12 tax years.  The press release stated in pertinent part:

> In July 2021, we filed a petition in the U.S. Tax Court to contest notices of deficiencies received from the IRS during the quarter for 2010, 2011 and 2012. ***These notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest.***  Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings.  We firmly believe that the IRS's positions in the notices are without merit and we will vigorously contest the notices through the judicial process.

149.    In response to the Company's announcements on August 3, 2021, Amgen stock declined $15.77 per share, or 6.5%, from $244.08 per share on August 3, 2021 to $228.31 per share on August 4, 2021, on abnormally high trading volume of more than 6.9 million shares.  Defendants, however, failed to disclose the full extent of their financial exposure to the U.S. government and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in Amgen stock remaining artificially inflated.  Among other things, Defendants failed to disclose the IRS was seeking payment from Amgen of approximately $5.1 billion in back taxes and approximately $2 billion in penalties for its 2013-15 tax years.

150.    An August 4, 2021 analyst report by Truist Securities focused on Amgen's tax dispute with the IRS and the importance of Amgen quantifying its $3.6 billion exposure to the IRS, stating in pertinent part:

> US Tax Petition: what was new was the ~$3.6B amount in the press release, but AMGN believes IRS' position is without merit and will take several years to resolve.
>
> • In July 2021, AMGN filed a petition in the US Tax Court to contest notices of deficiencies from the IRS during the quarter for 2010, 2011 and 2012.
>
> • These notices are related to a transfer pricing dispute with the IRS.
>
> • We note that these notices have been included in prior filings.

- However, the ~$3.6B amount is new and something the company believed would be material to note in the 2Q21 press release.

151.    An August 3, 2021 J.P. Morgan credit analyst report discussing Amgen characterized Amgen's second quarter results as "generally uneventful" but also highlighted the negative impact of the dispute with the IRS, stating the "2Q showed some company specific concerns for the credit" and that "a new tax dispute and high buybacks dimmed the quarter for the credit."

152.    On April 27, 2022, Amgen issued a press release announcing its financial results for the first fiscal quarter of 2022, which for the first time, quantified its outstanding tax liabilities sought by the IRS for its 2013-15 tax years.  By that time, Amgen had determined it would file a petition with the Tax Court with respect to its 2013-15 tax years.

153.    The press release stated in pertinent part:

**U.S. Tax Petition**

On April 18, 2022, Amgen received a notice of deficiency from the IRS for the 2013-2015 period proposing adjustments primarily related to the allocation of profits between certain of the Company's entities in the United States and the U.S. territory of Puerto Rico similar to those previously proposed by the IRS for the 2010-2012 period. ***This notice seeks to increase Amgen's U.S. taxable income for the 2013-2015 period by an amount that would result in additional federal tax of approximately $5.1 billion, plus interest. In addition, the notice proposes penalties of approximately $2 billion***.

Amgen firmly believes that the adjustments proposed by the IRS for the 2010-2015 period and the penalties proposed by the IRS for the 2013-2015 period are without merit:

*        *        *

- The IRS audited Amgen at length for many years on the allocation of profit between the U.S. and Puerto Rico.  These audits were resolved through agreements with the IRS, resulting in no financial statement detriment to the Company.  Refer to Footnote 5, Income Taxes, in Amgen's 2007 and 2008 Form 10-K filings, and Footnote 4, Income Taxes, in Amgen's 2012 and 2013 Form 10-K filings.

Further, the amount of the adjustments proposed by the IRS for the 2010-2015 period overstates by billions of dollars the magnitude of the dispute:

- Amgen believes, based upon the positions advanced by the IRS, that the IRS adjustments for the 2010-2015 period are overstated by approximately $2 billion due to the IRS failure to account for certain income and expenses. Amgen has reported its income and expenses in a consistent manner for many years and the IRS has appropriately accounted for the Company's income and expenses in all prior audits.

*       *       *

In addition, Amgen believes the IRS assertion of approximately $2 billion in penalties for the 2013-2015 period is wholly unwarranted. Amgen has applied a consistent transfer pricing methodology since 2002, has documented that transfer pricing methodology as required under relevant tax regulations, and has extensively discussed that methodology with the IRS across multiple tax audits over multiple years. The IRS has never previously proposed transfer pricing penalties.

Amgen believes that the Company has appropriate tax reserves. The Company filed a petition in the U.S. Tax Court in July 2021 to contest the adjustments previously proposed for the 2010-2012 period and plans to file another petition in the U.S. Tax Court to contest the adjustments proposed in the notice for the 2013-2015 period. Amgen will seek consolidation of the two periods into one case in Tax Court. The dispute is expected to take several years to resolve.

The IRS is currently auditing the 2016-2018 period. Amgen expects the audit to continue for several years, and it is possible the 2010-2015 dispute will be resolved before the conclusion of the 2016-2018 audit and administrative appeals process. Any transfer pricing adjustments the IRS may propose for this period will be lessened by the change in tax rates resulting from the 2017 tax reform law, which reduced the difference between the tax rates applicable in the U.S. and Puerto Rico by approximately two thirds beginning in 2018.

154.    Among other things, Amgen, for the first time, revealed to investors that the IRS was seeking approximately **$10.7 billion** in back taxes and penalties for its 2010-15 tax years collectively, with additional examinations underway for its 2016-18 tax years as well as by a number of state and foreign tax jurisdictions.

155.    In a telephone conference call that same day with analysts to discuss Amgen's financial results, Defendant Griffith discussed the Company's dispute with the IRS and reiterated the information contained in the Company's press release, stating in pertinent part, as follows:

> *You've had an opportunity to read the update to our litigation and dispute with the IRS over the proposed adjustments for the period from 2010 to 2015, included in the press release.* We firmly believe that the adjustments proposed by the IRS for

that time period and the penalties proposed by the IRS for the 2013 to 2015 period are without merit.

156.    During the analyst conference call, Defendant Griffith responded to questions from analysts about the tax dispute, including the following:

**Geoffrey Christopher Meacham BofA Securities, Research Division - Research Analyst**

Peter, *a lot more commentary on the tax dispute with the IRS on this earnings call compared to when you first talked about it last year, I think probably a higher number of the investors expected*.  So the question is, has there been a recent discussion with the agency or the service that prompted broader language today? And I know it's going to take years to fully resolve, but would you expect your tax reserves to change over the course of that discussion?  Or is that just something that's going to be a stagnant number?  And then when you fully resolve it, then you'll appropriately make that change?

**Peter H. Griffith Amgen Inc. - Executive VP & CFO**

Yes.  Geoff, thank you for the question. Look, we wouldn't – we're in litigation, so we wouldn't comment on discussions with the IRS first.  And then secondly, on reserves, as you can understand, we don't comment on where we're at in terms of the size of the reserves other than we would just simply say that we're very confident in our position and the level of reserves that we've established.

*                *                *

**Colin Nigel Bristow UBS Investment Bank, Research Division - Analyst**

I'll keep this quick.  Just quickly on the tax issues.  Could you just talk about whether we should view this as being essentially limited to 2015?  Or is there scope for this really to permeate through to effectively 2021? . . .

**Peter H. Griffith Amgen Inc. - Executive VP & CFO**

Colin, thank you.  Look, on the case, we're very confident in the position we've had and our structure and how we've allocated profits between Puerto Rico and the United States.  So we're very confident in those reserves.  If you did think about going forward, *I did suggest in the press release articulated that the IRS is currently auditing 2016 through '18*.  If they did propose any transfer pricing (inaudible) the magnitude of those adjustments will be lessened by the change in tax rate from the 2017 Tax Act, which reduce the differences between the tax rates applicable in the United States and Puerto Rico by approximately 2/3 beginning in 2018.  But once again, we're very confident in how we're structured (inaudible), and we're very confident in the level of our reserves.  And so we don't anticipate any changes going forward.

- 44 -

157.    In response to the Company's announcements on April 27, 2022, the price of Amgen stock declined $10.66 per share, or 4.3%, from $248.79 per share on April 27, 2022 to $238.13 per share on April 28, 2022, on abnormally high trading volume of more than 6.6 million shares.

158.    Numerous analysts covering Amgen and articles by the media discussed the size and importance of Amgen's tax liabilities, including the following.

159.    A Reuters article on April 27, 2022 titled *Amgen says IRS seeks billions in back taxes, shares fall 6%*, stated, in pertinent part, as follows:

> Amgen Inc (AMGN.O) on Wednesday said the U.S. Internal Revenue Service (IRS) is seeking additional back taxes of $5.1 billion, plus interest and penalties, related to the drugmaker's 2013 to 2015 accounting for profits between the United States and Puerto Rico, the location of most of its manufacturing operations.
>
> **Shares of Amgen, which also reported higher first-quarter revenue and earnings, were down more than 6% at $233 in extended trading**.
>
> **The company's quarterly financial results held "no major surprises," but the tax dispute is "notable**," Jefferies analyst Michael Yee said in a research note.  "So we're now into $12 billion plus of disputes and the 2016-2018 period is also now being audited," he said.

160.    An April 27, 2022 Pacific Coast Business Times article titled *Amgen shares drop after earnings release and disclosure of $5B tax dispute* (updated on April 28, 2022 to reflect Amgen's latest share price), stated, in pertinent part, as follows:

> **When Thousand Oaks-based Amgen released its financial results for the first quarter of 2022 on April 27, the biggest surprise didn't come from its dip in net profits or rise in revenue, but from a tax dispute with the Internal Revenue Service**.
>
> Amgen said it received a notice of deficiency from the IRS on April 18, seeking additional back taxes of $5.1 billion, plus interest and penalties, related to profits generated between 2013 to 2015 from its United States and Puerto Rico locations . . .
>
> *            *            *
>
> **Amgen shares opened at $235.73 on April 28, down 5.2% from the previous day's close, which was just before the earnings announcement and disclosure of the tax dispute**.

- 45 -

161.    A BMO Capital Markets analyst report on April 27, 2022, stated, in pertinent part, as

follows:

Post 1Q22: *The Taxman Really Cometh, Overshadowing Underlying Biz*
*Performance*

Bottom Line:

*Despite top- and bottom-line beats, a dramatically increased potential IRS liability*
*(>$10B) on the transfer price issue soured the tone on the call*.

162.    An April 27, 2022 Jefferies analyst report, stated, in pertinent part, as follows:

**IRS Tax Comments, Thoughts**

*Many questions during the EPS call on the tax dispute and new disclosures from*
*IRS on add'l tax penalties*. AMGN received a letter from the IRS on April 18th on a
notice of deficiency for the 2013-2015 tax years stemming from the profit allocation
on transfer pricing on the US vs Puerto Rico. *The IRS is claiming that AMGN is*
*deficient for $5.1B in taxes and the notice also issued a $2B penalty. This is new*
*and in addition to the current dispute for 2010-2012, which the IRS is claiming*
*AMGN is liable for $3.6B* and the IRS is currently conducting its audit review for
2016-2018 tax years too. Ultimately, the co could be found liable for more than the
~$11B ($3.6B+$5.1B+$2B) though some of it could be offset by various measures
like repatriation tax accrual and new tax laws in 2017. Mgmt reiterated their
confidence in a positive litigation outcome, though this will take many years. *These*
*updates certainly add noise to the story and was off the radar for most investors*
*and there's a lack of visibility too*.

163.    A J.P. Morgan analyst report on April 27, 2022, stated, in pertinent part, as follows:

1Q Snapshot - Modest Beat Overshadowed by Tax Questions

*Amgen reported a messy quarter* (see our first take; 1Q slides) *underscored by the*
*reemergence of a notice of deficiency from the IRS*. While mgmt intends to
*'vigorously contest' the proposed adjustments and penalties, details certainly added*
*noise to the print and have the potential to linger*. . .

*         *         *

*Amgen's transfer pricing tax petition case with the IRS shockingly reappears and*
*was a key focus during the Q&A*. Recall last year mgmt initially disclosed the
ongoing petition regarding the taxable income from the years 2010-2012. *Now*
*mgmt has been notified that the case been expanded to incl the years 2013-2015*
*and could add a tax bill of ~$5.1B (plus interest) and ~$2B in penalties.*
*Additionally the IRS continues to audit the period from 2016- 2018*.

164.    A UBS analyst report on April 27, 2022 stated, in pertinent part: "***the single biggest focal point of the 1QEPS print was the update on the ongoing profit allocation/tax issues with the IRS***, which has now expanded to include the 2013-15 period and could lead to an additional $5.1bn in federal tax, plus interest, plus potential penalties up to $2bn."

165.    It took the market several days to fully digest the news concerning Amgen's tax dispute with the IRS.  The price of Amgen stock continued to fall over the next several days as the market digested the news, reaching a low of just $227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022.

166.    An analyst report by RBC Capital Markets on April 28, 2022, stated, in pertinent part, as follows:

**1Q22: Portfolio Performance Overshadowed by IRS Back-Tax Tie-Up Adds New Swing Factor**

Our view: Sound quarter as product volumes start off strong for the new year on a path to reiterated FY22 guidance on the top and bottom lines.  ***However, a new disclosure for yet another IRS inquiry adds a new swing factor, with an excess of $7B at risk for back taxes and penalties on Puerto Rico ops potentially shifting eyes in the nearer term***.

167.    An April 28, 2022 William Blair analyst report stated in pertinent part, as follows:

**First-Quarter Results Overshadowed by Additional Tax Deficiency Notice and Audit**

*. . . **the company's financial report for the quarter was largely overshadowed by an additional notice of deficiency from the IRS recently received by Amgen for the period of 2013 to 2015 for an amount of $5.1 billion, plus interest, and penalties of $2 billion***. . . .

\*        \*        \*

***Amgen's earnings report was also soiled somewhat by the announcement that the company had recently received a notice of deficiency from the IRS for the period 2013 to 2015*** related to the allocation of profits between the United States and Puerto Rico where the company has a significant manufacturing presence.  The company had previously disclosed receipt in 2020 of a Revenue Agent Report proposing adjustments for this period.  This follows a similar notice of deficiency for the period

of 2010 to 2012 that was also previously disclosed, for which the company filed a petition in the U.S. tax court in 2021. *In total, the IRS has proposed increasing Amgen's taxable income for the years 2010 to 2012 and 2013 to 2015 by $3.6 billion and $5.1 billion plus interest, respectively. Further, the most recent notice of deficiency also includes an additional $2 billion in fines*. Amgen is pushing back on the IRS assessment, stating the adjustments are unmerited given the contribution of Amgen's Puerto Rico facilities to the company's business; *however, the new deficiency notice as well as the threat of additional tax adjustments in the future (Amgen is currently under audit by the IRS for the years 2016 to 2018) has clearly caused investor concern, with Amgen shares trading down around 6% after hours*.

*We note that these types of issues can take years to be resolved and therefore could serve as an overhang on Amgen shares in the near term*. Amgen noted that in the event that the company is unsuccessful in overturning the proposed adjustments, any additional tax that is imposed could be reduced by up to $3.1 billion of repatriation tax accrued from Puerto Rico earnings as well as $1.1 billion in tax deposits made to the IRS for the period 2010 to 2015. *In the meantime, however, the threat of being imposed with the tax adjustments/penalties proposed to date (and the potential for additional ones in the future) may limit the company's business development activities due to the risk of having to pay a hefty total to the IRS*, though management's tone on the call did not seem to suggest this, with management stating it believes Amgen is in a position to continue to invest in both internal and external innovation.

168.    Due to the complexity of the tax dispute with the IRS, analysts at UBS hosted a call with a tax expert to get a better grasp over Amgen's situation. A May 3, 2022 UBS analyst report discussing the call with the tax expert stated in pertinent part, as follows:

**Takeaways from expert call on AMGN tax issues – KOL [Key Opinion Leader] expects AMGN to settle**

**KOL expects AMGN to settle - state penalties could add to potential liabilities**

Following AMGN's update on the Puerto Rico IRS tax issues communicated with 1Q22 EPS . . ., *we hosted a KOL call* with Haroon Cheema, Principal at Timpani Global LLC, and Former Director & International Tax Counsel at Merck & Co., Inc. *to gain insight into the situation and discuss possible outcomes for AMGN* . . . The key takeaways from the call included: 1) *our expert reiterated his expectation for AMGN to settle given the potential liability for AMGN could be significant (up to $10bn per his estimate*, though we note AMGN sees significantly lower liability – see below) if the company ultimately loses its case and *also the IRS has been on a winning streak with these sort of cases recently*; 2) *our expert estimated a settlement would fall into the range of 65%-75% of total amount owed (penalties + interest)*; 3) expert expected the potential settlement time frame to be long, ~18 months; 4) additional years beyond the stated 2010-15 period (e.g., *2016-18*

*currently under IRS audit) are likely subject to the same tax issue*; 5) *state tax penalties should also be considered*, though are significantly less (likely <$1bn), and would likely form part of a settlement; and 6) tax reserves in AMGN's financial filings remain a good indicator of the potential outcomes.

### Expert believes AMGN should/will settle

Our expert believes *settlement is likely the best option* for AMGN and the sooner the better. Our expert believes AMGN is incentivized to *settle to avoid a cloud* looming over the company and *remove the risk of a very large payment, particularly given the IRS has been on a winning streak recently (e.g., IRS won a similar case against Coca-Cola*). Our expert noted losing the case would open doors for States (e.g., California) to investigate AMGN's potential tax deficiencies, leading to potential additional State tax penalties (though likely significantly lower than the potential federal liability - <$1bn). However, no matter which route AMGN plans to take (continue to contest or settle), the time frame will be long, with our KOL estimating ~18 month time frame if settlement is the ultimate outcome.

### KOL believes AMGN could be on hook for up to ~$10bn if it loses

The newest 2013-15 case adds an additional $5.1bn in federal tax+interest, as well as a $2bn penalty, to the prior 2010-12 $3.6bn in federal tax+interest. Repatriation taxes previously accrued on AMGN's foreign earnings would reduce this total by ~$3.1bn. However, it's also *likely that the period of 2016-18 (currently under audit) will result in further tax+penalties*. Taken together, our expert believes *this could raise the total burden to ~$10bn* (though we note AMGN has stated it sees its liability as significantly lower than this). Interestingly, our KOL noted *AMGN's current positioning is unconventional vs. other life science companies* which frequently attribute profits overseas based on the location of high-value patents vs. a manufacturing subsidiary in AMGN's case. Doing so suggests that the manufacturing process in Puerto Rico commands a premium profit over what might otherwise be expected for returns on a manufacturing facility. AMGN is taking the stance that its manufacturing prowess warrants the enhanced profit attribution and so would need to defend this in court.

### Even a settlement could still be substantial ($6.5bn-$7.5bn)

Our expert believes the *most likely range for a settlement* would be *$6.5bn-$7.5bn*. The rationale for this range was that the IRS is unlikely to accept anything less than 50% of the assessed taxes+penalties (would set bad precedent) and AMGN is unlikely to accept paying 80-90% of the total. To limit the amount to be paid, there may be opportunities for AMGN negotiating down the penalties. Also, as noted above, not reflected in the current estimated total liability is the *potential for State taxes/penalties* which, if AMGN chooses to settle, would likely be settled at the same time. Overall, even the settlement process would be long given the substantial back and forth between the IRS and AMGN.

**Tax reserves are good indicator of AMGN's perceived prob of success**

One of the main ways to track AMGN's outlook is when, and to what degree, tax reserves are amassed for uncertain tax positions. We note our expert highlighted this during our first KOL event . . . *Right now AMGN has not allocated the IRS-assessed totals in tax reserves, which aligns with their current position refuting the IRS' assessments* - note reserves are generally only allocated when the company believes there is <50% chance of winning its case.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### Second Quarter of 2020

169.    The Class Period begins on July 29, 2020. On that date, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2020, which was signed by Defendant Griffith. The 2Q20 Form 10-Q stated, in pertinent part, as follows:

As previously disclosed, *we received a Revenue Agent Report (RAR) from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012. The RAR proposes to make significant adjustments* that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. *In November 2017, we received a modified RAR that revised the IRS's calculations but continued to propose substantial adjustments*. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office, which currently has jurisdiction over the matter. If unable to reach resolution, we will vigorously contest the proposed adjustments through the judicial process. In addition, as previously reported, *in April 2020, we received draft notices of proposed adjustments (NOPAs) and subsequently in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015, which are similar to the proposed adjustments for the years 2010, 2011 and 2012* that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. *We disagree with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office*. We are also currently under examination by a number of other state and foreign tax jurisdictions.

*Final resolution* of these complex matters is not likely within the next 12 months and *could have a material impact on our condensed consolidated financial statements*. We believe *our accrual for income tax liabilities is appropriate* based on past experience, interpretations of tax law and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes, *the ultimate resolution of any tax matters may result in payments substantially greater or less than amounts accrued*.

170.    The statements referenced above in ¶169 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)    the U.S. Government, through the IRS, determined Amgen owed approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and sought payment of those amounts;

(b)    the U.S. Government, through the IRS, determined Amgen owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties, for its 2013-15 tax years and sought payment of those amounts;

(c)    the U.S. Government, through the IRS, collectively sought from Amgen approximately $10.7 billion in back taxes (plus interest), and penalties for its 2010-15 tax years;

(d)    the U.S. Government, through the IRS, would likely claim Amgen owed substantially more than the Company conveyed to investors for its tax years subsequent to 2015 during which the Company had used the same transfer pricing techniques as it had used during 2010-15;

(e)    the amounts Amgen had accrued to account for its outstanding tax liabilities for its 2010-15 tax years was substantially below the amounts necessary to satisfy those liabilities;

(f)    Amgen had failed to comply with GAAP, ASC 450, and other rules and regulations regarding the preparation of its periodic SEC filings, as alleged above in ¶¶73-136; and

(g)    based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Amgen's then-current business operations and future financial prospects.

171.    Additionally, the statements referenced above in ¶169 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts

- 51 -

owed and minimized the amounts sought by the IRS. Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and $2 billion in penalties for its 2013-15 tax years. Defendants were also required to disclose it was likely substantial amounts would be due for its tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

172.    Furthermore, the statements referenced above in ¶169 describing the adjustments from the RARs as "significant" and stating that "final resolution" of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater or less than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS. Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above. The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

173.    Additionally, the combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities. A reasonable investor would

have taken those statements to mean that Amgen's contingent liabilities for its 2010-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $10 billion in back taxes and penalties.

174.    The 2Q20 Form 10-Q, under the section "Contingencies and commitments," stated the following regarding loss contingencies and accruals:

**13.    Contingencies and commitments**

*Contingencies*

In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict. ***We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote***; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; and in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously. Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. ***In each of the matters described in this filing*** . . . ***in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material***. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. ***As a result, none of the matters described in this filing*** . . . ***in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material***. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Certain recent developments concerning our legal proceedings and other matters are discussed below: []

- 53 -

175.     The statements referenced above in ¶174 that "our opponents seek an award of a not-yet-quantified amount of damages" or that Amgen was unable "to estimate a range of possible loss" were materially false and misleading when made because the amount of damages could be quantified and Amgen was able to estimate a range of possible loss based on the NOPAs and RARs sent by the IRS for Amgen's 2010-15 tax years.  Defendants knew, or recklessly disregarded, the IRS was seeking from Amgen approximately \$3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately \$5.1 billion in back taxes, plus interest, and \$2 billion in penalties for its 2013-15 tax years.  Additionally, contrary to the statements referenced above, the amounts sought by the IRS were material.  Furthermore, contrary to the statements above that the referenced footnote describes "legal proceedings and other matters that are significant or that we believe could become significant," the referenced footnote failed to describe Amgen's disputes with the IRS over its 2010-15 tax years.

176.     The false and misleading statements referenced above in ¶¶169 and 174, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the 2Q20 Form 10-Q:

I, . . . certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Amgen Inc.;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)    Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**Third Quarter of 2020**

177.    On October 29, 2020, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 ("3Q20 Form 10-Q"), which was signed by Defendant Griffith.  The 3Q20 Form 10-Q stated, in pertinent part, as follows:

*In April 2017, we received a Revenue Agent Report (RAR) from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012. The RAR proposed to make significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. In November 2017, we received a modified RAR that revised the IRS's calculations but continues to propose substantial adjustments*. We disagree with the proposed adjustments and calculations, and the matter is currently within the jurisdiction of the IRS administrative appeals office. If unable to reach resolution, we will vigorously contest the proposed adjustments through the judicial process. *In addition, in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015 proposing adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico similar to those proposed for the years 2010, 2011 and 2012. In September 2020, we received a revised RAR that continues to propose substantial adjustments for the years 2013, 2014 and 2015. We disagree with the proposed adjustments and calculations* and will pursue resolution with the IRS administrative appeals office. We are also currently under examination by a number of other state and foreign tax jurisdictions.

*Final resolution* of these complex matters is not likely within the next 12 months and *could have a material impact on our condensed consolidated financial statements*. We believe *our accrual for income tax liabilities is appropriate* based on past experience, interpretations of tax law and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes, *the ultimate resolution of any tax matters may result in payments substantially greater or less than amounts accrued*.

178.    The statements referenced above in ¶177 were materially false and misleading when made for the reasons set forth in ¶170 above. Additionally, the statements referenced above in ¶177 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts owed and minimized the amounts sought by the IRS. Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and $2 billion in penalties for its 2013-15 tax years. Defendants were also required to disclose it was likely substantial amounts would be due for tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

179.    Furthermore, the statements referenced above in ¶177 describing the adjustments from the RARs as "significant" and "substantial" and stating that final resolution of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater or less than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS.  Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above.  The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

180.    Additionally, the combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.  A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2010-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $10 billion in back taxes and penalties.

181.    The 3Q20 Form 10-Q, under the section "Contingencies and commitments," stated the following regarding loss contingencies and accruals:

**13.    Contingencies and commitments**

*Contingencies*

- 57 -

In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict . . . *We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote*; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; and in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Reports on Form 10-Q for the periods ended March 31, 2020 and June 30, 2020.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. *We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously.* Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. *In each of the matters described in this filing . . . in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material.* In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. *As a result, none of the matters described in this filing . . . in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material.* While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Certain recent developments concerning our legal proceedings and other matters are discussed below: []

182.     The statements referenced above in ¶181 that "our opponents seek an award of a not-yet-quantified amount of damages" or that Amgen was unable "to estimate a range of possible loss" were materially false and misleading when made because the amount of damages could be quantified and Amgen was able to estimate a range of possible loss based on the NOPAs and RARs sent by the IRS for Amgen's 2010-15 tax years. Defendants knew, or recklessly disregarded, the IRS was seeking from Amgen approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and $2 billion in penalties for its

2013-15 tax years.  Contrary to the statements referenced above, the amounts sought by the IRS were material.  Furthermore, contrary to the statements above that the referenced footnote describes "legal proceedings and other matters that are significant or that we believe could become significant," the referenced footnote failed to describe Amgen's disputes with the IRS over its 2010-15 tax years.

183.    The false and misleading statements referenced above in ¶¶177 and 181, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the 3Q20 Form 10-Q, which repeated in all material respects the statements from the certification referenced above in ¶176.

**Fourth Quarter & Full Year 2020**

184.    On February 9, 2021, Amgen filed with the SEC its annual report on Form 10-K for the period ended December 31, 2020 ("FY2020 Form 10-K"), which was signed by both Individual Defendants.  The FY2020 Form 10-K stated, in pertinent part, as follows:

> ***In 2017, we received an RAR and a modified RAR from the IRS for the years 2010, 2011 and 2012 proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico.  We disagree with the proposed adjustments and calculations*** and have been pursuing resolution with the IRS administrative appeals office.  However, ***we have been unable to reach resolution at the administrative appeals level, and we anticipate that we will receive a Notice of Deficiency*** which we would expect to vigorously contest through the judicial process.  In addition, ***in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments*** that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico similar to those proposed for the years 2010, 2011 and 2012. ***We disagree with the 2013, 2014 and 2015 proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office***.  The IRS audit for years 2016, 2017 and 2018 is expected to start in the near term.  We are also currently under examination by a number of other state and foreign tax jurisdictions.
>
> Final resolution of these complex matters is not likely within the next 12 months. We believe ***our accrual for income tax liabilities is appropriate*** based on past

experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, ***the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our consolidated financial statements***.

185.    The statements referenced above in ¶184 were materially false and misleading when made for the reasons set forth in ¶170 above.  Additionally, the statements referenced above in ¶184 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts owed and minimized the amounts sought by the IRS.  Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and $2 billion in penalties for its 2013-15 tax years.  Defendants were also required to disclose it was likely substantial amounts would be due for tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

186.    Furthermore, the statements referenced above in ¶184 describing the adjustments from the RARs as "significant" and stating that "final resolution" of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS.  Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above.  The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been

required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

187.    The combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.  A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2010-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $10 billion in back taxes and penalties

188.    Additionally, the statements referenced above in ¶184, "[w]e disagree with the 2013, 2014 and 2015 proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office" created the false and misleading impression there was a reasonable possibility the administrative appeals office would rule in favor of Amgen for its 2013-15 tax years after it ruled against Amgen in connection with its 2010-12 tax years.  Defendants knew, or recklessly disregarded, that the IRS sought payment of billions of dollars in back taxes and penalties for Amgen's 2013-15 tax years for the same transfer pricing methods as it utilized for its 2010-12 tax years and there was a near certainty the administrative appeals office would reject Amgen's appeal.

189.    The false and misleading statements referenced above in ¶184, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the FY2020 Form 10-K, which repeated in all material respects the statements from the certification referenced above in ¶176.

**First Quarter of 2021**

190.    On April 28, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for

the period ended March 31, 2021 ("1Q21 Form 10-Q"), which was signed by Defendant Griffith.

The 1Q21 Form 10-Q stated, in pertinent part, as follows:

> *In 2017, we received a Revenue Agent Report (RAR) and a modified RAR from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012 proposing significant adjustments* that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. We disagree with the proposed adjustments and calculations and have been pursuing resolution with the IRS administrative appeals office. However, *we have been unable to reach resolution at the administrative appeals level. We anticipate that we will receive a Notice of Deficiency* which we will vigorously contest through the judicial process. In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. *We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office*. We are currently under examination by the IRS for the years 2016, 2017 and 2018. We are also currently under examination by a number of other state and foreign tax jurisdictions.
>
> Final resolution of these complex matters is not likely within the next 12 months. We believe *our accrual for income tax liabilities is appropriate* based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, *the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our consolidated financial statements*.

191.    The statements referenced above in ¶190 were materially false and misleading when

made for the reasons set forth in ¶170 above. Additionally, the statements referenced above in ¶190

were materially misleading when made because they discussed the disputes with the IRS but failed

to quantify the amounts owed and minimized the amounts sought by the IRS. Amgen's financial

statements were required to disclose the IRS was seeking from Amgen approximately $3.6 billion in

back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back

taxes, plus interest, and $2 billion in penalties for its 2013-15 tax years. Defendants were also required to disclose it was likely substantial amounts would be due for tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

192. Furthermore, the statements referenced above in ¶190 describing the adjustments from the RARs as "significant" and stating that the ultimate outcome of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS. Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above. The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

193. The combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities. A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2010-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $10 billion in back taxes and penalties

194. Additionally, the statements referenced above in ¶190, "[w]e disagree with the 2013, 2014 and 2015 proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office" created the false and misleading impression there was a reasonable possibility the administrative appeals office would rule in favor of Amgen for its 2013-15 tax years after it ruled against Amgen in connection with its 2010-12 tax years. Defendants knew, or recklessly disregarded, that the IRS sought payment of billions of dollars in back taxes and penalties for Amgen's 2013-15 tax years for the same transfer pricing methods as it utilized for its 2010-12 tax years and there was a near certainty the administrative appeals office would reject Amgen's appeal.

195. Further, the 1Q21 Form 10-Q, under the section "Contingencies and commitments," stated the following regarding loss contingencies and accruals:

## 12.    Contingencies and commitments

*Contingencies*

In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict . . . ***We describe in this footnote our legal proceedings and other matters that are significant or that we believe could become significant***.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. ***We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously***.

Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. ***In each of the matters described in this filing*** . . . ***in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material***. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. ***As a result, none of the matters described in this filing*** . . . ***in which we could incur a liability have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material***. While it is not possible to accurately predict

- 64 -

or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Certain recent developments concerning our legal proceedings and other matters are discussed below: []

196.    The statements referenced above in ¶195 that "our opponents seek an award of a not-yet-quantified amount of damages" or that Amgen was unable "to estimate a range of possible loss" were materially false and misleading when made because the amount of damages could be quantified and Amgen was able to estimate a range of possible loss based on the NOPAs and RARs sent by the IRS for Amgen's 2010-15 tax years.  Defendants knew, or recklessly disregarded, the IRS was seeking from Amgen approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and $2 billion in penalties for its 2013-15 tax years.  Contrary to the statements referenced above, the amounts sought by the IRS were material.  Furthermore, contrary to the statements above that the referenced footnote describes "legal proceedings and other matters that are significant or that we believe could become significant," the referenced footnote failed to describe Amgen's disputes with the IRS over its 2010-15 tax years.

197.    The false and misleading statements referenced above in ¶¶190 and 195, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the 1Q21 Form 10-Q, which repeated in all material respects the statements from the certification referenced above in ¶176.

**Second Quarter of 2021**

198.    On August 3, 2021, Amgen announced its financial results for its second quarter of 2021 in a press release (the "2Q 2021 Press Release"), which for the first time disclosed the amount sought by the IRS in back taxes for Amgen's 2010-12 tax years, stating in pertinent part, as follows:

> In July 2021, we filed a petition in the U.S. Tax Court to contest notices of deficiencies received from the IRS during the quarter for 2010, 2011 and 2012. ***These notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest.*** Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings. We firmly believe that the IRS's positions in the notices are without merit and we will vigorously contest the notices through the judicial process.

199.    In response to the Company's announcements on August 3, 2021, Amgen stock declined $15.77 per share, or 6.5%, declining from it closing price on August 3, 2021 of $244.08 per share to close at $228.31 per share on August 4, 2021, on abnormally high trading volume of more than 6.9 million shares traded.  Defendants, however, failed to disclose the full extent of their financial exposure to the IRS and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in Amgen stock remaining artificially inflated. Among other things, Defendants failed to disclose the IRS was seeking payment from Amgen of $5.1 billion in back taxes and $2 billion in penalties for its 2013-15 tax years.

200.    On August 3, 2021, Amgen held a conference call with analysts to discuss Amgen's quarterly financial results, including the Company's disclosure that the IRS was seeking approximately $3.6 billion, plus interest, in back taxes for Amgen's 2010-12 tax years.  During the call, Defendant Griffith responded to questions from an analyst about Amgen's disclosure concerning its 2010-12 tax years and potential liabilities to the IRS for tax years after 2012:

> **Salim Qader Syed Mizuho Securities USA LLC, Research Division - MD, Senior Biotechnology Analyst of Equity Research & Head of Biotechnology Research**

. . . So I just wanted to focus on the tax petition, if I can. So it seems like this notice of deficiency was not just for 1 year, but it was for 3 years, 2010, 2011 and 2012. So *I'm just curious if there's pattern here and how you guys are doing the accounting and is triggering these notice of deficiencies? And I guess the underlying question here, should we be expecting a notice of deficiency or ease for 2013 through '20*? And then just curious what the interest rate is that the IRS would impose here.

**Peter H. Griffith Amgen Inc. - Executive VP & CFO**

Salim, thank you. It's Peter. And on your question around the IRS matter, the dispute, look, *these notices are related to a transfer pricing dispute with the IRS regarding the allocation of the profits between the U.S. and the territory of Puerto Rico. So you can see we have a difference of opinion on the value of the significant risks and the complexity we undertake with activities performed at our Puerto Rico facility. We strongly believe the IRS' position is without merit, and we have appropriate tax reserves*, and this dispute will take several years to resolve.

I would like to note, Salim, that Puerto Rico is our flagship manufacturing facility, responsible for the majority of Amgen's global manufacturing. We're proud of our Puerto Rico operations, very proud of them and our colleagues there. We've had a major manufacturing presence in Puerto Rico for about 30 years. We have more than 2,200 highly skilled colleagues in Puerto Rico and who produce very sophisticated biologic medicines for patients all over the world with serious diseases. We've invested nearly $4 billion to expand and modernize those facilities in Puerto Rico, and we're proud to be consistently recognized as one of the island's best and most responsible employers. So on the matter of interest rate, I'll have to refer you to the IRS for that. *But that's the IRS matter in brief*.

\*     \*     \*

**Brian Peter Skorney Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst**

. . . Digging a little more on the disclosed notice of deficiency today. *I think last year, you also received an RAR and modified RAR related to 2013 through 2015 and are also under investigation for 2016 through 2018 by the IRS*. It just seems like there's all related to issues around profit allocation in Puerto Rico. *So I was wondering if you could just kind of like walk through the next steps in terms of the tax court petition?* Can the petition to be heard in the tax court fail? *And if it does go to court and the decision goes against you, does that sort of establish precedence for the other years as well? And based on the IRS calculation methodology for 2010, for 2012, have you run that same calculation to establish what an upper bound of liability for 2013 through now would be*?

**Peter H. Griffith Amgen Inc. - Executive VP & CFO**

Brian, thanks for the question. Look, we filed a petition with the U.S. tax court, in this case, could take several years to resolve. *The IRS is also proposing significant*

- 67 -

*adjustments to 2013 to '15 related to the similar issues, as you know. We disagree - - strongly disagree with the proposed adjustments. We're pursuing resolution with the IRS administrative appeals office on that.* The IRS, as you noted, they're currently auditing years 2016 through '18. And so *yes, we're sure they'll take the same position for the other periods under audit, and we believe that we have adequate reserves for that.*

201.    Defendant Griffith's statements referenced in ¶200 were materially misleading because even though he provided some information about the similarities between the RARs for Amgen's 2010-12 tax years as for its 2013-15 tax years, Defendant Griffith failed to quantify Amgen's exposure to the IRS for years after 2012.  Defendant Griffith knew, or recklessly disregarded, that the IRS was seeking approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for Amgen's 2013-15 tax years but failed to disclose those facts to investors even though he was directly asked whether Amgen has run the "same calculation to establish what an upper bound of liability for 2013 through now would be."  Instead of disclosing those facts, Defendant Griffith simply reiterated he "strongly disagree[s] with the proposed adjustments" and downplayed the difficulty Amgen faced both in administrative appeals for its 2013-15 tax years and in U.S. Tax Court for its 2010-12 tax years.  Defendant Griffith knew, or recklessly disregarded, it was a virtual certainty Amgen's administrative appeal would be rejected for its 2013-15 tax years and that Amgen would be forced to overcome very difficult legal standards in the Tax Court.  Indeed, in the U.S. Tax Court, Amgen would have to prove the IRS's allocations of income between the U.S. and Puerto Rico were arbitrary, capricious, or unreasonable.  The IRS's allocations must be sustained absent a showing of abuse of discretion.  Furthermore, Defendant Griffith misleadingly stated, "we have appropriate tax reserves" even though Amgen's reserves were not adequate to satisfy Amgen's liabilities to the IRS.

202.    On August 4, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021, which was signed by Defendant Griffith.  The 2Q21 Form 10-Q stated, in pertinent part, as follows:

> . . . In July 2021, we filed a petition in the U.S. Tax Court to contest two duplicate Statutory Notices of Deficiency (Notices) for 2010, 2011 and 2012 that we received in May and July 2021**.**  The duplicate Notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest. . .
>
> In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. ***We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office.***  We are currently under examination by the IRS for the years 2016, 2017 and 2018. . .
>
> Final resolution of these complex matters is not likely within the next 12 months. We believe ***our accrual for income tax liabilities is appropriate*** based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, ***the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements***.

203.    The statements referenced above in ¶202 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)    the U.S. Government, through the IRS, determined Amgen owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties, for its 2013-15 tax years and sought payment of those amounts;

(b)    the U.S. Government, through the IRS, would likely claim Amgen owed substantially more than the Company conveyed to investors for its tax years subsequent to 2015

during which the Company had used the same transfer pricing techniques for the allocation of profits between its U.S. and Puerto Rico operations as it had used during 2010-15;

     (c)    the amounts Amgen had accrued to account for its outstanding tax liabilities for its 2010-15 tax years was substantially below the amounts necessary to satisfy those liabilities;

     (d)    Amgen had failed to comply with GAAP, ASC 450, and other rules and regulations regarding the preparation of its periodic SEC filings, as alleged above in ¶¶73-136; and

     (e)    based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Amgen's then-current business operations and future financial prospects.

204.    Additionally, the statements referenced above in ¶202 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts owed and minimized the amounts sought by the IRS. Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years. Defendants were also required to disclose it was likely substantial amounts would be due for tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

205.    Furthermore, the statements referenced above in ¶202 describing the adjustments from the RARs as "significant" and stating that the ultimate outcome of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS. Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater

than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above.  The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

206.    The combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.  A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2013-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $7 billion in back taxes and penalties

207.    Additionally, the statements referenced above in ¶202, "[w]e disagree with the 2013, 2014 and 2015 proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office" created the false and misleading impression there was a reasonable possibility the administrative appeals office would rule in favor of Amgen for its 2013-15 tax years after it ruled against Amgen in connection with its 2010-12 tax years.  Defendants knew, or recklessly disregarded, that the IRS sought payment of billions of dollars in back taxes and penalties for Amgen's 2013-15 tax years for the same transfer pricing methods as it utilized for its 2010-12 tax years and there was a near certainty the administrative appeals office would reject Amgen's appeal.

208.    Further, the "Contingencies and commitments" section of the 2Q21 Form 10-Q stated, the following regarding loss contingencies and accruals:

**13.    Contingencies and commitments**

*Contingencies*

- 71 -

In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict . . . *We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote*; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2020; and in Note 12, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2021.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously.

Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. *In each of the matters described in this filing* . . . *in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. As a result, none of the matters described in this filing* . . . *in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material*. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Certain recent developments concerning our legal proceedings and other matters are discussed below:

*     *     *

*U.S. Tax Litigation*

> *Amgen Inc. & Subsidiaries v. Commissioner of Internal Revenue*
>
> See Note 4, Income taxes, for discussion of the IRS tax dispute and the Company's petition in the U.S. Tax Court.

209.    The statements referenced above in ¶208 that "our opponents seek an award of a not-yet-quantified amount of damages" or that Amgen was unable "to estimate a range of possible loss"

were materially false and misleading when made because the amount of damages could be quantified and Amgen was able to estimate a range of possible loss based on the NOPAs and RARs sent by the IRS for Amgen's 2013-15 tax years.  Defendants knew, or recklessly disregarded, the IRS was seeking from Amgen approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years.  Contrary to the statements referenced above, the amounts sought by the IRS were material.  Furthermore, contrary to the statements above that the referenced footnote describes "legal proceedings and other matters that are significant or that we believe could become significant," the referenced footnote failed to describe Amgen's dispute with the IRS over its 2013-15 tax years.

210.    The false and misleading statements referenced above in ¶¶202 and 208, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the 2Q21 Form 10-Q, which repeated in all material respects the statements from the certification referenced above in ¶176.

211.    On February 10, 2020, Amgen filed a registration statement on Form 3-ASR, which was utilized for a shelf offering of debt securities.  On August 6, 2021, Amgen filed the prospectus for the issuance of approximately $5 billion in notes.  The August 2021 Debt Offering Documents incorporated by reference Amgen's FY2020 10-K, the 1Q21 Form 10-Q, and the 2Q21 Form 10-Q. The August 2021 Debt Offering Documents were materially false and misleading for the reasons set forth in ¶203 above.  The August 2021 Debt Offering Documents are also false and misleading for the reasons mentioned above in ¶¶204-207, and 209, because the August 2021 Debt Offering Documents incorporated by reference the FY2020 10-K, the 1Q21 Form 10-Q, and the 2Q21 Form 10-Q, as well as the false statements stated therein.

- 73 -

212.    On September 14, 2021, Defendant Bradway presented at the Morgan Stanley Global Healthcare Conference and was asked questions about Amgen's tax issues with the IRS, stating in pertinent part, as follows:

**Matthew Kelsey Harrison Morgan Stanley, Research Division - Executive Director**

. . . *I think one of the other issues that comes up a lot for investors is I think people have gotten focused on the, I guess, potential tax liability that you may face from some of the IRS actions.* So could you just I guess maybe step back for people and talk about how concerned you are about that and what your outlook is for that case?

**Robert A. Bradway Amgen Inc. - Chairman, CEO & President**

Well, Matthew, *I think we've been very clear that we think the IRS' position is without merit. And it's as simple as that. We think their position is without merit. And we think we've taken appropriate adequate reserves for the matter in question.*

213.    The statements referenced above in ¶212 were materially false and misleading when made for the reasons set forth in ¶203 above.  The statements referenced above in ¶212 were materially false and misleading when made because Defendant Bradway minimized the risks and financial exposure Amgen faced with respect to its back taxes and penalties sought by the IRS. Defendant Bradway failed to disclose the IRS was seeking approximately $5.1 billion, plus interest, and approximately $2 billion in penalties for Amgen's 2013-15 tax years and would likely seek additional amounts for tax years after 2015.  Regardless of Defendants' view of the strength of Amgen's position in the dispute with the IRS, Amgen faced a difficult legal battle against the IRS and there was a greater than slight chance the IRS would prevail.  As a result, Defendants were required to – but failed to – disclose an estimate of the amount sought by the IRS.  Furthermore, Defendant Bradway's statement, "we've taken appropriate adequate reserves for the matter in question" was misleading because it conveyed that Amgen had set aside reasonable reserves to cover the dispute even though Amgen failed to take any reserves for that contingent liability.

- 74 -

**Third Quarter of 2021**

214.    On November 3, 2021, Amgen filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 ("3Q21 Form 10-Q"), which was signed by Defendant Griffith.  The 3Q21 Form 10-Q stated, in pertinent part, as follows.

> In addition, ***in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments*** that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012.  We disagree with the proposed adjustments and calculations and have been pursuing resolution with the IRS administrative appeals office.  ***As a consequence of the Tax Court litigation for the 2010-2012 period, the IRS administrative appeals office recently informed us that it does not plan to engage in discussions at this time regarding the allocation of profits between our entities in the United States and the U.S. territory of Puerto Rico for the 2013-2015 period*** . . .

> Final resolution of these complex matters is not likely within the next 12 months.  We believe ***our accrual for income tax liabilities is appropriate*** based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, ***the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements***.

215.    The statements referenced above in ¶214 were materially false and misleading when made for the reasons set forth in ¶203 above.  Additionally, the statements referenced above in ¶214 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts owed and minimized the amounts sought by the IRS.  Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately at least $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years.  Since the IRS administrative appeals office did not plan to engage in discussions regarding Amgen's 2013-15 tax years, it was a virtual certainty the IRS would send a Notice of Deficiency for

those tax years.  Defendants were also required to disclose it was likely substantial amounts would be due for tax years after 2015 during which Amgen engaged in similar transfer pricing strategies.

216.    Furthermore, the statements referenced above in ¶214 describing the adjustments from the RARs as "significant" and stating that the ultimate outcome of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may" result in payments "substantially greater than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS.  Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above.  The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

217.    Additionally, the combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.  A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2013-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $7 billion in back taxes and penalties

218.    Further, Amgen's "Contingencies and commitments" section stated the following regarding loss contingencies and accruals:

### 14.    Contingencies and commitments

*Contingencies*

In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict . . . ***We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote***; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2020; in Note 12, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2021; and in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended June 30, 2021.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. ***We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously.***

Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. ***In each of the matters described in this filing*** . . . ***in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. As a result, none of the matters described in this filing*** . . . ***in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material***. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Certain recent developments concerning our legal proceedings and other matters are discussed below:

\*      \*      \*

- 77 -

*U.S. Tax Litigation*

*Amgen Inc. & Subsidiaries v. Commissioner of Internal Revenue*

See Note 4, Income taxes, for discussion of the IRS tax dispute and the Company's petition in the U.S. Tax Court.

219.    The statements referenced above in ¶218 that "our opponents seek an award of a not-yet-quantified amount of damages" or that Amgen was unable "to estimate a range of possible loss" were materially false and misleading when made because the amount of damages could be quantified and Amgen was able to estimate a range of possible loss based on the NOPAs and RARs sent by the IRS for Amgen's 2013-15 tax years.  Defendants knew, or recklessly disregarded, the IRS was seeking from Amgen approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years.  Contrary to the statements referenced above, the amounts sought by the IRS were material.  Furthermore, contrary to the statements above that the referenced footnote describes "legal proceedings and other matters that are significant or that we believe could become significant," the referenced footnote failed to describe Amgen's dispute with the IRS over its 2013-15 tax years.

220.    The false and misleading statements referenced above in ¶¶214 and 218, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the 3Q21 Form 10-Q, which repeated in all material respects the statements from the certification referenced above in ¶176.

**Fourth Quarter & Full Year 2021**

221.    On February 16, 2022, Amgen filed with the SEC its annual report on Form 10-K for the period ended December 31, 2021 ("FY2021 Form 10-K"), which was signed by both Individual Defendants.  The FY2021 Form 10-K stated, in pertinent part, as follows:

*In 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015, also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico similar to those proposed for the years 2010, 2011 and 2012*. We disagreed with the proposed adjustments and calculations and pursued resolution with the IRS appeals office. *We were unable to reach resolution at the administrative appeals level, and we anticipate that we will receive a statutory notice of deficiency for these years as well*. We expect to contest any such notice related to 2013–15 through the judicial process. *We are also currently under examination by the IRS for the years 2016, 2017 and 2018 and by a number of state and foreign tax jurisdictions*.

Final resolution of these complex matters is not likely within the next 12 months. We believe *our accrual for income tax liabilities is appropriate* based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and the uncertain resolution of these matters, *the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our consolidated financial statements*.

222.    The statements referenced above in ¶221 were materially false and misleading when made for the reasons set forth in ¶203 above. Additionally, the statements referenced above in ¶221 were materially misleading when made because they discussed the disputes with the IRS but failed to quantify the amounts owed and minimized the amounts sought by the IRS. Amgen's financial statements were required to disclose the IRS was seeking from Amgen approximately at least $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-2015 tax years. The statements referenced above concerning the "examination by the IRS for the years 2016, 2017 and 2018" were misleading because Defendants failed to disclose it was a virtual certainty the IRS would seek significant back taxes from Amgen for the 2016-18 tax years due to Amgen's transfer pricing strategies.

223.    Furthermore, the statements referenced above in ¶221 describing the adjustments from the RARs as "significant" and stating that the ultimate outcome of the IRS dispute "could" have a "material impact" on Amgen's financial statements, and that the ultimate resolution "may"

result in payments "substantially greater than amounts accrued" were ambiguous and failed to adequately warn investors of the massive amount of money sought by the IRS.  Indeed, the SEC recognized in Staff Accounting Bulletin No. 99 – Materiality, 17 C.F.R. Part 211 (1999) that a 5% impact to metrics such as net income are commonly viewed by registrants as material but here Amgen's exposure to the IRS amounted to approximately 162% to 180% of net income, was greater than Amgen's cash and cash equivalents, and was substantial relative to other key metrics, as alleged above.  The statement "our accrual for income tax liabilities is appropriate" was misleading because Amgen had not accrued a meaningful amount to cover its exposure to the IRS and had Amgen been required to fully satisfy its debt owed to the IRS it would have raised questions about Amgen's ability to continue as a going concern.

224.    Additionally, the combination of the (i) vague descriptions that the adjustments "could" be "material," (ii) characterization that Amgen's "accrual" "may" be "appropriate," and (iii) omission of the substantial size of Amgen's contingent liabilities, minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.  A reasonable investor would have taken those statements to mean that Amgen's contingent liabilities for its 2013-15 tax years arising out of the IRS's audits were manageable relative to Amgen's liquidity and financial condition and did not come close to approaching more than $7 billion in back taxes and penalties

225.    The false and misleading statements referenced above in ¶221, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Bradway and Griffith and included in the FY2021 Form 10-K, which repeated in all material respects the statements from the certification referenced above in ¶176.

226.    On February 10, 2020, Amgen filed a registration statement on Form 3-ASR, which was utilized for a shelf offering of debt securities.  On February 18, 2022, Amgen filed the

prospectus for the issuance of approximately $4 billion in notes.  The February 2022 Debt Offering Documents incorporated by reference Amgen's FY2021 Form 10-K.  The February 2022 Debt Offering Documents were materially false and misleading for the reasons set forth in ¶203 above. The February 2022 Debt Offering Documents are also false and misleading for the reasons mentioned above in ¶¶222-224 because the February 2022 Debt Offering Documents incorporated by reference the FY2021 Form 10-K, as well as the false statements stated therein.

### Amgen's Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Could Reasonably Impact the Company's Financial Results

227.    Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, Amgen's Class Period SEC filings were required to furnish the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

228.    The approximately $3.6 billion in back taxes, plus interest, for Amgen's 2010-12 tax years and at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for Amgen's 2013-15 tax years were known events and uncertainties that were reasonably likely to have an impact on the Company's operations and therefore were required to be disclosed in the Class Period Forms 10-Q for 2Q20, 3Q20, 1Q21, and Form 10-K for FY2020, but were not.

229.    The approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for Amgen's 2013-15 tax years were known events and uncertainties that were reasonably likely to have an impact on the Company's operations and therefore were required to be

disclosed in the Class Period Forms 10-Q for 2Q20, 3Q20, 1Q21, 2Q21, 3Q21 and Forms 10-K for FY2020 and FY2021, but were not.

230.    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract . . . A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

231.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Id*. at *6.

232.    Since, by the start of the Class Period, the IRS has already determined and notified Amgen it owed more than $10 billion in back taxes and penalties for its 2010-15 tax years, Amgen's

substantial tax liabilities was a known event and uncertainty that would likely materially impact Amgen's financial condition or results of operations.

### Amgen's Class Period SEC Filings Omitted Significant Risk Factors Required to Be Disclosed Therein

233.    Pursuant to Item 1A of Form 10-K, Amgen's Class Period Forms 10-K were required to furnish the information pursuant to Item 105 of Regulation S-K [17 C.F.R. §229.105], including, among other things, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  Pursuant to Item 1A of Form 10-Q, Amgen's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in Amgen's Forms 10-K pursuant to Item 105 of Regulation S-K [17 C.F.R. §229.105].

234.    Amgen was required, but failed, to disclose the following in its Class Period Forms 10-Q for 2Q20, 3Q20, 1Q21, and Form 10-K for FY2020:

(a)    the U.S. Government, through the IRS, determined Amgen owed approximately $3.6 billion in back taxes, plus interest, for its 2010-12 tax years and sought payment of those amounts;

(b)    the U.S. Government, through the IRS, determined Amgen owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties, for its 2013-15 tax years and sought payment of those amounts;

(c)    the U.S. Government, through the IRS, collectively sought from Amgen approximately $10.7 billion in back taxes (plus interest), and penalties for its 2010-15 tax years;

(d)    the U.S. Government, through the IRS, would likely claim Amgen owed substantially more than the Company conveyed to investors for its tax years subsequent to 2015 during which the Company had used the same transfer pricing techniques as it had used during 2010-15;

- 83 -

(e)      the amounts Amgen had accrued to account for its outstanding tax liabilities for its 2010-15 tax years was substantially below the amounts necessary to satisfy those liabilities;

(f)      Amgen had failed to comply with GAAP, ASC 450, and other rules and regulations regarding the preparation of its periodic SEC filings, as alleged above in ¶¶73-136; and

(g)      based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Amgen's then-current business operations and future financial prospects.

235.    Amgen was required, but failed, to disclose the following in its Class Period Forms 10-Q for 2Q21, 3Q21, and Form 10-K for FY2021:

(a)      the U.S. Government, through the IRS, determined Amgen owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties, for its 2013-15 tax years and sought payment of those amounts;

(b)      the U.S. Government, through the IRS, collectively sought from Amgen approximately $10.7 billion in back taxes (plus interest), and penalties for its 2010-15 tax years;

(c)      the U.S. Government, through the IRS, would likely claim Amgen owed substantially more than the Company conveyed to investors for its tax years subsequent to 2015 during which the Company had used the same transfer pricing techniques as it had used during 2010-15;

(d)      the amounts Amgen had accrued to account for its outstanding tax liabilities for its 2010-15 tax years was substantially below the amounts necessary to satisfy those liabilities;

(e)      Amgen had failed to comply with GAAP, ASC 450, and other rules and regulations regarding the preparation of its periodic SEC filings, as alleged above in ¶¶73-136; and

(f)      based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Amgen's then-current business operations and future financial prospects.

**Any Purported Risk Warnings in Amgen's Class Period
Forms 10-Q and 10-K Were Inadequate**

236.    Even though the 3Q20 Form 10-Q, FY2020 Form 10-K, 1Q21 Form 10-Q, 2Q21

Form 10-Q, 3Q21 Form 10-Q, and FY2021 Form 10-K contained purported risk warnings, they did

not adequately warn investors about the untrue facts, misrepresentations and omissions alleged

herein.  These risk warnings: (i) were untrue, incorrect or misleading as a matter of current or

historical fact; and/or (ii) were not meaningful because, among other things, they were vague,

boilerplate and did not adequately warn of the true risks of investing in Amgen.

237.    Even though Amgen's SEC filings during the Class Period may have discussed

Amgen's disputes with the IRS concerning its 2010-15 tax years, it failed to disclose the IRS was

already seeking payment from Amgen of more than $10 billion in back taxes and penalties for its

2010-15 tax years and that Amgen was exposed to substantial liabilities for tax years after 2015.

**ADDITIONAL SCIENTER ALLEGATIONS**

238.    As alleged herein, Defendants acted with scienter in that Defendants knew, or

recklessly disregarded, that the public documents and statements they issued or disseminated in the

name of the Company or in their own name during the Class Period were materially false and

misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws.

Defendants, by virtue of their receipt of information reflecting the true facts regarding Amgen, their

control over, and/or receipt and/or modification of Amgen's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Amgen, were active and culpable participants in the fraudulent

scheme alleged herein.

239.    Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

240.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, income taxes, financial statements, and final condition, as alleged herein.

241.    The Individual Defendants, because of their positions with Amgen, controlled the content of the Company's public statements during the Class Period.  The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Amgen's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.  At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations.  To the extent they were lacking such a basis, they are likewise responsible and liable for the misrepresentations contained therein.

- 86 -

242.    The Individual Defendants as executive officers of Amgen, at a minimum, should have been aware of key facts related to the Company's operations, including its accounting procedures and compliance with GAAP.  Defendant Bradway and Griffith are both individuals with extensive experience in finance and accounting and therefore were aware of the importance of transfer pricing and its material impact on the Company's taxable income and financial results. Similarly, Defendants Bradway and Griffith were aware of Amgen's obligation to comply with GAAP and contingent liabilities disclosures under ASC 450.  Prior to becoming Amgen's Chief Executive Officer, Defendant Bradway served as the Company's Chief Operating Officer and before that the Company's Chief Financial Officer.  Defendant Griffith, prior to becoming Amgen's Chief Financial Officer, served as a partner at the accounting firm Ernst & Young  and in a variety of senior leadership roles at that firm, including Global Vice Chair, Corporate Development.

243.    The Individual Defendants were aware of the IRS audits into Amgen's transfer pricing because the IRS audited Amgen for years and Amgen was directly and intimately involved with the process.  The IRS served numerous information document requests, toured Amgen's flagship manufacturing facility in Puerto Rico, and interviewed numerous employees concerning the Company's transfer pricing tax strategy.  This necessarily involved senior employees in Amgen's finance and accounting departments, who reported to Defendant Griffith as CFO.  Pursuant to these audits, the IRS communicated to Amgen the amount of back taxes and penalties Amgen owed the U.S. government for its 2010-15 tax years in NOPAs and RARs received by Amgen before and during the Class Period.

244.    Detailed information contained in the Company's SEC filings and press releases and Defendant Griffith's and Bradway's statements and responses to questions on conference calls with analysts about the details of the IRS audits, the transfer pricing methods at issue, and the Company's

receipt of communications from the IRS, including NOPAs and RARs, also supports their scienter. For example, on the first day of the Class Period, Amgen's Form 10-Q for the second quarter of 2020 admits that Amgen received RARs for its 2010-12 and 2013-15 tax years, that the RAR for its 2010-12 tax years "proposed to make significant adjustments" and that the RAR for its 2013-15 tax years "are similar to the proposed adjustments" for its 2010-12 tax years. By this time, Defendants were aware of the amounts of the tax deficiencies sought by the IRS for its 2010-12 and 2013-15 tax years. Similarly, Defendant Griffith provided answers on the Company's August 3, 2021 conference call, and Defendant Bradway during the Morgan Stanley Global Healthcare Conference on September 14, 2021, about the IRS's audits, including about its 2013-15 tax years, supporting their scienter.

245.    In drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations, the Individual Defendants were either already knowledgeable, became knowledgeable, or recklessly disregarded the underlying facts regarding the IRS examinations, including that the IRS determined and communicated that Amgen owed more than $10 billion in back taxes and penalties for its 2010-15 tax years.

246.    The scienter of the Individual Defendants is further evidenced by their SOX mandated certifications on Amgen's internal and disclosure controls, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Amgen was made known to them.

247.    Additionally, the fraud alleged herein relates to the core business and operations of Amgen, so knowledge of the fraud may be imputed to Defendants. Defendants failed to review or check information they had a duty to monitor or ignored obvious signs of fraud. Given the size of Amgen's contingent liabilities and the legal obstacles to obtaining reversal of the IRS's

determinations of Amgen's tax liabilities, Defendants knew, or recklessly disregarded Amgen's contingent liabilities should have been publicly disclosed. Given Defendants' knowledge of the truth concerning the Company's failure to comply with GAAP, material misstatements and omissions concerning Amgen's tax liabilities, material deficiencies and ineffectiveness of the Company's disclosure controls and controls over financial reporting, the statements and omissions detailed above, made contemporaneously with that knowledge, were false and/or misleading. Furthermore, these facts were known by Amgen employees in senior positions, including, Peter Price and John Cise, among others, and their knowledge can be imputed to Amgen itself.

248. Even though Defendants knew or recklessly disregarded by the start of the Class Period the IRS sought from Amgen more than $10 billion in back taxes and penalties for Amgen's 2010-15 tax years, Defendants hid those facts from investors and minimized Amgen's potential exposure. Defendants only disclosed the precise amounts sought by the IRS because they knew those amounts were going to be publicly revealed anyway when the Company attached the notices of deficiencies to its petitions filed with the U.S. Tax Court. Defendants also possessed substantial motives for misrepresenting and omitting the amount of tax deficiencies sought from Amgen by the IRS during the Class Period.

249. Amgen is a capital intensive business and relies on its ability to issue debt to raise funds from investors on favorable terms to operate its business. Defendants were motivated to hide the sheer size of tax deficiencies sought by the IRS to enable Amgen to raise approximately $9 billion from investors on terms favorable to the Company. Had Defendants quantified and revealed the full scope of Amgen's contingent liabilities to the IRS, it would have negatively impacted Amgen's ability to issue debt to investors on terms as favorable to the Company. Indeed, as set forth below, the prices of the Company's debt securities issued during the Class Period declined in

response to Amgen's disclosure on April 27, 2022 that the IRS was seeking approximately $5.1 billion in back taxes and interest as well as approximately $2 billion in penalties for its 2013-15 tax years:

| Issue Date | Issue Amount | Maturity Date | 4/28/2022 (Price Decline) | 4/29/2022 (Price Decline) | 5/2/2022 (Price Decline) | Total Price Decline |
|---|---|---|---|---|---|---|
| 8/9/2021 | $1,250,000,000 | 8/15/2028 | $0.01 | $0.67 | $0.43 | $1.11 |
| 8/9/2021 | $1,250,000,000 | 1/15/2032 | $0.42 | $0.26 | $0.65 | $1.33 |
| 8/9/2021 | $1,150,000,000 | 8/15/2041 | $0.37 | $1.82 | $0.31 | $2.50 |
| 8/9/2021 | $1,350,000,000 | 1/15/2052 | $0.00 | $1.85 | $0.09 | $1.94 |
| 2/22/2022 | $750,000,000 | 2/22/2029 | $0.40 | $0.33 | $0.54 | $1.27 |
| 2/22/2022 | $1,000,000,000 | 2/22/2032 | $0.66 | $0.26 | $0.41 | $1.33 |
| 2/22/2022 | $1,000,000,000 | 2/22/2052 | $0.00 | $1.22 | $1.55 | $2.77 |
| 2/22/2022 | $1,250,000,000 | 2/22/2062 | $0.00 | $1.49 | $0.77 | $2.26 |
| **Total**: | $9,000,000,000 | | | | | |

250.     The decline in the prices of Amgen notes in response to the disclosure of Amgen's contingent liabilities to the IRS for its 2013-15 tax years establishes the news was considered material by the market and negatively impacted investors' perception of Amgen's credit-worthiness.

## LOSS CAUSATION/ECONOMIC LOSS

251.     During the Class Period, as detailed herein, Defendants deceived the market and artificially inflated the prices of Amgen common stock and operated as a fraud or deceit on Class Period purchasers or acquirers of Amgen common stock.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Amgen common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases or acquisitions of Amgen common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

252.     Defendants' false and misleading statements and omissions, which as alleged above were made without any reasonable basis, had the intended effect and caused Amgen common stock to trade at artificially inflated levels throughout the Class Period.

253.    On August 3, 2021, Amgen issued a press release announcing its financial results for the second fiscal quarter of 2021 which, for the first time, quantified its outstanding tax liabilities to the IRS for its 2010-12 tax years.  Amgen announced the IRS was seeking additional federal tax of approximately $3.6 billion, plus interest.

254.    In response to the Company's announcements on August 3, 2021, Amgen stock declined $15.77 per share, or 6.5%, from it closing price on August 3, 2021 of $244.08 per share to close at $228.31 per share on August 4, 2021, on abnormally high trading volume of more than 6.9 million shares traded.  Defendants, however, failed to disclose the full extent of their financial exposure to the IRS and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in Amgen stock remaining artificially inflated. Among other things, Defendants failed to disclose the IRS was seeking payment from Amgen of $5.1 billion in back taxes and $2 billion in penalties for its 2013-15 tax years.

255.    On April 27, 2022, Amgen issued a press release announcing its financial results for the first fiscal quarter of 2022, which for the first time, quantified its outstanding tax liabilities sought by the IRS for its 2013-15 tax years.  Among other things, Amgen announced the IRS was seeking payment from Amgen of approximately $5.1 billion, plus interest in back taxes and approximately $2 billion in penalties for its 2013-15 tax years.

256.    In response to the Company's announcements on April 27, 2022, the price of Amgen stock declined $10.66 per share, or 4.3%, from its closing price on April 27, 2022 of $248.79 per share to close at $238.13 per share on April 28, 2022, on abnormally high trading volume of more than 6.6 million shares traded.

257.    It took the market several days to fully digest the Company's disclosures on April 27, 2022 concerning Amgen's tax dispute with the IRS.  The price of Amgen stock continued to fall

over the next several days as the market digested the news, reaching a low of just $227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022.

258.    The declines in the price of Amgen common stock after the disclosures came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and a materialization of the undisclosed risks alleged herein.  The timing and magnitude of the price declines in Amgen common stock negates any inference that the loss suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Amgen common stock and the subsequent significant declines in the value of Amgen common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

259.    At all relevant times, the market for Amgen common stock was an efficient market for the following reasons, among others:

(a)     Amgen common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     as a regulated issuer, Amgen filed periodic public reports with the SEC and the Nasdaq;

(c)     Amgen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Amgen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(e)    As a result of the foregoing, the market for Amgen common stock promptly digested current information regarding Amgen from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers or acquirers of Amgen common stock during the Class Period suffered similar injury through their purchase(s) of Amgen common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:<br>AFFILIATED UTE DOCTRINE

260.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because Defendants' material omissions during the Class Period caused harm to Plaintiff and the Class. Because the Complaint alleges Defendants' failure to disclose material adverse information regarding Amgen and the then-undisclosed, but known, amount of tax liabilities assessed by the IRS for its 2010-15 tax years - information Defendants were obligated to disclose - positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

261.    Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## NO SAFE HARBOR

262.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

263.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

264.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

265.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

266.    The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Amgen's common stock during the Class Period.

267.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Amgen were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

268.    The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

269.    As a result of the foregoing, the market price of Amgen's common stock was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Amgen's common stock during the Class Period in purchasing Amgen's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

270.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

271.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

272.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

273.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

274.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct

of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the IRS's determination that Amgen owed more than $10 billion in back taxes and penalties for its 2010-15 tax years.

275.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

276.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

277.    The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

278.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  August 31, 2023                ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
WILLIAM A. MASSA


                                                                 */s/ Evan J. Kaufman*
                                                                  EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
wmassa@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*