O7ICrooO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROOFERS LOCAL NO. 149 PENSION
FUND, on Behalf of Itself and
All Others Similarly Situated,

                Plaintiffs,

         v.                           23 Civ. 2138 (JPC)

AMGEN INC., ROBERT A. BRADWAY,
and PETER H. GRIFFITH,

                Defendants.

------------------------------x
                                      New York, N.Y.
                                      July 18, 2024
                                      10:00 a.m.

Before:

                    HON. JOHN P. CRONAN,

                                      District Judge

                         APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiff
BY:  EVAN J. KAUFMAN
     MARK T. MILLKEY

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Defendants
BY:  JAY B. KASNER
     TANSY WOAN
     PETER B. MORRISON

O7ICrooO

(Case called)

MR. KAUFMAN:  Good morning, your Honor.  Evan Kaufman with Robbins Geller Rudman & Dowd on behalf of lead plaintiff and the proposed class.

THE COURT:  Good morning, Mr. Kaufman.  And Mr. Millkey.

MR. MILLKEY:  That's right.  Thank you, your Honor.

MR. KASNER:  Good morning, your Honor.  Jay Kasner from Skadden Arps on behalf of the defendants.

THE COURT:  Good morning, Mr. Kasner, and Ms. Woan and Mr. Morrison.

MR. KASNER:  Your Honor, if it pleases the Court, may I introduce to your Honor Kim Dunn and Mary Beth Cantrell from Amgen.  Ms. Dunn is vice president of law at Amgen and Ms. Cantrell is senior associate general counsel.

THE COURT:  Good morning to you, as well, Ms. Dunn and Ms. Cantrell.

So we're here today for oral argument on the pending motion to dismiss.  I'm not going to have a timer, but I was thinking roughly a half hour per side.  We'll start with the defendants, it's their motion, and I'll allow a brief rebuttal.

Before we do that, I did want to confirm with Mr. Kaufman what theories you are and are not pursuing in this case as that may help define the scope of argument today.  There were a few theories in the amended complaint, sometimes

O7ICrooO

more in passing that were not addressed in the opposition papers or maybe just very briefly.  So I want to make sure everyone's on the same page.

The first is just to confirm that you're only pursuing a material statements and omissions theory under Rule 10b-5.  The amended complaint did not specify which subsection of Rule 10b-5.  There was a passing reference to scheme liability by alleging the defendants participated in a fraudulent scheme, but I don't see any theory of scheme liability in your papers, only material misstatements and omissions theories.  I just want to make sure that understanding is correct.

MR. KAUFMAN:  That is correct, your Honor, we're not pursuing a scheme liability theory.

THE COURT:  What about item 105 and 303, regulation SK.  Are you pursuing that?  I'll tell you why I'm asking.  The defendants devote about four pages of their moving brief, item 105 and item 303, with various arguments laid out.  I don't see them really addressed in your opposition brief.  There was a single statement I think in a preliminary statement and in a footnote, as well.  So it seems abandoned to me, but I wanted to hear you on that.

MR. KAUFMAN:  Well, your Honor, we don't need it. It's not necessary for our claims, but after the Supreme Court's holding in *Macquarie v. Moab*, we believe the Supreme Court made it clear that our complaint does provide a basis for

O7ICrooO

a claim based on 303, which provided additional support for the pure disclosure claim because our theory is that the company failed to make -- they made half truths and they failed to make complete statements.  And in *Moab*, the Supreme Court said that that still can provide support for a securities fraud claim under 10b based on an omission, that something else was required to be disclosed in item 303.  So it's still part of our case, but it's not the core part of our case.  We don't think, in light of the Supreme Court's ruling, that we should be conceding or waiving that.  The lower courts will also be working out exactly what that means going forward, but we think it's clear that we still have a viable claim based on that.

THE COURT:  And just 303 or the factors under 105?

MR. KAUFMAN:  105 we're still pursuing, also.

THE COURT:  I obviously haven't reached any decisions in this case, but if I were to find that this was not a half-truth situation, are you able to prevail on either of those two?

MR. KAUFMAN:  No.  The theory would be that if you were to find that there was a half truth, that would be the basis for the 303 and the 105, not for pure omission.

THE COURT:  Now, the amended complaint also alleges that Amgen's statements that its accrual for income tax liability was appropriate, that those statements were misleading because Amgen had not accrued a meaningful amount to

O7ICrooO

cover its exposures to the IRS and because its statements minimized and failed to inform investors of the magnitude of Amgen's contingent liabilities.

With respect to the tax reserves part about that, whether or not Amgen announced its statements that it accrues sufficient appropriate tax reserves, are you pursuing a theory there separate and apart from the other parts of what I just read?

MR. KAUFMAN:  No, we're not alleging that there was anything inappropriate or inaccurate with respect to their reserves, so we're not challenging the reserves themselves. It's more of the statements about the reserves should be read in context with their other statements, which altogether gave a certain impression to investors based on their totality of the statements.

THE COURT:  You're not pursuing a theory, it seems to me, but tell me if I'm wrong, that Amgen misled investors by implying that there's a reasonable possibility that the administrative appeals office would rule in its favor for tax years '13 through '15 after the prior determination; is that right?

MR. KAUFMAN:  A reasonable possibility for them to win?

THE COURT:  Paragraph 188 of the amended complaint, paragraph 188 alleges that Amgen's statements, that we disagree

O7ICrooO

with the '13 through '15 proposed adjustments and calculations, and a pursuing resolution with the IRS administrative appeals office created the false and misleading impression that there was a reasonable possibility that the administrative appeals office would rule in favor of Amgen for its 2013-2015 tax years after it ruled against Amgen in connection with the 2010 to 2012 tax years.

Your briefing doesn't really address a theory that Amgen misled investors by implying essentially there was a reasonable possibility that it would prevail.  I don't read you to be pursuing that theory of misleading investors, but I want to make sure about that.

MR. KAUFMAN:  That's correct.  This is really part of our main theory with respect to whether disclosure was required under ASC 450.

THE COURT:  And then in the defendants' moving brief, they argue that any theory of liability, based on Amgen's statements, are certifications as to its internal control regarding financial reporting regarding any certification signed by Bradway and Griffith, and also regarding any portion of financial statements, aside from the tax accruals were misleading, that all of those different theories would fail.  I don't take you to be pursuing any of those theories here, but is that accurate?

MR. KAUFMAN:  Meaning a theory of an affirmative

O7ICrooO

statement, misrepresentation based on the certifications, and yeah, it's --

THE COURT:  Internal control certifications?

MR. KAUFMAN:  Right.  We're focusing on that more for support for *scienter* where we believe that, you know, and that's what we try to address in our opposition brief.

THE COURT:  And you point to the prospectuses for the two debt offering in connection with motive, but you're not arguing that those contain misleading statements, are you?

MR. KAUFMAN:  No, your Honor.

THE COURT:  That is most helpful.  Thank you.

So let me hear from Mr. Kasner, your motion.

MR. KASNER:  Yes, your Honor.  If it would please the Court, may I just clarify one or two things that you had in a dialogue with plaintiff's counsel about what has been abandoned, to use a term that your Honor has used in other matters where similar issues have come up.

Just to be clear, with respect to the reserve issue and just for clarity of the record, in the opposition brief that plaintiff filed, page 23, note 17, and page 29, note 26, make explicit that they are not pursuing a claim on the basis of inadequate reserves.  In fact, they suggest that we had misapprehended their claim, notwithstanding that that allegation appears in about 15 paragraphs, but so be it.

Internal controls, we've discussed.

O7ICrooO

Stock certifications, we discussed.

I believe that the debt offering documents, your Honor, are also off the table as a result of the colloquy with plaintiff's counsel.

Just for clarity for your Honor, in light of your Honor's question, as we see it, there are a couple of other allegations that were made as a claim that were not responded to that we pointed out. May I identify those, your Honor, just for clarity of the record?

THE COURT: You may.

MR. KASNER: Thank you, your Honor.

It does not appear as if plaintiff has responded to our argument or contended that Amgen did not comply with ASC 740. The issue, of course, whether or not that applies or 450 applies is very much at issue, but it's important, I think, to clarify that for reasons that I'll come to during the course of my argument.

They also do not dispute anywhere, although, in their papers, that receipt of what is termed "a notice of deficiency" from the IRS would at that point render the audit final. That appears at page 17 of our opening brief, I did not see that disputed either in their opposition, and I did not see any response in their opposition to the point that, in light of Amgen's market cap, which at the time was $127 billion, and its post-class period capital raise of $24 billion, that that

O7ICrooO

has bearing on plaintiff's motive allegations to raise capital independent of the argument I'll come to as to why that's insufficient regardless of that, but that was not disputed in their papers either, your Honor.

With respect to *Macquarie* and 303, they really did not address that either, your Honor. We, as your Honor noted — and this was prior to *Macquarie* coming down — devoted some pages to that. There's a footnote in the opposition that makes passing reference to that, page 14, note 8. I would submit, your Honor, that there was no substantive argument presented there independent of the overarching issue of whether or not there was a half truth by virtue of not having timely disclosed a preliminary $10 billion number that was being discussed.

THE COURT: I certainly was going to ask Mr. Kaufman about the ASC 740 question, in particular whether their agreement that Amgen did comply. Is there agreement that if ASC 740 is all that applies here, they're in compliance with that?

MR. KAUFMAN: First of all, no. We don't accept that at all. There are no allegations in the complaint about 740. I'll plan on getting into that when I oppose defendants' motion, but no, we don't accept that.

I just wanted to respond to a couple things that Mr. Kasner said.

One is with respect to the NOD being a final

O7ICrooO

disposition of the IRS audit, we don't concede with that entire concept of what is the -- actually, as we argued in our brief, the end of the audit, it was provided -- the RARs and the NOPAs were provided at the conclusion of the audit and that's what we think is sufficient for the -- with respect to finality of a number. So we don't concede what Mr. Kasner suggests.

And then with respect to 303, yes, we did not dedicate a lot of pages, we put in a footnote. Supreme Court was hearing that the place issue we were relying on, which was that 303 creates an independent duty for pure omission. That was why we originally alleged it in the complaint. So we -- whereas we didn't support that argument, now that -- we could not have made the argument we're making now because the Supreme Court had not yet issued its opinion. And the parties had submitted supplemental -- defendants submitted a copy of the opinion and a notice of supplemental authority, submitted a letter, and we also submitted a letter on that issue where we believe we asserted our support for that argument.

THE COURT: Understood. Thank you.

Mr. Kasner, I'm going to ask you first, I'm sure you'll get to this, it may be the flip-side of one of the issues you raised. If ASC 450 applies, do you agree that Amgen did not comply with 450?

MR. KASNER: Your Honor, Amgen did not attempt to comply with 450 because it doesn't apply, at least based on the

O7ICrooO

allegations of the complaint here.

And I would just note, and then I'll move on, your Honor, I know your Honor didn't intend to devote a lot of the time to this colloquy back and forth, and I appreciate you letting me put these other pieces that weren't disputed on the record.

My friend on the other side doesn't dispute that the complaint contains no allegations suggesting that 740 was not complied with.

If it pleases the Court, may I proceed?

THE COURT:  Yes.

MR. KASNER:  Thank you.

Once again, Jay Kasner on behalf of the defendants, your Honor.

There is no dispute on this record that Amgen made repeated disclosures to the investing public about its accounting for income taxes, in particular the calculation of income taxes, in light of the various jurisdictions in which multinational companies like Amgen operate.  Amgen's filings with the Securities and Exchange Commission that are in the record contained risk-factor disclosures about the potential impact of audits by taxing authorities, allocation of income and expenses among tax jurisdictions about the method by which Amgen determines the tax benefits that can be recognized as a result of the jurisdictions in which it operates, the fact

O7ICrooO

that such decisions require the application of judgment, a statement that attains significance in the case law when considering whether there was an intentional wrongdoing here or not, and also follows closely with the language in each one of Ernst & Young's clean opinions during the class period and before as to the judgmental nature of the tax judgments that the company had made, again, which were fully disclosed to the investing public.

Amgen also included in its financial statement disclosure each year. As I mentioned, a so-called clean opinion by its outside auditors Ernst & Young, which included attention to the tax benefits associated with the allocation of profits across multiple jurisdictions, including making decisions in accordance with the applicable accounting literature.

Among other things, and I'll come back to this in a moment, an example of that appears in the December 31st, 2020 filing on 10K, exhibit G to Ms. Woan's declaration, that's document 42-7 in the record. You can see in there, your Honor, a discussion of what was termed a critical audit matter by Ernst & Young laying out completely for the investing public what it was that the company did to arrive at its unrealized tax benefit disclosure and chart, what 740 — not 450 — required that it do, and the two-step process that Ernst & Young tested.

It also disclosed, your Honor, and the investing

O7ICrooO

public was made aware that not only did Ernst & Young test the technical merits, but particularly with respect to transfer pricing, Ernst & Young evaluated the operating effectiveness of internal controls and involved experts in transfer pricing, which I must confess is mind-numbing, your Honor, as I'm sure the Court, in reading these papers, began to consider, as well. But, nevertheless, your Honor, there is ample disclosure throughout the SEC filings in sections entitled "income taxes," in financial statements that reflect the calculations required under 740, nothing under 450.

During the course of the class period, your Honor, or the comported class period and before, Amgen candidly disclosed to the investing public in its 10K filing for fiscal year 2016, "tax authorities are becoming more aggressive in their audits and are particularly focused on the allocation of income and expense among tax jurisdictions."  That's page 29 of document 42-4 in the record, Woan declaration, exhibit D.

Amgen also told investors at that time that up until 2022, the IRS had audited Amgen for many years on the allocation of profit between the U.S. and Puerto Rico, which is the significant component of the issue here, given the large manufacturing facility that exists in Puerto Rico, and told investors up until now — meaning 2016 — these previous audits had been resolved through agreements with the IRS resulting in no financial statement detriment to the company.  That appears

O7ICrooO

in the first quarter press release for that year, Ms. Woan's declaration, exhibit B at page 7.

Things changed, your Honor, at or around that time. Amgen fully disclosed the shift in the IRS's view on transfer pricing to investors. Specifically, in March 2017, following an exchange of information and dialoguing between the internal revenue service and Amgen, the IRS sent to Amgen what was called a notice of proposed adjustment. What that is, after a back and forth between the IRS and Amgen, documents being exchanged, conversations, negotiations, no different, your Honor, than exists at many agencies of the federal government, including ones no doubt that your Honor was familiar with during your time at the U.S. Attorney's Office. You have dialogue about resolution of things. Here's the government's view, here's the other side's view, and you talk.

Then, procedurally, what happens is there came a point where the government sent a notice of proposed adjustment in what was called an RAR, a revenue agent report, which is a little bit of the backup of what the government said for fiscal years 2021 and '22. Specifically, what the investing public was told is we've got these NOPA and RAR — as I understand the lingo in this space, the NOPA — and the IRS had proposed significant adjustments for years 2010 through 2012, your Honor, "significant adjustments relating to the allocation of profits between certain of our entities in the United States

O7ICrooO

and the U.S. territory of Puerto Rico."  That's at ECF 42-5, page 10.  They further disclosed that Amgen "disagreed with the IRS's proposed adjustments and would pursue resolution through the administrative appeal process."

Now, we have not yet gotten anywhere close, your Honor, to the notice of deficiency.  Things are ongoing, there is dialoguing not only about the IRS's view about the judgments that are being brought to bear that go into a decision of how to allocate profits, but what the right number is if in fact there is something to disagree about with respect to the IRS.

Contrary to the suggestion that this is "merely," which appears in plaintiff's brief, what I'm about to tell you was merely a disclosure.  The company left no doubt that the outcome of tax matters could have a "material impact" on the company's financials.  That appears, among other places, at ECF 42-5, page 10, Ms. Woan's declaration, exhibit E at 7.

In the third quarter of 2017, Amgen further disclosed information to keep the investing public up to speed on what was going on between the transfer pricing issues and the IRS. It told investors, "We are in discussions with the IRS examination team and understand that the RAR regarding years 2010 through 2012 may be modified."

Similarly, the 2017 10K contained a risk factor disclosure that warned investors on this subject. Specifically, it said, "The adoption and interpretation of new

O7ICrooO

tax legislation or exposure to additional tax liabilities could affect our profitability."  That is Ms. Woan's declaration, exhibit C at 31, the 2017 10K.

The company went on to say, "We are subject to income and other taxes in the United States and other jurisdictions in which we do business.  As a result, our provision for income taxes is derived from a combination of applicable tax rates in the various places we operate.  Significant judgment is required for determining our provision for income tax."  That appears at the 2017 10K, Woan declaration, exhibit C at 31.  Again, they went on, this is not merely obfuscation, this is disclosure.

Your Honor, I'm going through this at some length because it's critical to understanding why there is no sufficiency to the complaint either for material omission or *scienter*.  This is robust disclosure, the accuracy of which, other than with respect to 740 versus 450, is not challenged in this case.

Amgen went on to disclose, "Amgen's tax returns are routinely examined by tax authorities," and reiterated that, "the tax authorities were getting tougher with respect to the allocation of income and expense among tax jurisdictions."  And that just didn't apply to us, your Honor.  There are other companies out there that are multinational companies that are alluded to in our papers that also have similar accounting

O7ICrooO

issues that the IRS is looking into that.  Parenthetically, if plaintiffs' suggestion is accepted that you have to disclose the tentative, fluid, preliminary number that's going back and forth is going to wreak havoc, quite frankly, on the disclosure regime in public company America for multinational corporations.

Your Honor, I will try to move forward.

The disclosures the company made while it was going through this administrative appeal process relative to 2010 to 2012 remained fairly consistent in light of what I've just discussed with the Court until the first quarter of 2021.  In its form 10K filed on April 28th, 2021, Amgen told investors, one, we have been unable to reach resolution with the IRS for years 2010 through 2012 at the administrative appeals level; two, we expect to receive a notice of deficiency for 2010 through 2012, and we will vigorously contest the NOD through the judicial process.

In its form 10Q, Amgen continued to warn the same way and went on to say the IRS-proposed adjustments were "significant."  Now, the reasonable investor sees the words "significant substantial material."  Those are charged words as a matter of law, your Honor.  Those are not burying these comments, they're not merely the word that my friends on the plaintiffs' side used in their brief on page 13, merely.  The investing public was told the IRS-proposed adjustments were

O7ICrooO

"significant."  This appears in Amgen's first quarter of 2021 10Q, ECF 42-16 at 11.  That's Ms. Woan's declaration, exhibit P at 8.

And then, significantly, your Honor, it goes on, again, forthcoming, not obfuscating, Amgen states, "Due to the complexity of the provision for income taxes and uncertain resolution of these matters, the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our consolidated financial statements."

Not to get ahead of myself, your Honor, but as our brief discussed, that language in this context has been accepted over and over as sufficient disclosure in these circumstances without the need to disclose a preliminary number.  I would commend your Honor, among others, and I'll come to that in a moment, the UBS case out of the Second Circuit where they looked at the exact same language, albeit in the context of the Department of Justice in SEC investigation. They specifically said that UBS did not need to disclose prematurely the numbers that it was bandying about with the SEC and the Department of Justice in the context of negotiations with respect to, among other things, a DPA.

To close the loop, your Honor, on the 2010 through 2012 time period, on May 1st of 2021, Amgen received what's termed a notice of deficiency.  At that point, as alleged in

O7ICrooO

paragraph 108 of the amended complaint, the notice of deficiency is a legal determination that is presumptively correct and consists of a letter explaining the purpose of the notice, the amount of the deficiency, and the taxpayers options, a statement showing how the deficiency was computed and an explanation of the adjustments.  This was on May 1st.

On August 3rd, your Honor, because it took a little bit of time for Amgen to file suit against the government, which was one of the options that it had given its disagreement with what the government had asserted, on August 3rd, Amgen issued a press release announcing its second quarter 2021 financial results, and included in that release was disclosure concerning the petition that it had filed.  That's also in the record.  Then the next day they filed a 10Q, having the same warning, telling investors about the petition that was filed.  That appears at Ms. Woan's declaration, exhibit H, at page 10.

Then, your Honor, because of the fact that the notice of deficiency was now the subject of litigation as opposed to just an ongoing dialogue with the government, they disclosed how much the government was seeking in the notice of deficiency.  That appears at Woan declaration, exhibit H, at page 10.  That's the 10Q for 2021.

It goes on to say that Amgen firmly believes that the IRS's position is without merit and will vigorously contest. They continue to make the same disclosure, your Honor, through

O7ICrooO

fiscal year '21.  An example of that appears at the 2021 10K, Ms. Woan's declaration, exhibit K at 65

And then again, if your Honor is so inclined, Woan declaration, exhibit H, the June 30, 2021 10Q, which is ECF 42-8 at page 10, in note 4 to the financial statement, which is headed "income tax," not "contingencies," "income tax," it says as follows.  And I'll just put this in the record for the sake of completeness, your Honor, with your indulgence, please. "Final resolution of these complex matters is not likely within the next 12 months."  That phrasing, your Honor, is derived from the requirements of 740, which make a distinction in terms of what you need to do between matters that are likely to be resolved within 12 months and matters that are not in terms of the unrecognized tax benefit calculation.  It has nothing to do with 450.

It goes on to say, "We believe our accrual for income tax liabilities is appropriate based on past experience, interpretation of tax law, application of the tax law to our facts, and judgments about potential actions by tax authorities."  That's their view, it's judgmental, it's multi-factual, people can reasonably have good faith disagreements, but they're being forthcoming, nobody's defrauding anybody here.  "However, due to the complexity of the provision of income taxes and uncertain resolution of these matters, the ultimate outcome of any tax matters may result in

O7ICrooO

payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements."

Then, in the last paragraph there, disclosure is made about what has happened to the unrecognized tax benefit accrual, which 740 requires that Amgen make with respect to uncertain income tax provisions. It tells investors, as a result of all this stuff that's going on between the notice of deficiency for 2010 and 2012, the audit that was underway at that point from 2013 to 2015, we are increasing or have increased our unrecognized tax benefits and discuss that, tell investors of what that was.

In the interest of time, your Honor, I had planned on doing the same soliloquy with respect to the other tax years, but unless your Honor wishes --

THE COURT: Let me just ask, though, when you're talking about the disclosures that were made about those adjustments being significant or substantial, isn't there a difference between those terms and over $10 billion? The other cases you cited, UBS or others that you have in your brief, how does the liability, potential liability of those cases compare to what we're facing here?

MR. KASNER: Your Honor, there's no question that $10 billion in a vacuum is a large number. I couldn't possibly stand here and say that.

O7ICrooO

Now, it has to be viewed in relation to other factors. So, $10 billion for a company that is worth $6 billion or has a market capitalization of $6 billion is different than a $10 billion liability potentially with a company that has a $127 billion market cap as of that point in time.

The other thing, your Honor, our position is that the disclosure that is required of the unrecognized tax benefit, which is really what this number is, it's what is the government saying you are not entitled to by virtue of what you put on your tax return, situation specific, your allocation of profits in the government's view between Amgen and its Puerto Rican subsidiary weren't right, for lack of a better word.

That doesn't mean, first of all, your Honor, that that number is going to be the ultimate number that, through dialogue with the IRS, you're going to come up with. And so, if you accept the proposition — and I would like to talk through it for a moment — the accounting literature that applies here, because it's probative of the question your Honor is asking, but in a nutshell, the $10 billion is subject to change and subject to negotiation. In fact, as the record reflects, there was a modified revenue report on NOPA based on errors that were made.

So, if you impose an obligation, your Honor, to make disclosure of this type in this circumstance, you are going to be putting people in a bind because then what you would have is

O7ICrooO

a duty to update that number in a public context during the course of a negotiation.  As your Honor undoubtedly knows, there is a back and forth with negotiation with the government if the government wants to assess a penalty, and the number has to have some certainty to it both in the sense of what the IRS's position is rather than back and forth, and back and forth.

That's why, your Honor, in this case, if you're looking at the issue from a *scienter* point of view, the judgment issue becomes very important because there is nothing alleged in the complaint, and we can go through the efforts to raise money for bonds and all that stuff that the Second Circuit has rejected in the *San Leandro* case, all the factors that they've come up with as to whether that was intentionally done.

In that regard, I would commend to your Honor Judge Berman's decision in the *Embraer* case, and Judge Gardephe's opinion in the *Iconix* case, both of which I had the pleasure of representing the defendants in that case which similar arguments were being made.  And the fact that the number is large, how do you make that judgment, your Honor?  In other words, let's assume that my friends at Robins Geller come in next week, another company having tax issues with the government, that number isn't $10 billion, that number is $450,000 or the number is $25 billion, there have to be

O7ICrooO

overarching principles that apply to these sorts of judgments, your Honor, otherwise it becomes *ad hoc*, there's no certainty, and that's what these accounting principles are for.

Amgen, as it disclosed to the investing public and as Ernst & Young attested to every year in clean audits, including the one I referenced, that is exhibit G from 2020, they tested these judgments.  There is nothing in the record, nothing, there is no allegation whatsoever of information that came to the attention of management suggesting that the judgments that were being applied about how much to put in the bucket of unearned tax benefits was wrong or was fraudulent, more importantly, because it's not just that you're wrong, if you make judgments like this in good faith, the fact that the government takes a position that's different than yours isn't dispositive.  That's essentially what happens all the time.

Also, your Honor, this is not a situation where you're looking at the other account.  I mean, this is getting to the crux of the issue of course that's presented by the complaint, but 450 does not apply.  If this were a loss contingency, the analysis might well be different in terms of the point at which you need to say something about a range or an estimate.  I'll come to it in a moment, but what your Honor will see is that -- let me back up.  450 was originally housed in Financial Accounting Standard Board 5, FASB5.

In March of 1975, your Honor, and I think this is

O7ICrooO

important to understand because at the end of the day, the question you're asking about the size of the number and then you have to say something, and isn't that different with respect, I think, the legal principles that apply are not different depending upon how large the number is.  If you have an obligation to disclose, you have an obligation to disclose. The fact that the number might be large may go to materiality potentially, or whether that is something that is "important to an investor."

But as your Honor has recognized time and again in your Honor's opinions, merely because something is important to an investor does not impose a duty of disclosure.  What you have to show in this circumstance that what was being told in the face of all of this robust disclosure that I've been discussing with the Court, that the absence of the number itself, which was fluid and in flux and subject to discussion, that should have been disclosed.

Well, we told investors what our unrecognized tax benefit was.  It was over $3 billion.  That number was fully disclosed in our financial statements.  We also told them that if the government is right about what their numbers are that we're discussing, it could have a significant material impact on our financial condition.  With all respect, the reasonable investor that is reading that disclosure and seeing those numbers, in the context of a $127 billion market cap company,

O7ICrooO

understands, wow, I'll bet that they're talking about a really big number. And it's not as if we waited to put that out. Once we knew this is their number in the audit, we put it out.

Let me, if I can be --

THE COURT: You're of course not disputing the materiality of statements regarding the tax judgments here? You're not saying that there was no materiality here?

MR. KASNER: Your Honor, at this juncture, we are arguing there was no duty to disclose.

So very, very briefly, because I don't want to overstay my welcome in light of what your Honor's timeframe was, but I do think it's important to have some rooting in the literature of what applies here very, very quickly. March 1975, the Financial Accounting Standard Board publishes FASB5. That's in the record as exhibit RR to Ms. Woan's declaration, to 50-7. FASB5 addresses accounting for contingencies.

Paragraph 4 of FASB5 back in 1975, ECF 50-7, page 6, provides examples of what it terms "loss contingencies," which is what my friends on the other side of the coin here claim this was. And we will acknowledge that as of 1975, pending or threatened litigation and actual or possible claims and assessments were included in FASB5, and then FASB5 talks about the accrual of loss contingencies.

In 2006, accounting for uncertainty in income taxes, which is what we're talking about here, including as a result

O7ICrooO

of transfer pricing determinations, was specifically removed from FASB5 and incorporated into Financial Accounting Standards Board interpretation No. 48, which we'll refer to as FIN48.  It appears in the record as exhibit AA to Ms. Woan's declaration, ECF 42-27.

The purpose of this interpretive document was to clarify the manner in which accounting for income taxes would apply going forward and to clarify certain things.  In fact, and I'll come to it in a moment, if your Honor notices on page 3 of FASB interpretation No. 48.  It specifically says it amends FASB5, paragraphs 2 and 39.

If it pleases the Court, I'd like to hand up a blown-up version of the paragraph 39 to which FIN48 refers because it's very difficult to read and this is critically important.  May I approach, your Honor?

THE COURT:  Yes, you may.  Thank you.

MR. KASNER:  This is already in the record, Your Honor, so I'm not giving counsel something they haven't seen already.

So, FAS5, your Honor, the whole ballgame here, in a nutshell, is:  Does FAS5 or 450 apply to accounting for income taxes or not?  Again, if I'm overstaying my welcome, your Honor, please tell me.

THE COURT:  I certainly will give Mr. Kaufman plenty of leeway, as well, since I think these are important issues to

O7ICrooO

talk through.  They're certainly not straightforward.  So I appreciate it.

MR. KASNER:  No, this is not a breach of contract claim.

So, this paragraph shows when FIN48 amended paragraph 39, this reflects the amendment.  The way it was amended, as your Honor can see, this talks about reasonably estimated and probability, all the business words that apply when you're accounting for a loss contingency.  But, the effect of FIN48 was to remove accounting for income taxes from what was then FAS5, what is now 450.  This paragraph, as your Honor can see, reflects the edits that were made when FIN48 was adopted to what had previously been FAS5.  And your Honor will note and, I'll just put in the record, that at least in two or three separate places, the word "taxes" are removed.

Your Honor, there are, as your Honor will see, what was implemented through FIN48 was what is currently in 740.  Basically, instead of using probability, which is embodied in loss recognition, Financial Accounting Standard Board specifically rejected the FAS5 probable and estimable more likely than not standard.  What this now required in FIN48 and what has been imparted into 740 is if you have -- and your Honor can see on page 48 of FIN48, it says, this interpretation applies to all tax positions accounted for in accordance with statement 109.  An individual tax position that has to be

O7ICrooO

accounted for is defined to include any appeals or litigation.

So, to the point that my friend had mentioned to the Court that the notice of deficiency is somehow not a final step in the audit, indeed, FIN48 and 740 permits this judgmental process that we go through now to continue even when there is litigation as there is now, which is important, your Honor, because it expanded the scope of when you are entitled to carry this unrecognized tax benefit on your balance sheet, which is what the accounting literature says you need to account for, not disclosing your best estimate of what your liability is. You are not obligated to do that.

In fact, your Honor will note in here — and I'll direct your Honor's attention to where this can be found — the financial board specifically rejected requiring individualized disclosure of contingent liabilities. You are permitted to, because this is unearned tax benefits, take into account a lot of sins. It's not just transfer pricing, it's other tax positions that you take where if you conclude that you are more likely than not to be correct and to realize that, but it's not 100 percent, let's assume it's 70 percent, you have to account for the 30 percent of the uncertainty in a reserve account, which is what's called an unrealized tax benefit reserve, UTB, which is included in the financial statements each quarter, audited by Ernst & Young at the end of the year, and included in the record.

O7ICrooO

Just a couple of other observations, your Honor.

On page 48-15 of FIN48, there is an illustrative disclosure — that was their words — about how the disclosure of this unrecognized tax benefit should be made in your financial statements. What is the example they use? They use a hypothetical involving a dispute over a transfer pricing decision that was made and was challenged by the Internal Revenue Service. There's no doubt that accounting for income taxes such as we have here was intended 20 years ago to be subsumed within FIN48 and no longer with FASB5 or 450.

If your Honor wants to get even more into the weeds, and then I will move on, if you refer to page 48-24 of FIN48, there is a discussion in there about how the Financial Accounting Standard Board specifically rejected the FAS5 probability standard in favor of this table we talked about. They note, your Honor, to your Honor's question of why don't you just disclose the number, the accounting literature recognizes that in this area, if you were to disclose the piece of the tax, not the whole thing, not in an aggregate, but each individual component, that that actually could be detrimental to the taxpayer in terms of his or her or its ability to negotiate with the government. That's directly in paragraphs B63, B64 of FIN48 on pages 48-24 and 48-25.

And then, finally, your Honor, in the proverbial coffin on this argument that somehow 450 applies in this

O7ICrooO

context, where you're talking about accounting for income tax, if you take a look at appendix C, C2 on page FIN48-27, which is ECF page 29 in exhibit AA to the Woan declaration, in two places, your Honor, the Financial Accounting Standard Board makes explicit that FIN48 now provides the guidance for accounting for income taxes and FAS5 "no longer applies to income taxes."

Similarly, that's where the language that I presented to the Court is amended, the same page. And so, I think that, with respect, that is also, as we'll come to, and promise, one of the reasons why we think Judge Cote, with all respect, got it wrong in 450, because these arguments that I'm presenting to you were never presented to her, your Honor.

THE COURT: I was going to just get confirmation on that. I didn't see any indication in any of the opinions in doing an analysis along the lines that you did, it's your understanding, and I'll of course ask Mr. Kaufman, as well, that these arguments were not presented?

MR. KASNER: That's correct, your Honor. There was no argument presented on the motion to dismiss, that 740 applied to the exclusion of 450.

What Judge Cote was presented with — and we've had an opportunity to review the briefing in that case, your Honor, as well as the complaint — the plaintiff in that complaint alleged three operative provisions: 450, 740, and a third one, each

O7ICrooO

one of which Judge Cote lays out in her motion to dismiss opinion. But nowhere did we find in any of the briefing, including any issue where this came up most starkly on the *Daubert* motion phase. Judge Cote was busy with five different opinions in that case. That appears at 2021 WL 2935027. If the Court bears with me just for one moment.

THE COURT: That would be the July 11th opinion?

MR. KASNER: Yes, your Honor. There was a discussion where the party that had *Perrigo*, whose expert wanted to testify about 740 and the other side *Daubert*ed him, the shareholders *Daubert*ed him, and Judge Cote said, well, you never argued to me that 740 applied to the exclusion of 450. That's right in her opinion. Judge Cote then went on to point out, whether this is a distinction with a difference or not, your Honor, it was a distinction that Judge Cote drew upon that her case dealt with capital gains tax. 740, she says twice, once in her motion to dismiss opinion, second in the *Daubert* opinion, 740 deals with accounting for income tax. That's a distinction that she drew between her case and what we're here before your Honor as another basis why she said that 740 doesn't apply here, it's 450.

While we're on that subject, your Honor --

THE COURT: Let me also ask, towards the end of that opinion, Judge Cote mentioned that her conclusion there aligns with guidance from DWC and Deloitte. Is it your view that that

O7ICrooO

really is not on point here, that deals with capital gains taxes here, not income taxes?

MR. KASNER:  I think that's clear from her opinion, yes.

Your Honor, just while we're on the subject of Judge Cote's opinion in *Perrigo*, in her summary judgment opinion, which appears at 2021 WL 3005657, in the context of her talking about 450, which I do want to come back to, your Honor, just for the point that there are explicit provisions of 450 which Judge Cote did not mention, because, in her view, this was a capital gains issue that specifically say 450 does not apply to income tax accounting.  It references 740 in two separate places of 450.

In fact, your Honor, while I'm there, let me point out where those can be found and then I'll come back to Judge Cote's opinion in a moment.

Your Honor, that can be found in 450-20-15-2, which says, "The following transactions are excluded from the scope of this subtopic because they are addressed elsewhere in the codification," and then you go down to 450-20-15-2C, and it says, "uncertainty in income taxes, which is discussed in section 740-10-25."

Then, your Honor, when I sit down, I will find the other place here and make the Court aware of that, but there was another provision of 740 which says the exact same thing.

O7ICrooO

And significantly, your Honor, in 740-10-55-217, there is an example, No. 30, disclosure relating to uncertainty in income taxes.  Similar to what was in FIN48 that we talked about before your Honor, the example that they point to, the accounting literature points to in 740, not 450, but 740 relates to a dispute between a company and the IRS involving transfer pricing, differences of opinion, how that is accounted for, what that does to your unrecognized tax benefit in the aggregate, not requiring a standalone disclosure like 450 might require and as Judge Cote concluded that it did.

One other point I wanted to make, your Honor, in her summary judgment opinion, on page 5 of the Westlaw version, Judge Cote, at *6, references the hypothetical about how you account under a 450 standard for litigation, a litigation claim.  Your Honor will note that the language that Judge Cote was relying upon was the language that was amended by FIN48 that I handed up to the Court.  So she didn't rely upon, and it's not even clear -- and believe me, I've had enough matters in front of Judge Cote, she's a very hardworking, very good jurist.  I suspect that this was put in front of her by one of the litigants without telling her the significance of the fact that the example that has to do with litigation only results from an amendment that took place many years earlier when FIN48 was enacted, which struck three or four references to tax matters and where the Financial Accounting Standards Board in

O7ICrooO

multiple replaces, that I haven't pointed out for the record, indicated that FIN48 has replaced FAS5 when it comes to accounting for income tax contingencies.

THE COURT:  Just looking at FAS5, though, why isn't a reading that this language clarified and maybe broadens what's covered to include not just income tax matters, but just used more generally rather than exclude income tax matters?

MR. KASNER:  Where are you reading from, your Honor?

THE COURT:  When an income tax matter is crossed out and instead a dispute with another party.

MR. KASNER:  Oh, okay.

THE COURT:  -- take out income tax as opposed to include it would broaden the scope.

MR. KASNER:  Your Honor, if it pleases the Court, may I hand up to you a clean copy of FIN48 to answer your question?

THE COURT:  Sure.

MR. KASNER:  Evan, I assume you have it?

MR. KAUFMAN:  Which exhibit?

MR. KASNER:  AA.  It's 48.

Your Honor, may I approach?

THE COURT:  Yes.

MR. KASNER:  Apologies.  We don't have a stapler, but we do have a clip.

And so, your Honor, as I mentioned before, this is FIN48, which removed accounting for uncertainty and income

O7ICrooO

taxes from FAS5 and is the genesis of paragraph 39 to which you were referring.

If your Honor goes to page 48-26 in appendix C, and then, your Honor, you'll see that this addresses the impact of FIN48 and the impact hence of 740 on FAS5 and, in the future, 450.

If you turn to the next page, your Honor, 48-27, you'll see in paragraph 39, that's the language that I gave to the Court blown up.  If you look at the footnote before that, and admittedly that footnote relates to paragraph 2, but C2 on the top says, "Statement 5 is amended as follows:"  Statement 5 is FASB5, which is now 450.  Added text is underlined and deleted text is struck out.

Look at the footnote, your Honor.  If it pleases the Court, footnote 1A makes clear that because FASB interpretation No. 48 — that's what we're talking about here, accounting for uncertainty in income taxes — provides guidance for accounting for uncertainty in income taxes, this statement, meaning FAS5, no longer applies to income taxes.  If there was any doubt, your Honor, that that was the import of that stricken language, if you turn to C3, it says the same thing.  The language that's stricken is of FASB5-type language.  The language there is FIN48 language.

So, if there was any doubt, your Honor, but then, as I mentioned, when you look at 740, it's quite clear, as I pointed

O7ICrooO

out before, that that 450 does not apply here, 740 applies.

THE COURT:  And this statement here refers to statement 5?

MR. KASNER:  That's correct, your Honor, which is the genesis of the language that I handed up and is repeated down below in FIN48-27.  It says that C2, statement 5, is amended as follows, et cetera.

Your Honor, I was planning on covering in some detail Ernst & Young's opinions.  Given the amount of time I've already taken, those are in the record, would your Honor prefer that I proceed?

THE COURT:  Those go mainly to *scienter*, I take it?

MR. KASNER:  Yes.

THE COURT:  I was hoping you were maybe going to get to this, but discuss the contingent liability disclosures in the 10Q for the first quarter of 2021, for example, essentially the language referring to each of the matters described in this filing in which we could incur a liability, in particular, why the reference thereto in this filing does not apply to the entire 10Q, and if it does, why was the amount of damages is not quantifiable at that point?  Let me pull this up on my computer, as well.  I believe the 10Q that I'm referring to, and it may be in multiple ones, but exhibit P to Ms. Woan's declaration, 42-16.  It's 220, I believe.

MR. KASNER:  Your Honor, I will pull that up, but that

O7ICrooO

same -- I'm sorry.  Your Honor's question is -- apologies.

THE COURT:  This is essentially the argument plaintiff makes in pages 19 to 21 of their opposition brief.  I believe your brief, in part, faults them for having an ellipse.

But what I'm trying to understand is maybe a couple of questions initially.  I'm looking at the third paragraph of 12, contingencies and commitments and the second sentence starting with, "Nature of the matters described."  This begins with, "In each of the matters described in this filing."  So my first question is whether you agree that this filing refers to the entire 10Q or something different?

MR. KASNER:  No.  I would agree with that, your Honor.

THE COURT:  That's the first thing I don't understand, why this filing isn't referring to the entire 10Q, given that obviously in this 10Q the NOPAs and RARs were described elsewhere.  If it does refer to this 10Q, it would seem like this would be a quantifiable amount.

MR. KASNER:  Your Honor, the thing is it is listed elsewhere in the Q.  That is discussed elsewhere in the Q.  So that was the issue on which we took issue with the argument of counsel, because there's a specific section dealing with income taxes in note 4 and that is where the discussion of that appears.

Your Honor, obviously, Ernst & Young saw this disclosure and specifically signed off on that.

O7ICrooO

I would also refer the Court to exhibit H, which is the June 30, 2021 10Q.  And your Honor will note, perhaps the language is made a little bit more clear than it was in that, your Honor, that if you take a look at page 25 of exhibit H, you will see — and that's in the contingency section — at the very bottom, it makes reference to the dispute with the IRS. It's explicit there, your Honor.

If you go to note 4 for income taxes, that's the language, your Honor, that lays out in chapter and verse what we've discussed not only in terms of the cautionary language and the risk warnings, but specifically with respect to the amounts that the IRS is claiming at various times in the notice of deficiency for the two periods.

If, your Honor, for example, were to look again at the 12/31/20 10K, the issue here is one of intent to defraud of knowingly accounting for something in a manner that is incorrect.  Ernst & Young has a discussion of the unrecognized tax benefits section, page F3, and also makes that point quite clear as to which footnotes in the financial statements relate to transfer pricing and taxes.

And, your Honor, obviously I know I'm beating a proverbial dead horse, footnote 13 and note 19 are 450 contingency disclosures, if you look at the balance of what's in there.  Those are distinct from what's in the 1 and 6, as I mentioned, and as it appears, for example, in exhibit H.

O7ICrooO

And also, your Honor, just to say it, as of this point, there has been disclosure made, at least with respect to the amount that the government is seeking with respect to the 2010 to 2012 time period in note 4.

THE COURT:  I'm sorry.  There are so many filings here that I'm not sure I'm following which one you're referring to as note 4.

MR. KASNER:  Yes, your Honor.  This is exhibit H, for example.

THE COURT:  I'm looking at exhibit P right now.  So the Q1, 2021.  Maybe I'm just not asking the question clearly, which probably is the case, but the sentence here that says, "in each of the matters described in this filing."

MR. KASNER:  Yes.

THE COURT:  "This filing" would seem to be the 10Q, because that's the filing that's referred to here and that's what this is contained in.

MR. KASNER:  Yes.

THE COURT:  In that 10Q elsewhere, there is a discussion of the IRS audit, and I believe the note that was an RAR.  So those are described.  The sentence reads:  "In each of the matters described in this filing."

MR. KASNER:  Your Honor, I apologize.  I'm looking at footnote 12 in that document.  I just don't see the language.

THE COURT:  It's on page 20 of that document.

O7ICrooO

MR. KASNER:  Yes.

THE COURT:  Third paragraph.

MR. KASNER:  Yes.

THE COURT:  Second sentence.  "Each of the matters described in this filing, our opponents seek an award of a not yet quantified amount of damages."  Wasn't the amount of damages quantified?

MR. KASNER:  Your Honor, that proves the point.  That proves the point.  That is imprecise language because the disclosure with respect to the tax dispute appears in a different footnote.  The import of that is this footnote.  Your Honor, if your Honor can take a look at, please, exhibit P, footnote 3 on page 42-16, your Honor will see that under "income taxes," not under "contingency," there is a discussion in there about the status of the audit --

THE COURT:  I'm on page 42-16 now.

MR. KASNER:  And it's page 11 of 55, your Honor.

THE COURT:  You're referring to where?

MR. KASNER:  Well, the entirety of it.  But if you look at the top of, "One or more of our legal entities file income tax returns..." et cetera, that's the exact same disclosure that appears in every footnote as relevant here, and it does not appear in the contingency footnote to which your Honor referred in footnote 12.

Not having been the person that drafted the

O7ICrooO

disclosure, your Honor, I can't say for certain, but I would suspect the intent -- it's proven by the language.  The disclosure doesn't appear there, it appears in "income taxes." Your Honor can see that the discussion in there has to do with the RARs and et cetera at this point, and that the administrative appeals procedure had ended and the company anticipates receiving a notice of deficiency, and then they're going to have to file suit.

That's why I think, your Honor, what becomes relevant to the question that you're asking and what the intent was of the company is, if you look at exhibit H, which is the 10Q for the period ending June 30, perhaps this was crafted, I wouldn't say with a little more care, but does have a slightly different disclosure because by this point, your Honor, as of the time of the document that you were referring to, exhibit P, there had not been a litigation filed yet.  By the time you get to exhibit H, for example, which is the next 10Q, you will see that the page 28 of 235, under "U.S. tax litigation," lists Amgen v. IRS Commissioner.  Then it says see note 4, "Income taxes for discussion of the dispute in the company's petition."  There had not been a litigation as of that point, your Honor, but, nevertheless, the disclosure in the income tax footnote in exhibit P that appears in footnote 3 is the same as appears over and over again, updated as necessary under "income taxes."

O7ICrooO

THE COURT:  I'm wondering, as a response to the arguments the plaintiff is making, for example, on page 19 of their brief, which says because the IRS provided the upper limit of Amgen's liability in the NOPAs and RAR, the defendants have no credible argument that will be mal-sought by the IRS had not been quantified or the company cannot estimate a range of possible loss.  These 10Qs don't seem to quantify the amount or estimate the loss.

MR. KASNER:  Precisely.  However, the position we're taking is under 740, what we were required to do is make a judgment as to whether or not it was more likely than not that we would realize a tax benefit, and then if there was a piece, if it was over 50 percent, but it was less than 100 percent certainty, the value of that spread -- so we made a judgment, as we disclosed time, after time, after time, our tax experts, our auditors, they hired experts.  What do we think about our position?  And if, in good faith — and there's no accusation that we did anything here in bad faith — if, in good faith -- and there's no allegation that it wasn't in good faith.  The judgment is we still feel very comfortable, which is exactly what we disclosed in a narrative, then we were not obliged under 740 to say anything.  If this were a 450 disclosure, as FAS5, then yes, there may have been an argument that you should have considered other things, but there is no suggestion here, your Honor, that we didn't comply with 740.  There's nothing,

O7ICrooO

no facts alleged.  That's not only -- and then when you look at what we do disclose, as soon as we find out the number from the government, we put that out in our next statement.

Before we received the notice of deficiency, we didn't know what the government was going to say.  We said the appeals process had been exhausted, we had expected to get a notice of deficiency, we got it, we sued.  The next SEC filing, we disclosed the fact that we sued, we got the notice of deficiency, and this is the number, and not with respect to 2010, 2011, and 2012.  We did the same thing with respect to 2013, 2014, and 2015 once things had advanced to that point.

THE COURT:  I guess I'm looking at this as separate from a 740 issue.

MR. KASNER:  You can't, your Honor, with all due respect.

THE COURT:  What about under the standard, once a company chooses to speak, it has an obligation to speak --

(Indiscernible crosstalk)

MR. KASNER:  Okay.  If we're not in the world of -- if you assume for the moment, arguendo, that 740 applied, these are really two different analyses, your Honor.  I unfortunately haven't gotten an opportunity to talk about why there was no claim for just a free-floating duty to disclose.

You also have to consider the *scienter* point here, as well, your Honor.  So even if, arguendo, you conclude you

O7ICrooO

should have said something, which I will submit we didn't have to, then you have to say in light of everything in the record and the complaint, where is the evidence alleged to satisfy the *Tellabs* standard that someone knowingly approved an accounting disclosure that didn't comply.  In other words, if you're sitting there and your auditors are telling you you don't have to put this number out, 740 doesn't require it, even if that is incorrect, as a matter of pleading and as a matter of law in this circuit, that's not enough.  And again, I commend your Honor to Judge Gardephe's opinion in *Iconix*, which gets into a whole discussion about that.

But back to your point about why we didn't put a number out.  Just, if you are accepting the premise that when we got the notice of deficiency that we knew what the upper limit was because we put disclosure out immediately thereafter, if it's the administrative appeals process, we were still taking an appeal, your Honor.  We had good-faith ability to pursue an appeal in the hopes that, through that appellate process like we had done year-in, year-out in the past until the government started taking a more aggressive view, that we didn't have a disclosure obligation because all we were required to do was to embed the judgment about the transfer pricing issue in our aggregate unrecognized tax benefit disclosure.  That's what the accounting literature required.

So, once we got -- we said, we expect to get a notice

O7ICrooO

of deficiency.  We got it, we sued, and we put disclosure out.  If we were doing something nefarious here, your Honor, we would have buried the number.  Why did we disclose the number at all if we were trying to hide it from the public?  The inference has to be from a *Tellabs* perspective and from a disclosure perspective.  There wasn't an obligation to disclose the number.  Again, I would commend your Honor to the UBS case from the Second Circuit, which basically says the same thing that I'm saying in terms of disclosure.

THE COURT:  You may be right that there was not an obligation to disclose the number, you may be right as to your analysis of 740, and you also may have arguments as to *scienter* here for sure.  What I'm really fixing on is once the company decided to make this statement, and the sentence I keep on quoting, once the company decided to speak in this manner, was the sentence the whole truth?  In each of the matters described in this filing, our opponents seek an award of a not yet quantified amount of damages.  Each of them have described in the filing include the NOPAs and the RARs, and it seems like the IRS had a quantified amount in those two documents.

So I'm putting aside whether there was a duty to say this, there may not have been, but once you said this, was this statement accurate?

MR. KASNER:  Your Honor, this was FAS5 required disclosure, this is 450 required disclosure.  So if the

O7ICrooO

language was imprecise in using the term in this filing, and it should have said in this footnote, that becomes apparent, your Honor, I would submit, when you look at the filing -- first of all, the discussion in this filing -- because you have to view the documents holistically, your Honor. The circuit has been clear on that. You can't view this in a vacuum. So shareholders had the information with respect to the income taxes in note 4. So it was in the document.

Now, if this language was imprecise, because this is 450 language, contingencies and commitments. Contingency disclosure is 450. So if this was somewhat inartful into this filing -- there's no discussion in here, your Honor, at all, in this section at all about the tax dispute. That appears somewhere else.

But with respect, I believe you would be exalting form over substance to conclude that even though that document -- the disclosure appears elsewhere in this document, why didn't you put it under here? And even if it had been under here, under 740, we were not obliged to disclose the number.

THE COURT: All right. Thank you.

I know you've touched upon it throughout at different points, but is there anything further you want to address on *scienter*?

MR. KASNER: Your Honor, I think in the interest of time, I think it's all laid out in our papers.

O7ICrooO

The one thing that I would say is the motive and opportunity here we address in our papers.  What the Second Circuit has said in *Calman* is that where motive and opportunity doesn't exist, the information supporting conscious disregard is heightened.

Let me paraphrase from the Court's decision in *Calman* where they concluded that the allegations of *scienter* were insufficient.  This appears at 264 F.3d 144.  Because this case does not present facts indicating a clear duty to disclose, plaintiff's *scienter* allegations do not provide strong evidence of conscious misbehavior or recklessness.  Again, Judge Gardephe goes through this issue in the *Iconix* case, as well.

And just very briefly, for the record, in his situation, Judge, the matter before him involved accounting for joint ventures where there were two restatements.  That hasn't happened here.  Even in that circumstance, what Judge Gardephe said is there is no recklessness because, A, the accounting judgments, like here, were publicly disclosed in the company's filings; B, the company received clean audits for three years, the accounting firm BDO assessed the accounting principles used by the company, reviewed its financials for material misstatements and concluded that the company's financial statements present fairly in all material respects, the financial position of the company in conformity with gap.  He noted there were no internal documents or confidential

O7ICrooO

witnesses coming forward to shed light on defendants' knowledge, which is here.

And I would note, a little bit of a detour, I would note that even though my friends on the plaintiffs' side indicated in the first page of their complaint that they have based their allegations on interviews with witnesses, there's nobody that says that senior management at Amgen was aware that the accounting that was being done or the disclosures that were being made were not conforming with applicable law. There's no suggestion of that whatsoever.

Then, what Judge Gardephe says is, taken together the company's public disclosures of its accounting practices and BDO's clean audits undermine any inference of *scienter*, the allegations support a more cogent and compelling inference of non-fraud. And I think, your Honor, if you were to apply those here, those factors, the result would be the same. And just to say it, although I am by no means retreating from our position on the disclosure point, obviously, in the absence of *scienter*, this case cannot proceed, and particularized allegations of *scienter*.

I would also note, your Honor, given everything that we've talked about at some length, a passage, and maybe I'll close with that, unless the Court has any other questions.

I did not, by the way, address Judge Schneider's opinion's in *Silver Wheaton*, which was the other case. All I

O7ICrooO

will say is in that case, your Honor, Judge Schneider -- two things.  Number one, with respect to the 740 discussion, there were well pled — in his view — factual allegations to support the idea that there was no daylight between the parent and the subsidiary; therefore, based on allegations of well pled facts, that the parent dominated the subsidiary, based on confidential witnesses, he concluded that 740 would not have allowed transfer pricing, at least on the pleading stage.  He also went on to say, your Honor, that if 740 doesn't apply, FAS5 would apply.

Now, by then, FIN48 had long since amended FAS5. Judge Schneider was relying upon FAS5 decisions predating that. He also applied the international financial standards because they were a Canadian company, the language of which for contingencies is the same as FAS5.

So we think, for all of those reasons, those are very different facts than there are here.

I would close, your Honor, with what you said in your decision in *In re Garrett*.  And to quote, "These allegations encounter an immediate motive problem.  Why would the Garrett defendants promise the market that Garrett would continue to innovate and remain a cutting-edge company if they knew the company was doomed to failure because it was nearly impossible for Garrett to survive as an independent company."  With all respect, your Honor, obviously the words are different, but the

O7ICrooO

concept is the same.  Amgen made robust disclosure here.  When the number was put in an NOD and there was a litigation, they didn't sit on it, they put it out.  They had audited financials on very complicated judgments.  There are no allegations of particularized facts here at all that would warrant a conclusion that they knew that they were doing something that didn't comport with disclosure obligations.  The far more compelling inference is the defendants believed and continued to believe, as they've disclosed, that Amgen's transfer pricing judgments were correct and had no intention of misleading anyone.

And I thank your Honor very, very much for your time.

THE COURT:  Thank you for answering all my questions in that very thorough argument.

We've gone on for a long time and I want to give everyone a break.  We'll take about a 10-minute break, if that's okay with everyone, and resume with the conference.

(Recess)

Mr. Kaufman, whenever you're ready.

MR. KAUFMAN:  I have in my outline "good morning," but now it's afternoon.  So, good morning.

THE COURT:  For the simpler cases, that could be done.

MR. KAUFMAN:  Evan Kaufman on behalf of lead plaintiff, Asbestos Workers Philadelphia Pension Fund and the post class.

O7ICrooO

Defendants focus heavily on the accounting claim and the different rules of gap which apply, and I will address that issue shortly.

But, the Court does not even need to get into those issues in order to sustain the complaint. As Judge Koeltl held in the opinion *Wang v. Cloopen Group*, which we cite in our brief at 661 F. Supp. 3d 208. *Cloopen Group*, in that case, one of the issues was whether the value of warrants -- that the initial value of a warrant should be disclosed. And in the opposition brief for the plaintiffs, they raised that they asserted a potential gap violation. Judge Koeltl, because it was not alleged in the complaint, refused to consider the gap violation of argument, but still, regardless, still sustained the complaint based on a duty to disclose fully complete information.

By first day of the class period, the IRS had already informed Amgen it was seeking approximately $10.7 billion in back taxes and penalties for the 2010 to 2015 tax years. Contrary to how defendants describe it, this was a massive amount of potential liabilities for Amgen relative to its financial condition. For example, the amount was 132 to 139 percent of Amgen's cash and cash equivalence. So that means that if -- had Amgen been required to pay that amount, it would have wiped out all of its cash and would have had to raise debt just to satisfy its obligation. It also would have wiped out

O7ICrooO

more than one and a half years worth of net income on the company.  So, clearly, this was a very, very large amount and material amount for investors.  Defendants, in their brief, they don't dispute that we alleged materiality.  So, from our perspective, it appears defense has conceded that point.

During the class period, defendants made statements about the dispute with the IRS.  They disclosed that the IRS was focusing on transfer pricing, and the IRS was seeking back taxes for the 2010 to tax years, but they failed to disclose the magnitude or scope of the amount.  Once defendants spoke about Amgen's dispute with the IRS and its potential liabilities, defendants were on a duty to disclose full and complete information about the scope and magnitude of those potential liabilities.

Instead of providing full and complete information and disclosing these material facts, defendants held back critical information which would have enabled investors to comprehend the massive scope of the potential liabilities.  As the Supreme Court pointed out in the recent *Macquarie v. Moab Partners* decision, and I'm quoting, "Half truths are representations that state the truth only so far as it goes while omitting critical qualifying information."  That's at page 5 in the slip op opinion.  According to Webster's dictionary, the first definition of "qualifying" means to reduce from a general to a particular or restricted forum.

O7ICrooO

The Supreme Court also wrote in *Macquarie v. Moab*, "Literal accuracy is not enough, an issuer must as well desist from misleading investors by saying one thing and holding back another."  Then they provided an example, which I think encapsulates this case very well.  In other words, the difference between a pure omission and a half truth is a difference between a child not telling his parents he ate a whole cake and telling them he had dessert.  Rule 10b-5 requires disclosure of information necessary to ensure that statements already made are clear and complete, i.e., that the dessert was in fact a whole cake.  Here, defendants made half-truth disclosures about the IRS dispute and magnitude of potential liability using words, significant, may be material.  But they omitted facts which rendered the statements they made misleading.

THE COURT:  Haven't courts found such disclosures to be sufficiently robust not to violate Rule 10b-5?  I mean, here, the disclosure noted that the proposed adjustments were significant, were substantial, they could have material impact on the financial statements.  Aren't those the type of disclosures that were found to be sufficient?

MR. KAUFMAN:  Potentially could be.  The defendants haven't cited any cases directly on point.  We have.  We cited several cases which are almost identical to this case in which the complaints were sustained.

O7ICrooO

Here, you have to look at what was disclosed about the significance and maybe material, but also what was also disclosed such as every time Amgen or the individual defendants discussed the IRS dispute, they minimized it.  They talked about how it had no merit, how they were going to, you know, they disagreed, how their existing reserves were adequate to cover it.

First of all, as we allege in the complaint, an analyst retained an expert at the end of the class period and determined that Amgen had not reserved any reserves for these contingent liabilities, which is consistent with their statements that they believe it had no merit because they would have had to reserve or preserve for it because it would have to be a probable -- it would have to meet the probable test.  So they didn't reserve an amount for it.  So based on their statements that their reserves were enough, it created the impression for a reasonable investor that the amount was less than $3 billion and that you're nowhere even close to over $10.7 billion.

If you look at the stock price, what happens after these disclosures, after each disclosure -- the first disclosure, when they disclosed the 3.$6 billion liability or contingent liability, Amgen's stock declined.  The only reason it declined, defendants do not dispute loss causation, was because of the disclosure of this contingent liability.  And

O7ICrooO

then analysts for that first disclosure were asking questions specifically about how to quantify the remaining amount.  The defendant cites that the question -- they refuse to answer it. They talked about how they thought they were going to win the overall tax dispute.  And then the way they describe it is using the same significant term that they used the original time, even though just for the 2013 to '15 time period, the amount was billions of dollars more than the $3.6 billion from the original time period.  So they're describing the same terms.  So investors did not have an understanding of the true magnitude of the potential liabilities.

In the *Elan* case, the Second Circuit, the Second Circuit in *Elan*, which is 706 F.3d 145, even statements which literary truths is acceptable to quite another interpretation may be considered a material misrepresentation.  So, from the perspective of a reasonable investor looking at all of Amgen's disclosures, could their disclosures have been susceptible to an interpretation that the amount was much less than $10.7 billion, and the answer is yes.  When you look at just the word "material," typically 5 percent of net income is considered material.  Here, it was more than a year and a half worth of -- put simply, defendants' statements were misleading to investors and failed to reveal that the potential liabilities were even close to more than $10 billion.

Defendants made an argument in their papers, which I

O7ICrooO

didn't hear today, that an omission has to be inconsistent with the partial disclosure.  They cite the *Allergan* case for that, but that case does not support that proposition.  We weren't able to find any reference of consistent or inconsistent to the disclosure, but rather, as *Allergan* stated in its opinion, the test is not whether representation of material is inconsistent, but whether there is a sufficiently close nexus between the statements and the omitted facts.  Here, there really can't be a dispute that there is a sufficiently close nexus between the disclosure of the scope magnitude of $10.7 billion and the company's other disclosures regarding their dispute and the potential liability to the IRS.

Also referring back to the *Wang v. Cloopen* case with Judge Koeltl, he considered a similar issue where the company disclosed the existence of a liability associated with warrants, and they made statement concerning a steady increase in warrant liabilities, but they didn't disclose fair value of the warrant.  And Judge Koeltl held that they were under a duty to disclose the original fair value because it was information necessary for investors to understand the scope of the potential liability.

And he also wrote, because of the omission, "investors were left in the dark about the magnitude of the liability." So here, even though defendants made disclosures, investors were still in the dark about the magnitude of the potential

O7ICrooO

exposure.

Before I get to the gap claim, I also wanted to touch upon the affirmative misstatements in the contingency section that your Honor was asking questions about. I didn't really hear any type of explanation as to how those statements were not misleading because it was in the contingent liability section. It expressly stated that amounts could not be quantified, even though at that time the IRS had already informed Amgen of the amount that they were seeking. So that is a false statement, as well.

THE COURT: But is it reasonable to read the phrase in this filing to keep everything in the 10Q under that phrase? I mean, isn't that way too broad of a reading?

MR. KAUFMAN: Well, it's what it says. It says, in this filing. And it also, in the filing, there are disclosures about the dispute with the IRS, but they failed to quantify the amount. In the earlier disclosures where they were talking about before the first disclosure of $3.6 billion, they talk about how they'd be significant and they'd be material, but in the contingency section where our allegation is these were contingencies and contingent liability, in this filing, it refers to all the discussions in the filing. So I don't think it's too broad. I think you have to incorporate the other sections into that, as well, because that's what the document says.

O7ICrooO

THE COURT:  Is it material, given the other disclosures in the document?

MR. KAUFMAN:  Is it material?

THE COURT:  Yes.

MR. KAUFMAN:  Well, it's material because it says -- when you read the sections together, they made disclosures about the dispute with the IRS, they didn't quantify how much it would be.  They used vague terms such as "significant" or "could be substantial."  And then another section where they're talking about potential liabilities, they say in this filing, which necessarily refers to things outside of that section where they're just reinforcing that they can't be quantified.  So there's nothing to indicate in the filing that it could be quantified.

With respect to the gap.  Plaintiff plausibly alleges that Amgen violated ASC 450.  At the motion to dismiss stage, what the Court needs to look at is whether the facts, as alleged, drawing off -- taking the allegations as true, drawing more reasonable inferences in favor of the plaintiffs, as the plaintiffs alleged, a plausible claim that ASC 450 applies and that defendants violated their disclosure obligations under ASC 450.  From that perspective, plaintiffs have.

THE COURT:  But that's a legal question, though, isn't it, as to whether 450 applies or not?

MR. KAUFMAN:  The plaintiff alleges that, as an

O7ICrooO

allegation, that defendants were required to ASC 450, that has to be accepted as true.  Then we lay out what's required under ASC 450.  We set forth the allegations that ASC 450 defines a loss contingency as an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss to an entity that will ultimately be resolved when one more future events occur or fail to occur.  And that loss contingency includes potential liabilities arising from pending or threatened litigation — which this involves — or separately possible claims or assessments.  So the IRS audit, the fact that the IRS had told, at the end of the audit, Amgen this is the amount that we're seeking from you, that created at that time a contingent liability.

Defendants bring up the concept of what's a final number and talk about the NOD as opposed to the NOPA -- I mean RAR.  And that's a complete strawman argument that has no bearing whatsoever on ASC 450.  ASC 450 is not disclosed, does not reference a final number.

As to by the nature of what a contingency is, a loss contingency is an estimate and it's an uncertainty, it's not a final number.  As Judge Cote recognized in the *Perrigo* opinion, it doesn't matter if the number may change a little bit.  As long as there was more than a slight chance that the company would need to pay that money, there was a requirement under ASC 450 that they had to disclose an estimate of that amount.

O7ICrooO

And if the estimate could be estimated, there was a requirement, and that's what the complaint alleges and that's what -- and as a result, the complaint should be sustained on that basis.

THE COURT:  Obviously, I know you're not saying this, but you can't just allege in the complaint that any standard applies and then say they didn't meet that standard, you have to look at the facts alleged and see if in fact that standard applies here, which is what I think I need to do with ASC 450 versus ASC 740.

MR. KAUFMAN:  Your Honor, I don't actually think you need to go that far.  All you need to look at is what does ASC 450 require, have we sufficiently alleged facts to raise a plausible inference that defendants have violated 450.  And when you look at the facts that we've alleged, that the IRS reviewed and analyzed the documentation, they have hundreds of document requests, they audited Amgen for years, they went back and forth with Amgen about what the potential amount would be.  They gave Amgen the opportunity to argue and try to get the amounts reduced, and by the time of the RARs, they had already toured their Puerto Rican facilities.  By the time they received the RARs, that was a number that had been signed off officially by the IRS.  Lawyers had reviewed it and the audit was complete, as we allege in the complaint.  We allege what an entire audit process is.  It would be the end of the audit

O7ICrooO

process.  Based on that, at that time, Amgen was in a position to know that it was -- there was more than a slight chance that they would be responsible for that amount.

Now, defendants, in response to that, they don't even attempt to say they complied with 450 because they don't have an argument that they did.  It's clear that they did not comply with 450.  What they do is they argue that in a different accounting provision that was not even alleged in the complaint, that applies and 450 doesn't apply.  That argument fails on several reasons.

First, this is a completely inappropriate factual argument at the motion to dismiss stage.  Defendants will have the opportunity to raise this later in the litigation with the benefit of expert reports.  We're lawyers making legal arguments and the Court now is being asked to look at interpretations of edits to accounting rules to determine what was the thinking behind why something was changed or wasn't changed.  So that's clearly a factual issue that's inappropriate at this stage.  And there's no basis, based on the allegation in the complaint, to consider defendants' ASC 740 argument at this time.  All that needs to be done is plaintiffs --

THE COURT:  Is it your view that I cannot look at the history of ASC 450 and ASC 740 to try to understand their meaning?

O7ICrooO

MR. KAUFMAN:  Our position is that it's a highly technical accounting issue that defendants are raising at the motion to dismiss stage that is the subject of experts to testify about what, you know, accountants and CPAs are the ones that implement these rules.  These aren't legal issues, these are factual accounting issues and issues that are subject to experts.

THE COURT:  Maybe with respect to whether a company complied with these, that would be something subject to experts, but here there seems to be no dispute that Amgen's disclosures did comply with 740 and did not comply with 450.  So the question is really whether 740, or 740 and 450, apply here.  Why is that not appropriate at the motion to dismiss stage?

MR. KAUFMAN:  It's a highly technical argument that's really the subject of experts.  Defendants, they can make that argument, but if you just look at the complaint itself, the question is whether, based on the facts alleged, having alleged that 450 applies, you have to look at just the facts, and based on those facts, have we sufficiently alleged or raised a plausible inference that defendants violated that rule.

And now, this is really a defense, what defendants are raising.  They're saying, no, 450 doesn't apply and these are the reasons why 450 doesn't apply.  They're providing different accounting rules, saying that 740 and not 450 applies, even

O7ICrooO

though it was the position, as we explained in our papers, they both could apply because they relate to two separate things.

Judge Cote actually heard this issue.  Now defendants, they're very careful in how they describe Judge Cote's opinions because, yes, Judge Cote did not consider the 450 verses 740 issue at the motion to dismiss because the defendants hadn't raised it, but she certainly addressed that issue in the litigation at the *Daubert* stage, the summary judgment stage, and then, at the motion for reconsideration of summary judgment, adapted it.  After a full record and after competing expert reports on precisely the same issues that defendants are raising here, Judge Cote, after the benefit of all of that, excluded defendants' expert that was advocating for the application of 740 and expressly held that in a situation that was identical to what we have here, although this deals with transfer pricing and that dealt with the sale of an entity, that contingent liabilities are different from expenses, contingent liabilities are different from reporting income taxes, they're separate accounting provisions, and based on those expert reports, based on that full record, Judge Cote held that 450 applied.

And then defendants argue, well, you know, theirs didn't relate to income tax.  But, in *Perrigo* 5, which we cite in our papers, defendants actually raised that argument in their motion for reconsideration to Judge Cote and said that

O7ICrooO

because of income tax, 740 applies.  And I'll just read from the opinion.

Well, first, Judge Cote said notwithstanding that, her opinion stood.  To the extent that defendants point out any errors in the opinion's analysis, example, misconstruction of accounting firm guidance and confusion on a tax of capital with income tax at a capital gains rate; failure to acknowledge that ASC 740 applies as well as to previously filed tax returns, the reported errors exist at the margin of the analysis.  The core analysis contained in the opinions remain valid.  Once the audit findings letter was issued — that's the equivalent of the RAR — Perrigo's disclosure of its contingent liability was governed by the standard set out in ASC 450.  The exception within ASC 450 for "uncertainty in income taxes" does not apply to disclosure of contingent liabilities and does not direct a disclosing party to ASC 740.  Thus, the defendants have not succeeded in showing that ASC 740, rather ASC 450 governs Perrigo's disclosure obligations in the form 10Q.

THE COURT:  Assuming Judge Cote wasn't presented with the argument that Mr. Kasner spent some time going through today, namely that I believe in 2006, the accounting for asserting an income tax was removed from the predecessor to ASC 450, which was FAS5, I guess, and necessarily was then incorporated into FAS or FIN48, which then later turned into ASC 740.  So I am curious to hear your response to that

O7ICrooO

argument and the various provisions of those predecessors that Mr. Kasner pointed to.

MR. KAUFMAN:  First, actually, the first time I read this blowup, I actually took the same impression that your Honor took, that why doesn't this broaden the amount?  And then, Judge Cote, though -- but defendants did raise the issue that 740 deals with the income taxes.  Judge Cote recognized, with the benefit of experts, that those are two separate things, that reporting income taxes for a financial state, what's going to impact the financial statements for the next 12 months is very different from potential contingent liabilities to a company.  And just because they both may deal with income taxes doesn't mean that the company doesn't have an obligation under both because investors clearly were not aware of the magnitude of the liabilities to Amgen from the IRS's view based on anything that was disclosed pursuant to 740.  And 740 only deals with this UTB, and Amgen didn't report anything for it.  So there was no disclosure in 740 about this contingent liability.

So, basically, what Amgen is saying, what their argument is, ASC 740 applies, but they didn't disclose anything related to it.  So what they're saying is there's no disclosure at all required to advise investors that Amgen could be exposed to this massive potential liability.

THE COURT:  In terms of the predecessor provisions

O7ICrooO

that Mr. Kasner pointed to, understanding that to dispute what to pick from them, you do not dispute that I can consider the taxes that FAS5 and FASB48 can take judicial notice of that, do you?

MR. KAUFMAN:  You can take notice of the existence, but not any type of interpretation from it or the truth of the matter asserted, like based on something that was removed. That's really something, you need depositions for that or you need experts for that.  I don't know if you could just take a lawyer's opinion on eliminating language from a rule to draw an inference, something that's this complicated.

THE COURT:  How is that different from looking at legislation in this statute, for example?

MR. KAUFMAN:  I'm sorry?

THE COURT:  How would that be different than looking at legislation history for a statute and looking at how a statute has changed?

MR. KAUFMAN:  Well, that would deal with the law, a legal issue, where these are accounting issues.

Basically, what defendants are asking your Honor to do at the motion to dismiss stage is to rule, as a matter of law, that Judge Cote got it wrong after summary judgment, even though she considered a full record and competing expert reports, and that the court in *Silver Wheaton* also got it wrong when they held that the plaintiffs plausibly alleged a claim

O7ICrooO

under 450.  And we just don't think it's the proper time to even reach a conclusion on that and the Court doesn't need to.

With respect to *scienter* --

THE COURT:  Can I just ask how your view of the interplay of ASC 450 and 740 might play out?  And this is more to clarify my mind.  You seem to argue that when the IRS takes an audit and the audit results in proposed adjustments, there was forming entities that must disclose the adjustments as a loss contingency under ASC 450 and also comply with any obligations under ASC 740 to recognize a certain tax position. Under that view, wouldn't recognition be required under both 450 and 740 at the point when any audit-related loss becomes probable?  Once you get to that point, wouldn't your view trigger essentially dual recognition?

MR. KAUFMAN:  Well, our position is that they're really separate things.  740 applies to what could impact the financial statements over the next 12 months.  Here, as defendants even state in their SEC filings, they don't expect this to happen for years.  So, on the one hand, you have existing tax positions, and what they're looking at is tax positions they've taken and what could result in an impact to the financial statements over the next 12 months — that's for 740.  For 450, you have a potential contingent liability, it could be several years down the road, but it's contingent liability that the company is exposed to.  And investors, in

O7ICrooO

order for investors to fully appreciate the risk in investing in a company, they need to understand what potential liabilities are and that's why you have 450.

As we go through in our papers, that's why, from our perspective, they're separate things. Just because there may be some 740 requirements with respect to income taxes, that doesn't negate the fact that you have a requirement under 450. And as Judge Cote recognized, 740 deals with reporting something and 450 deals with the disclosure when there's more than a slight chance.

THE COURT: Thank you.

You were going to move on to *scienter*. I'm just trying to think about what you said. I guess that makes sense here. What if the investors have a loss within the next 12 months? In that scenario, would there need to be recognition under both provisions?

MR. KAUFMAN: If they had to report something under 740, from our perspective, they are separate requirements. They are separate requirements that serve different purposes and Amgen didn't disclose the full scope of liability. Also, Amgen didn't report anything for this contingent liability. It was zero that was reported specifically for this contingent liability.

Here, plaintiffs adequately alleged *scienter* based on recklessness alone. There's not even a need for a motive

O7ICrooO

allegations.

With respect to the pure duty to disclose complete information, we allege numerous facts establishing that by the first day of the class period, each of the defendants knew or recklessly disregarded that Amgen had a $10.7 billion contingent liability to the IRS.

As I stated previously, the IRS had extensively audited Amgen for years over transfer pricing, hundreds of information document requests, toured Amgen's Puerto Rico facilities, and interviewed dozens of Amgen employees. Senior Amgen executives were directly involved with the audit. We allege at paragraphs 59 to 62, Peter Price and John Cise were involved, and they're senior executives.  And also Amgen's outside counsel was retained for this matter.

During the audit, Amgen notified -- the IRS notified Amgen about its tax deficiencies and then Amgen sought and failed to convince the IRS to change its position.  This is all before they received the RARs.  Then, at the end of the audits, when the audits were closed, IRS said the NOPAs and the RARs to Amgen, which detailed the findings, informing Amgen it owed the $10.7 billion in back taxes and penalties.

And defendants' own statements show that they were aware of the details surrounding the audits and the amounts sought.  There were SEC filings, they described the audits in details, as defendants described throughout their briefs and

O7ICrooO

made robust disclosures about the IRS audits.  They acknowledge that there could be significant adjustments and it could have material impact to an inference they should have known or they knew what the amounts were by making statements like that.  And then, on conference calls, the individual defendants said they disagreed with the proposed adjustments.  Also, very compelling facts that they knew or should have known what those adjustments were.

With respect to the *scienter* specifically for the gap violation, this was not a small accounting violation.  First, if the Court draws the inference that plaintiffs have plausibly alleged that ASC 450 applies, the complaint also has raised a strong inference of *scienter* because transfer pricing was a major part of Amgen's business, even though Amgen was in the business of selling drugs and pharmaceutical products, this transfer pricing had a major impact on Amgen's financial results.

As we allege in the complaint, an analyst commented that the transfer pricing enabled Amgen to have one of the lowest tax rates in the entire industry and enabled them to report consistent earnings.  As a result, the CEO and the CFO, or the individual defendants, would have been aware or they should have been aware of something that could negatively impact the financial benefits of transfer pricing.

THE COURT:  For me to find *scienter* as to the gap

O7ICrooO

issue, wouldn't I have to find a clear duty to disclose here?

MR. KAUFMAN:  Yes, your Honor would need to find that plaintiffs have sufficiently alleged that the complaint states a plausible inference.

Your Honor, just going back to the 450 versus 740, you don't even need to find that 450 applies over 740, you don't need to find that to sustain the complaint.  All you need to find is that there's a plausible inference that 450 applies.  So you could still think in your mind that 740 should apply, but as long as you think it's plausible, as long as you think plaintiffs can present experts to testify and convince a trier of fact or convince you later in the case that 450 applies, then you should sustain the complaint based on that basis and you should draw the inference that 450 applies.

THE COURT:  Given the arguments as to why 740 would apply instead, and on top of that the guidance Amgen received from its accounting firm, how can I find that there was a clear duty to disclose here that Amgen and the individual defendants violated?

MR. KAUFMAN:  Defendants' primary argument in defense of their argument that they complied with the proper accounting regulations, that they keep citing to the clean audit things.

First, many courts, especially with respect to *scienter*, many courts have found that the *scienter* allegations were adequate, even when defendants obtained clean audited

O7ICrooO

opinions.  Some of the largest financial frauds in history had clean audit opinions.  The Enron fraud, Arthur Anderson issued a clean audit opinion to Enron, and we all know how that turned out, and it didn't turn out well for Arthur Anderson.

Second of all, this is also a factual issue, why they issued a clean audit opinion.  It's unclear at this stage what Amgen disclosed to EY about the tax dispute or whether EY ignored red flags or even knew that Amgen was violating gap.  In fact, there was a potential conflict of interest, potential conflict of interest between Ernst & Young and Amgen during the class period because at the same time that Ernst & Young was Amgen's auditor, wore a separate hat serving as a tax consultant to Amgen, and Amgen paid Ernst & Young millions of dollars for tax consulting services for "expatriate tax compliance and international tax compliance."  This information comes from Amgen's annual proxies and --

MR. KASNER:  Your Honor --

MR. KAUFMAN:  If your Honor would let me, I have excerpts from the annual --

THE COURT:  Let me hear from Mr. Kaufman.  I think I know what he's going to be saying, but go ahead.

MR. KASNER:  Actually, when I get up, there are things being said that have absolutely no basis in an allegation in the complaint, and I will address them all, but I do object and move to strike to the extent that counsel is inserting sheer

O7ICrooO

speculation, not bordered by Rule 11, about Ernst & Young having conflicts.  If that was an issue in this case, it was incumbent, your Honor, on him to put it in his complaint.  So I move to strike and I would object to any further matters like that.

THE COURT:  I do want to know where --

MR. KAUFMAN:  Your Honor, may I provide you with a handout that I prepared?  It's just excerpts of Amgen's annual proxy reports.

MR. KASNER:  I object to that.

MR. KAUFMAN:  This information comes directly from that.  The defendants are certainly aware of Amgen's proxy statements and the Court can take judicial notice of Amgen's SEC filings.

MR. KASNER:  Your Honor, that's nowhere pled in their complaint.  There isn't --

MR. KAUFMAN:  It's a response to defendants' argument.

THE COURT:  Hold on.

Mr. Kasner.

MR. KASNER:  May I finish, your Honor?

There's nothing in the complaint suggesting that Ernst & Young was compromised.  If they are introducing this document of which the Court may be able to take judicial notice for the purpose that it was disclosed, that doesn't mean that's true. This is classic sandbagging.  The PSLRA was enacted to prevent

O7ICrooO

this sort of behavior, your Honor.  So I would object.

THE COURT:  As to one of the points Mr. Kaufman just said, isn't that right, although, if this were a public filing, I could take journal notice of this filing, but it sounds like you're relying on the truth of something --

MR. KAUFMAN:  No, your Honor.  It's in support of my argument that this is an issue of fact that should not persuade your Honor at this time.  All this exhibit is, it's excerpts from Amgen's own annual proxy reports, which specify what they paid to EY.  We don't allege anything about the clean order opinion in the complaint because we don't think it has any relevance.  Defendants raise it in their -- they made arguments through throughout their reply brief.  This was a way to respond to that.  And it's something that is -- I mean, it just reinforces this is a factual argument that should not be given such great weight.  And defendants, they rely heavily on these clean audit opinions.  So I think it's very important for this to be submitted in connection with this argument that EY got paid for tax services, $2.5 million.

MR. KASNER:  Your Honor, I would object to him putting that into the record until your Honor has ruled.

THE COURT:  This was not alleged in the complaint. I'm not sure it would be relevant to my decision.  Though, I will not allow it at this point.  I will think about it.  If I do think it's appropriate, I'll ask you to submit it.

O7ICrooO

MR. KAUFMAN:  Thank you, your Honor.  We just think this reinforces our argument that it's a factual issue and that it shouldn't have a bearing on whether the complaint sufficiently alleges that defendants were required to comply with 450 and violated 450.

THE COURT:  You hit on before the contingent liability disclosures in the 10Q for the first quarter of 2021.  Can you address how *scienter* is alleged as to that, assuming that I find there to be a misstatement or omission in connection with the sentence that we've been focused in on, how there's *scienter* given the other disclosures in that report and the arguable reasonableness that defendants would have viewed that language as applying only to that particular note and not to the entire 10Q.

MR. KAUFMAN:  Well, first of all, like how defendants view that, you know, why it should be there, it should be in a different section — that's another factual argument defendants are raising, you know, why it was in a certain section.  And then when you look at where defendants actually eventually disclosed the dispute, they discuss the dispute with the IRS in that, in the contingency section after they disclose the $3.6 billion.

So, on the one hand, they're saying there's no requirement to disclose anything about this IRS dispute in the contingency section, but then once they make their disclosure

O7ICrooO

about the $3.6 billion and defendants make -- with respect to that, one side-point, the defendants make the argument that, oh, we disclosed everything we had to, we were full and fair and we even disclosed the full number, you know, at a later point.  The reason they disclosed that number at the later point was because they were going to be -- they're required to make it public, as we allege in the complaint, in connection with the tax filing in the U.S. tax court.  It's a requirement that you attach the NOD to the petition in the tax court.  As a result, they knew that the number was public anyway, so that's when they disclosed it.  But they still, when they made that disclosure, they discussed it specifically, even though they referred to another part of the SEC filing, they did list it under the contingency section.  So it's really like a conflicting argument also here.

So with respect to the *scienter*, there's several points.  One is they have a duty to disclose full, complete, and accurate information, putting aside even the gap part.  Regardless of whether it's made in a section that's required to comply with the accounting rules, they still have that same requirement under the federal securities laws to provide full and complete information.  So putting aside whether they violated any type of accounting rules, the requirement to be accurate and complete, and just based on that, they clearly knew they could quantify the amount.  They really can't dispute

O7ICrooO

that they did.

With respect to the accounting violation, I think you have to go back to whether plaintiffs have plausibly alleged a violation of 450.  And if you do reach that conclusion, plausibly alleged, not that 450 -- even that 750 -- okay.  If you reach the decision that at least we plausibly alleged that 450 applies, then that is sufficient to create a duty on behalf of the defendants and that they were recklessly not recognizing that duty.

You have the CEO and the CFO, both highly trained in accounting rules.  The CFO used to be a major partner in Ernst & Young, and the CEO used to be the CFO.  So they both, you can draw an inference that they were experts in the accounting regulations.  They knew they didn't disclose the contingent liability, they knew they didn't quantify contingent liability.  So, as a result, they were reckless in not disclosing those facts under ASC 450.

I just wanted to make one final point.  In *Perrigo*, Judge Cote determined that once the company received the notification from tax authorities the duty to disclose under ASC 450 was obvious.  As long as that, once again, that that rule, plaintiffs have plausibly alleged that claim, then the *scienter* necessarily follows.

Unless your Honor had any other questions, that's all I have.

O7ICrooO

THE COURT:  Just going back through my notes, but I think we covered everything.

Going back to my question about *scienter* for the contingent liability disclosure in the 10Q, is it your view that the same standard of clear duty would apply as to *scienter* there?

MR. KAUFMAN:  Yes.

THE COURT:  Thank you.

Mr. Kasner, I'll give you a few minutes to reply.

MR. KASNER:  Thank you, your Honor.

Before I get into the specifics, your Honor, just a couple of regrettable comments that I am forced to make there. There are a number of very irresponsible and serious assertions that have now been made about a major public company in this country and its senior executives that find no place in the pleading and no place in this courtroom.  I'd like to put on the record, if the Court please, because this is a public company whose securities are traded publicly and whose officers have reputations.  Counsel may believe there was a duty to have made a disclosure, but to suggest, for example, that the company did not take any reserve in this matter for the unearned tax benefit, which he said three or four times, is nowhere in the complaint, and I would urge the Court, if counsel thinks he has a good faith basis to allege that, let him put it in a complaint that pleads with specificity as

O7ICrooO

required by the PSLRA.

I would direct the Court, just because I would like this in the record as well, to exhibit G, document 42-7, page 102, which is part of the Ernst & Young audit opinion and critical audit matters for 2020.  Under "unrecognized tax benefits," where it says, "as discussed in notes 1 and 6 to the consolidated financial statements," not the contingency section, which we were talking about and your Honor has had a lot of questions about it and I will come back to.  So, readers of this knew transfer pricing and the tax issues appear in notes 1 and 6.  Again, the documents have to be read holistically.  Even if there was an error in the way that that portion of the document to which you pointed may have been phrased, the total context of the document, which I'll come to, makes clear that these are two separate things we would submit.

It goes on to say, "As of December 31st, 2020, the company accrued $3.4 billion of gross unrecognized tax benefits, including transfer pricing."  Elsewhere in the disclosure, there is language about the importance of the Puerto Rican company to Amgen as a whole.  So it was an absolutely outrageous comment for him to make with no basis whatsoever.  Senior lawyers from the company are sitting in the courtroom hearing this, your Honor.  We can do better than that in New York, we can and we do.  So I express absolute umbrage and I hope your Honor isn't offended at all by the fact that

O7ICrooO

I'm a little bit upset now, because it's extremely irresponsible and I don't think that the senior lawyers at his firm would have done something like that.

MR. KAUFMAN:  Your Honor, may I respond to this?

THE COURT:  Very briefly.

MR. KAUFMAN:  If you actually listen to what I said, I said that an analyst that was retained -- that an analyst retained an expert that looked at Amgen's amount and determined that Amgen had not reported anything for this dispute with the IRS.

MR. KASNER:  And, your Honor, he then later said that there were no reserves taken without qualification.

MR. KAUFMAN:  With respect to this particular dispute.

THE COURT:  I think the portion of the 10Q that Mr. Kasner cited that's on 42-7, page 102, speaks for itself. To the extent any clarification was needed, I'm not troubled by that.

MR. KASNER:  Thank you, your Honor.

With respect to the notion that an analyst at UBS who was involved with this somehow, I would note, your Honor, that the same analyst report to which counsel was referring indicated, because it's in the record, that Amgen's position at issue here is "backed by data and absolutely has a reasonable case."  That's at exhibit KK at 17-20.  We're not here to try that case now, Judge, but I just wanted to make the Court aware

O7ICrooO

of that.

We also heard, your Honor, about the fact that 740 governs one thing and 450 governs another thing, and ASC 740 governs recognition, but not disclosure. That's simply not so, your Honor. As we went through at great length, and my friend here did not take issue with basically anything I said other than trying to prevail upon your Honor that there's a plausibility standard that's at work here and all they need to do is allege that it's plausible that 450 applies — I'll come back to that in a minute — that is not the correct standard in a case under the Private Securities Litigation Reform Act. The standard here, as your Honor knows well from the numerous opinions that you've offered in this space since taking the bench, is it's a heightened pleading standard. The Rule 8(a) plausibility is not the applicable standard.

With respect, it is appropriate for you, as many, many other judges have done in addressing motions to dismiss, accounting violations is to look, does this apply or not. What counsel is saying to the Court is bury your head in the sand, I said 450 applies, that's good enough for me to go into discovery. As the Supreme Court recognized long ago when Justice Rehnquist wrote the *Blue Chip Stamps v. Manor Drug Stores* opinion, that's the game plan in these cases, get into discovery and then force a settlement because of the burdens of discovery, which is why the PSLRA, as your Honor knows,

O7ICrooO

requires some sort of a gatekeeping function here.

In addition, the idea that 740 and 450 don't apply simultaneously is simply incorrect.  We addressed this point in our brief at page 8, but just for the Court's benefit in the record, 450 expressly excludes uncertainties in income tax.  We didn't hear anything from counsel about that.  We went through it, he didn't dispute it.  Your Honor is able to make that judgment.

And speaking of accounting cases, your Honor, I also take umbrage at the suggestion that Amgen is in any way appropriate to say in the same breath as Enron.  I don't know what counsel thinks he's doing with that sort of irresponsible throwing things out.  This case is a dispute over good faith accounting judgments.  So I meant to mention that, as well. I'll now get off my soapbox for a moment, but really, it's just not appropriate, your Honor.

THE COURT:  Can you say a little bit more about why the question as to how to read ASC 450 and 740 is not something where expert testimony would be beneficial.

MR. KASNER:  The language is plain on its face.  The complaint concedes in paragraph 44 that the dispute with the IRS involves of a transfer pricing audit.  740 deals with transfer pricing.  That's something that your Honor can read from the text of 740.  Your Honor can also read from the text of 740 the section that's entitled "Disclosure."  So there's a

O7ICrooO

recognition piece to 740 and then there is a disclosure piece to 740. As I mentioned earlier, 740-10-55-217, which appears at document 42-25, at page 95, sets out an example about how someone like Amgen was obliged to disclose uncertainty in income taxes. Even Judge Cote agrees that this case is different in her view from a capital gains tax case. So, your Honor, the idea that you're going to need expert testimony to read what's on the plain text, it's undisputed what this says.

Now, I would never presume to suggest to your Honor that if you feel you need expert testimony, and that's fine, I respectfully disagree. Courts interpret -- this is no different than any other statute.

So I do think that for the reasons that I went through earlier, I won't repeat again, it is clear, it's clear from 450 as well as I mentioned that 450 twice says it doesn't apply to transfer pricing or to accounting for income taxes. Counsel didn't say a peep about that.

So, again, he's offering that you bury your head in the sand simply because they say 450 applies, that's good enough for me, we can start rummaging through Amgen's files because we all know that once that starts, there's enormous pressure on a multinational company to limit their legal spend on a case like this. We all know it. That's exactly what the game plan is here and I would respectfully request that your Honor does have that ability to determine this.

O7ICrooO

I would like to talk for a moment about your Honor's request with respect to the contingencies again. Your Honor, as I mentioned to the Court, this is in 42-16, the Q1/21 10Q, it is clear, we would submit, that this disclosure is about contingencies. This is not a contingency. If your Honor looks at the beginning, we describe in the first full paragraph, we describe in this footnote our legal proceedings and other matters, et cetera. Then it goes on in the next paragraph to talk about recording accruals for loss contingencies, then it goes on to talk about the 450 standard. That doesn't apply here. I realize that's a contested issue, your Honor, but with all due respect to my friend on the other side, the language of the various regulations and rules are clear.

Then, when you go to the next paragraph and it talks about in this filing, I would submit, your Honor, that a fair reading would mean in this footnote, because then it goes to "or note 19," and if the phraseology described in this filing was intended to mean everything, it wouldn't have to reference "or in note 19." So I would submit to your Honor that to the extent that you're trying to parse that language, a fairer reading is that that was in error when read in context.

THE COURT: Isn't "in note 19" referring to note 19 in a different filing, though, the annual report?

MR. KASNER: Yes.

THE COURT: So it's not referring to another note

O7ICrooO

within the same --

MR. KASNER:  It relates to contingencies, though, your Honor.  It doesn't relate to income taxes, which, as we've discussed, is a separate disclosure.

One point, your Honor, in terms of *scienter* or duty to disclose, you can assume that the reader of this knows what a NOPA is and knows what an ROR is.  As counsel argued to the Court moments ago, the ROR and the NOPA contain numbers.  So when Amgen, which we believe appropriately so, under the accounting literature, didn't disclose the number at that point because it was still fluid and also from a generalized duty to disclose we believe was supported by the case law, to which I referred the Court.

I also neglected to point out in our brief Judge Koeltl's decision in the AIG Bank of America case.  Very similar situation where there had been disclosure about a dispute in a circumstance, but there was no disclosure about the side effects of what AIG was seeking from Bank of America in the course of their negotiations with one another.

People who are on notice, Judge, the total mix of information disclosed under income taxes, what we were required to disclose, people, investors were aware that there were numbers that were included in a NOPA and an ROR, that we believe that the numbers that were being bandied about, if they were able to prove them, prove them up, could have a

O7ICrooO

significant material negative impact on our financial condition. We disclosed this, we pointed it out earlier, $3 billion in unrecognized tax benefits in our balance sheet as of that point in time.

So, again, to allow this case to go forward into discovery, in light of the record that exists with the total mix of information, looking at the document holistically, we believe is unwarranted under the law and also unwarranted under the *scienter* case law, which we've talked about at some length.

I agree with your Honor's question to counsel, and I would answer it that if, in terms of assessing *scienter*, the fact it was disclosed will be perhaps not in the contingency footnote, even though the contingency footnote uses the word "filing," this filing, when two paragraphs up it's talking about contingencies, we think is an immaterial difference given that the information is out there and holistically.

I think that a lot of time was spent on Judge Cote's decision in *Perrigo*. There was no dispute, though, from my friend that Judge Cote's reliance upon the portion of 450 that had the language X, the tax language that I pointed out to the Court from FIN48, is significant. That's why I think your Honor can look at that material and legislative history, for lack of a better word, to understand what 450 does and doesn't apply to, and what 740 applies and doesn't apply to.

The only last point that I would make, your Honor,

O7ICrooO

just to be clear, the question here is not whether, for *scienter* purposes, is, respectfully, not whether Amgen or the individuals were aware of the number, the legal issue presented is whether particularized facts have been alleged to give rise to a strong inference that the company and individuals knew that they needed to make a disclosure of that number sooner than they did.

If the evidence that has been put in the record at this point suggests that the strong inference is supported by non-culpable inferences, such as the fact that there were auditors all around, such as that there was robust disclosure that was made, the very types of points that the *Calman* case looked at and that Judge Gardephe in the *Iconix* case looked at, we submit that regardless of what your Honor may think about the disclosure point, there's an absence of *scienter* allegations here sufficient to warrant dismissal of the pleading.

With that, I thank you, your Honor.

MR. KAUFMAN:  Your Honor, may I be heard with a short response, because Mr. Kasner made some statements that are not accurate about me, so I just wanted to respond to that.

THE COURT:  Briefly, you may.

MR. KAUFMAN:  Defense counsel said there are no allegations in the complaint about what I said about the tax reserves.  I just want to read from paragraph 168 of the

O7ICrooO

complaint on page 50.  It's referring to that analyst, the UBS analyst report that I referred to when I was discussing this earlier.  It says, right now, Amgen has not allocated the IRS-assessed totals and tax reserves which aligns with their current position refuting the IRS's assessments.  Note, reserves are generally only allocated when the company believed there is less than a 50-percent chance of winning its case.  I just wanted to clear that up for the record.

And with respect to the issue of the contingency section, I think, clearly, these were contingencies, they were contingencies the entire time.  That is why when Amgen finally disclosed the $3.6 billion figure, they disclosed it in the contingency section.  Like, what miraculously changed all of a sudden, take it from not a contingency to a contingency?  It was a contingency the entire time from when they received the RAR and then forward.  Their argument is that, oh, we filed in tax court, but that doesn't go to whether it's contingency or not.

For a "what is contingency," you look at ASC 450. When you look at ASC 450, the same thing that caused it to be a contingency for purposes of a disclosure when they disclosed the figure were the same facts that were required to be disclosed before they disclosed the figure.  So the entire time it was contingency.  Amgen just failed to disclose it in that section until they were forced to reveal the number when they

O7ICrooO

filed in tax court.

Thank you, your Honor.

MR. KASNER:  Your Honor, I'm sorry --

MR. KAUFMAN:  Oh, one more thing.  I'm sorry.

THE COURT:  Go ahead.

MR. KAUFMAN:  I just implore your Honor to go back and reread each of the *Perrigo* opinions we cited because it is clear that Judge Cote addressed nearly every argument that defendants make in this case and rejected them, including the issue that 740 deals with income taxes, and because of that, 450 doesn't apply.

THE COURT:  But you do agree though — and I have the opinions in front of me — she was not presented with the argument regarding the predecessor versions of 450 and 740; right?  In particular, the edits to FIN48 and FAS5.

MR. KAUFMAN:  I don't recall seeing anything in the opinions discussing that.  However, having gone back and reread the briefing, it's possible that she has been.  But the clear fact was that on motion for consideration, when defendants try to raise new arguments, she said it doesn't matter, these are separate things.  Once you have a contingency, you're required to disclose it and that's it.

THE COURT:  Thank you.

MR. KASNER:  Your Honor, just one point, if I may.

THE COURT:  Yes.

O7ICrooO

MR. KASNER:  I believe counsel may have misspoken.  In exhibit H to Ms. Woan's declaration, which is document 42-8 at page 13, the disclosure about the notice of deficiency with respect to 2010, 2011, and 2012 is placed in the income tax section, financial footnote 4.

MR. KAUFMAN:  Your Honor, I didn't misspeak.  There was disclosure about the amount.  It was disclosure about the fact that there was a dispute and then it referred to the other note.

THE COURT:  That does indicate that --

MR. KASNER:  Your Honor, that's a cross-reference.

MR. KAUFMAN:  But they made the disclosure in that section.  So it's in that section.

MR. KASNER:  Your Honor -- well, I've made my arguments.

THE COURT:  We went very long.  Thank you, all.  Thank you for your excellent briefing and argument.  Thank you to the reporter for his patience, as well.  And Mr. Kasner's colleagues who have kept very busy, especially the gentleman behind him with my questions and providing documents.  So thank you.  Thank you, all.

I of course will take this under advisement.  I'll do my best to get an opinion out as soon as I can.

Thank you.

* * *

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300