UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
ROOFERS LOCAL NO. 149 PENSION FUND, *on                            :
behalf of itself and all others similarly situated*,               :
                                                                   :
                                     Plaintiff,                    :          23 Civ. 2138 (JPC)
                                                                   :
                    -v-                                             :          OPINION AND ORDER
                                                                   :
AMGEN INC., ROBERT A. BRADWAY, and PETER                           :
H. GRIFFITH,                                                        :
                                                                   :
                                     Defendants.                   :
                                                                   :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Through an accounting technique known as "transfer pricing," multinational corporations

can shift their profits to subsidiaries in low-tax jurisdictions, thereby lowering the consolidated

entity's overall tax bill.  Amgen, Inc. ("Amgen" or the "Company") used this technique to great

effect over the past decade, claiming a median effective tax rate of just 12.5% by allocating billions

of dollars in income to its Puerto Rico subsidiary.  And by achieving such a low tax rate, the

Company has been able to report higher earnings and consistently beat the market's expectations.

        Amgen's aggressive accounting practices, however, quickly attracted the attention of the

Internal Revenue Service ("IRS"), which conducted audits of the Company's 2010 to 2015 tax

returns.  After years-long examinations that involved hundreds of document requests, several tours

of the Company's Puerto Rico facilities, and dozens of employee interviews, the IRS determined

that Amgen had underpaid its taxes for those six years to the tune of approximately $8.7 billion

and owed an additional $2 billion in penalties.  Amgen made its dispute with IRS public but for

years kept the size of the liability it was facing—more than an entire year of its profits—a secret.

So when news finally broke that the IRS was seeking $10.7 billion in back taxes and penalties, plus interest, the Company's share price plummeted.

In this putative class action, Lead Plaintiff Asbestos Workers Pension Fund (the "Pension Fund") claims that, from July 29, 2020, through April 27, 2022 (the "Class Period"), Amgen and two of its high-level executives, Robert A. Bradway and Peter H. Griffith, misled investors about the extent of the potential tax liability the Company was facing in connection with its transfer-pricing dispute with the IRS. The Pension Fund alleges that while Defendants disclosed the existence of the IRS dispute and noted that the agency had proposed "significant adjustments," which "could have a material impact" on the Company's operations and cash flows, Defendants failed to inform investors about the true extent of the financial risk to the Company by hiding that the IRS was seeking to recover $10.7 billion. Through its Amended Complaint, the Pension Fund charges Defendants with violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. The Pension Fund also alleges that Bradway and Griffith, by virtue of their control over the Company, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants have moved to dismiss both counts, arguing that the Amended Complaint's allegations do not establish that Defendants made any actionable misstatements or omissions, or that they did so with the requisite mental state. The Court held oral argument on Defendants' motion on July 18, 2024. For the following reasons, the Court concludes that the Pension Fund has plausibly alleged that Defendants' failure to disclose the true extent of the liability they faced from the IRS dispute could have misled Amgen's investors, and that the Amended Complaint permits a strong inference that the omission of the Company's potential multi-billion-dollar

liability was reckless under the circumstances.  The Court therefore denies Defendants' motion to dismiss and orders them to answer the Pension Fund's allegations.

## I. Background

### A.    Facts[1]

"Amgen is an independent large biopharmaceutical company that discovers, develops, [manufactures], and markets medicines for grievous illnesses."  Am. Compl. ¶ 2.  Although headquartered in California, Amgen "claims to perform a substantial amount of its commercial manufacturing activities at its facility in Puerto Rico."  *Id.*  Bradway was Amgen's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period, as well as the Company's President since 2010.  *Id.* ¶ 18.  From 2010 to 2012, immediately before assuming the role of CEO, Bradway was Amgen's Chief Operating Officer, and from 2007 to 2010, he was an Executive Vice President and the Company's Chief Financial Officer ("CFO").  *Id.*  Griffith joined Amgen in 2019 as Executive Vice President of Finance and served as the Company's CFO during the Class Period.  *Id.* ¶ 19.  Prior to that, Griffith "was a partner at EY (formerly Ernst & Young)."  *Id.*

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 34 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint and other documents susceptible to judicial notice, including Amgen's legally required filings with the SEC.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that, on a motion to dismiss, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

"Prior to and during the Class Period, Amgen sought to reduce the amount of its U.S. income taxes by shifting income from the U.S. to Puerto Rico, which has a lower corporate income tax rate than the U.S., utilizing an accounting practice known as 'transfer pricing.'" *Id.* ¶ 3. Through transfer pricing, "companies attempt to shift tax liabilities to low-cost tax jurisdictions." *Id.* ¶ 32. The practice entails determining "the price one division in a company charges another division for goods and services provided," enabling "[m]ultinational corporations, such as Amgen . . . to allocate earnings among their subsidiary and affiliate companies that are part of the parent organization." *Id.* ¶ 33. From 2010 to 2015, when Puerto Rico had a comparatively low tax rate, "Amgen utilized transfer pricing to shift a substantial amount of its taxable income from the U.S. to Puerto Rico." *Id.* ¶ 32. Thus, "Amgen's use of transfer pricing enabled the consolidated entity to benefit from an extremely low effective tax rate, which dramatically increased the Company's net income prior to and during the Class Period." *Id.* ¶ 3.

An article published in *The Wall Street Journal* on August 1, 2022 reported that "Amgen has claimed one of the lowest tax rates in the pharmaceutical industry, reporting a median effective tax rate of just 12.5% over the past decade, compared with an 18% median rate across the 10 largest U.S. drug companies." *Id.* ¶ 36. The Company's "2013-15 tax years were especially aggressive with Amgen claiming an effective tax rate of just 3.5%, 7.6%, and 13%, respectively." *Id.* These practices did not go unnoticed by U.S. tax authorities. "Amgen's aggressive transfer pricing practices caused the [IRS] to conduct multiple in-depth examinations of its transfer pricing methodologies." *Id.* ¶ 4. The IRS focused on two periods: initially Amgen's 2010 to 2012 tax years, and then Amgen's 2013 to 2015 tax years. *Id.*

In 2013, the IRS commenced an "examination of Amgen's federal income tax returns for its 2010-11 tax years," and subsequently expanded the audit "to include . . . the 2012 tax year."

*Id.* ¶ 57.  In February 2017, Amgen disclosed in its Form 10-K[2] for the year ended December 31, 2016, that its "income tax returns are routinely audited by the tax authorities" in "the U.S. federal jurisdiction, various U.S. state jurisdictions and certain foreign jurisdictions," and that the Company was "currently under audit by the IRS for tax years ended December 31, 2010, 2011 and 2012."  Dkt. 42 ("Woan Decl."), Exh. D ("2016 Form 10-K") at 94; *accord id.* at 33 ("Our tax returns are routinely examined by tax authorities in the United States and other jurisdictions in which we do business, and a number of audits are currently underway.  Tax authorities are becoming more aggressive in their audits and are particularly focused on the allocations of income and expense among tax jurisdictions.").[3]  Roughly contemporaneously with this filing, "[b]etween January and March 2017, Amgen received NOPAs [*i.e.*, Notices of Proposed Adjustments] from the IRS for its 2010-12 tax years informing Amgen it owed [] approximately $3.6 billion in back taxes, plus interest."  Am. Compl. ¶ 65.  A NOPA "provides taxpayers with a summary of the audit adjustments proposed by the IRS."  *Id.* ¶ 84.  The adjustments proposed in the NOPAs "related primarily to the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities and allocated additional profits to the U.S."  *Id.* ¶ 65.

Next, on April 12, 2017, "Amgen received an RAR [*i.e.*, Revenue Agent Report] from the IRS" also for its 2010 to 2012 tax years, which contained "the proposed adjustments."  *Id.* ¶ 66.  An RAR "shows the changes the IRS has made to the income, credits, and deductions on the taxpayer's income tax return, as well as the income tax due, and penalties and interest."  *Id.* ¶ 85; *see* Woan Decl., Exh. S at 2 (IRS website page explaining: "Revenue Agent Reports (RARs)

---

[2] Form 10-K is a comprehensive financial report that public companies must file annually with the SEC.  *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

[3] Citations to pages in exhibits attached to the Woan Declaration refer to the pagination generated by the Electronic Case Filing system rather than the internal pagination of the documents, unless otherwise indicated.

should contain all the information necessary to ensure a clear understanding of the adjustments

and demonstrate how the tax liability was computed.").[4]   A company can challenge adjustments

proposed in NOPAs and RARs through the IRS's administrative appeals process and, if that fails,

by filing a petition in the United States Tax Court.   Am. Compl. ¶¶ 55-56.   The Pension Fund

alleges that the IRS's issuance of the NOPAs and the RAR for the 2010 to 2012 tax years meant

that

> there was a greater than slight chance that Amgen would be obligated to pay more
> than $3 billion in additional income taxes because the IRS does not issue a NOPA
> or RAR until it has concluded an extensive transfer pricing examination supported
> by a thorough analysis of the underlying facts of the matter, which includes the
> determinations of legal and economic experts assigned to the case.

*Id.* ¶ 91; *see also id.* ¶¶ 92-95 (describing the process that typically leads up to the issuance of a

NOPA and an RAR).   The Pension Fund also alleges that the IRS "periodically met with senior

Amgen officials to confirm all relevant facts developed during its examination" and that Amgen

---

[4] NOPAs and RARs "are generally accompanied by Form 886-A."   Am. Compl. ¶ 86.
According to the Amended Complaint, Form 886-A

> provides a detailed explanation of the audit adjustments and contains the following
> information:
>
>> [(a)] the case related facts, *e.g.*, the activity or non-activity the organization
>> or plan has engaged in or started;
>>
>> [(b)] the law, applicable code and regulation sections, and Rev. Rulings,
>> Revenue Procedures, etc., that supports the IRS's position;
>>
>> [(c)] the Government's position, which states why the application of the law
>> to the facts supports the conclusion reached by the examination team;
>>
>> [(d)] the taxpayer's position and authority the taxpayer is relying upon (as
>> opposed to the IRS's conclusions); and
>>
>> [(e)] the IRS's conclusion, setting forth the taxpayer's correct income tax
>> liability after consideration of all of the above.

*Id.*; *see also* Woan Decl., Exh. S at 2-3 (describing the format of Form 886-A).

was given an opportunity—that it took—to respond to and discuss the IRS's proposed adjustments prior to the NOPAs and the RAR being issued. *Id.* ¶ 98.[5]

Amgen first disclosed that it had received the NOPAs and the RAR for the 2010 to 2012 tax years in multiple places of its Form 10-Q[6] for the quarter ended on March 31, 2017, which was filed with the SEC on April 26, 2017, Am. Compl. ¶ 83.  Woan Decl., Exh. E ("Q1 2017 Form 10-Q") at 9-10, 33, 37.  Amgen made these disclosures in a note regarding "Income taxes" in the subsection labeled "Notes to Condensed Consolidated Financial Statements," *id.* at 9-10, in a section on "Income taxes" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations," *id.* at 33, and in a disclosure under "Risk Factors," *id.* at 37.  While Amgen did not indicate the amount of the proposed adjustments in that quarterly report, Amgen stated throughout the report that it "disagree[d] with the proposed adjustments and plan[ned] to initiate the administrative appeals process," and further that "[f]inal resolution of the IRS audit could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably."  *Id.* at 10; 33, 37; *accord* Am. Compl. ¶ 89.  Amgen further noted that it "believe[d its] income tax reserves [were] appropriately provided for all open tax years."  Q1 2017 Form 10-Q at 10, 33; *accord* Am. Compl. ¶ 89.

The Company's annual report for the fiscal year ended December 31, 2017 included similar language.  As it had done in the prior year's report, *see* 2016 Form 10-K at 33, Amgen stated that the Company faced a risk from tax authorities "becoming more aggressive in their audits" and

---

[5] On November 29, 2017, Amgen received a modified RAR for the 2010 to 2012 tax years, which "revised the IRS's calculation but continued to propose substantial adjustments."  Am. Compl. ¶ 66.

[6] Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of each of the first three quarters of the fiscal year. *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.308a.

being "particularly focused on the allocations of income and expenses among tax jurisdictions." Woan Decl., Exh. C ("2017 Form 10-K") at 35.  That 2017 annual report disclosed that the modified RAR for tax years 2010 to 2012 received on November 29, 2017, like the original RAR for those years, proposed "substantial adjustments," and noted that "[f]inal resolution of the IRS audit could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably." *Id.* at 35, 57, 99.  Amgen further explained that while it believed its accrual for income taxes was appropriate, "due to the complexity of the provision for income taxes, the ultimate resolution of any tax matters may result in payments greater or less than amounts accrued." *Id.*

The next significant event occurred around early 2018, when the IRS began auditing Amgen's 2013 to 2015 tax years. *See* Am. Compl. ¶ 57 ("On February 14, 2018, the IRS requested Amgen's documentation for Amgen's transfer pricing practices for its 2013-15 tax years and opened an audit into its 2013-15 tax years on or before that date.").  A little more than two years later, in April 2020, "Amgen received NOPAs proposing . . . adjustments for its 2013-15 tax years, informing Amgen it owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years." *Id.* ¶ 67.  The NOPAs once again focused on "the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities." *Id.*  Amgen disclosed its receipt of NOPAs for the 2013 to 2015 tax years in its Form 10-Q for the quarter ended March 31, 2020, but once again did not reveal the size of the proposed adjustments or penalties, explaining only that these were "similar to the [prior] proposed adjustments."  Woan Decl., Exh. T ("Q1 2020 Form 10-Q") at 11, 37.  In May 2020, "Amgen received an RAR for its

2013-15 tax years which included the proposed adjustments." Am. Compl. ¶ 68.[7] By this point, the IRS had "informed Amgen it was seeking approximately $10.7 billion in back taxes for its 2010-15 tax years and penalties for its 2013-15 tax years." *Id.*

On July 29, 2020, the start of the Class Period, Amgen filed a Form 10-Q with the SEC for the quarter ended June 30, 2020. *Id.* ¶ 101; Woan Decl., Exh. F ("Q2 2020 Form 10-Q"). This quarterly report disclosed Amgen's receipt of the new RAR for the 2013 to 2015 tax years, reiterated that Amgen had received NOPAs for those years and RARs for the 2010 to 2012 tax years, and stated that resolution of these matters "could have a material impact" on the Company's financial statements. Q2 2020 Form 10-Q at 14, 43. While Amgen once again characterized the proposed adjustments as "significant" or "substantial," the Company did not disclose specific information revealing the magnitude of the IRS's proposed adjustments. *Id.* In the "Income taxes" section of that report, Amgen stated:

> As previously disclosed, we received a[n RAR] from the [IRS] for the years 2010, 2011 and 2012. The RAR proposes to make significant adjustments that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. In November 2017, we received a modified RAR that revised the IRS's calculations but continued to propose substantial adjustments. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office, which currently has jurisdiction over the matter. If unable to reach resolution, we will vigorously contest the proposed adjustments through the judicial process. In addition, as previously reported, in April 2020, we received draft [NOPAs] and subsequently in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015, which are similar to the proposed adjustments for the years 2010, 2011 and 2012 that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. We disagree with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office. We are also currently under examination by a number of other state and foreign tax jurisdictions.

---

[7] In September 2020, Amgen "received a revised RAR which continued to propose substantial adjustments for its 2013-15 tax years." Am. Compl. ¶ 68.

> Final resolution of these complex matters is not likely within the next 12 months
> and could have a material impact on our condensed consolidated financial
> statements.  We believe our accrual for income tax liabilities is appropriate based
> on past experience, interpretations of tax law and judgments about potential actions
> by tax authorities; however, due to the complexity of the provision for income
> taxes, the ultimate resolution of any tax matters may result in payments
> substantially greater or less than amounts accrued.

*Id.* at 14.  These same disclosures were made again in that quarterly report under "Income taxes"

in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Id.* at 43; *accord* Am. Compl. ¶ 101.  These disclosures were then repeated "in all material

respects" in Amgen's Form 10-Q for the quarter ended September 30, 2020, its Form 10-K for the

year ended December 31, 2020, and in its Form 10-Q for the quarter ended March 31, 2021.  Am.

Compl. ¶¶ 105, 177, 184, 190; *accord* Woan Decl., Exh. U ("Q3 2020 Form 10-Q") at 13, 44;

Woan Decl., Exh. G ("2020 Form 10-K") at 43, 74, 80, 123;[8] Woan Decl., Exh. P ("Q1 2021 Form

10-Q") at 11, 35.  None of those filings, however, disclosed the full degree of the potential liability.

Am. Compl. ¶¶ 102-104, 106, 170, 178, 185, 191.

Like the Company's other quarterly reports, the report for the second quarter of 2020

included in "Notes to Condensed to Consolidated Financial Statements" a discussion of contingent

liabilities under the note, "Contingencies and commitments," and the subheader,

"Contingencies."[9]  That section did not explicitly mention the NOPAs, the RARs, or any dispute

with the IRS.  This disclosure began with the following:

> In the ordinary course of business, we are involved in various legal proceedings,
> government investigations and other matters that are complex in nature and have
> outcomes that are difficult to predict.  See our Annual Report on Form 10-K for the

---

[8] In Amgen's 2020 Form 10-K, this disclosure was made, in substance, under the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as in the report of Amgen's independent auditor.

[9] A Contingencies section also was located in Amgen's 2020 and 2021 Form 10-Ks in the report of Amgen's independent auditor under "Notes to Consolidated Financial Statements."  *See, e.g.*, 2020 Form 10-K at 147; Woan Decl., Exh. K ("2021 Form 10-K") at 144.

year ended December 31, 2019, Part I, Item 1A. Risk Factors-*Our business may be affected by litigation and government investigations.* We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; and in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020.

We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that has been accrued previously. Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. In each of the matters described in this filing; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. As a result, none of the matters described in this filing; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Q2 2020 Form 10-Q at 32; *accord* Am. Compl. ¶ 174. Following these paragraphs, Amgen listed

specific ongoing litigation. Q2 2020 Form 10-Q at 32-34. This Contingencies disclosure, along

with a list of ongoing litigation, was repeated in sum and substance in the report for the third

quarter of 2020, Q3 2020 Form 10-Q at 31-33; the 2020 annual report, 2020 Form 10-K at 147-

57; the report for the first quarter of 2021, Q1 2021 Form 10-Q at 23-24; the report for the second

quarter of 2021, Woan Decl., Exh. H ("Q2 2021 Form 10-Q") at 27-28; the report for the third

quarter of 2021, Woan Decl., Exh. I ("Q3 2021 Form 10-Q") at 30-32; and the 2021 annual report,

2021 Form 10-K at 144-51.

On February 9, 2021, Amgen filed its Form 10-K for the fiscal year ended December 31,

2020.  Am. Compl. ¶ 184.  That filing disclosed that the Company had "been unable to reach

resolution at the administrative appeals level" and that Amgen anticipated that it would receive a

Notice of Deficiency ("NOD") regarding its 2010 to 2012 tax years.  2020 Form 10-K at 43, 74,

80, 123; *accord* Am. Compl. ¶ 71.  This disclosure was repeated in the quarterly report for the first

quarter of 2021.  Q1 2021 Form 10-Q at 11, 35, 43.  An NOD "is, according to the IRS, a 'legal

determination that is presumptively correct'" and is comprised of "[a] letter explaining the purpose

of the notice, the amount of the deficiency, and the taxpayer's options[;] [a] waiver to allow the

taxpayer to agree to the additional tax liability[;] [a] statement showing how the deficiency was

computed[;] [and an] explanation of the adjustments."  Am. Compl. ¶ 108.  As expected, in May

2021, Amgen received an NOD, dated April 27, 2021, through which the IRS sought $3.6 billion

in back taxes, plus interest, from Amgen for the Company's 2010 to 2012 tax years.  *Id.* ¶ 72.[10]

Amgen disclosed its receipt of the NOD three months later when, "[a]fter the market closed

on August 3, 2021," *id.* ¶ 110, Amgen issued a press release with its financial results for the second

quarter of 2021 and announced that it had "filed a petition in the U.S. Tax Court to contest notices

of deficiencies received from the IRS during the quarter for 2010, 2011 and 2012."  Woan Decl.,

Exh. II at 17.  Amgen further explained in that release that the NODs sought to increase its "U.S.

taxable income by an amount that would result in additional federal tax of approximately $3.6

---

[10] In July 2021, Amgen received a duplicate NOD regarding the same tax years of 2010 to
2012.  Am. Compl. ¶ 72.

billion, plus interest." *Id.* This marked the first time Amgen revealed the amount of the tax adjustment the IRS was seeking for the 2010 to 2012 tax years. Am. Compl. ¶ 110. Following this disclosure, Amgen's "common stock declined $15.77 per share, or 6.5%, from $244.08 per share on August 3, 2021 to $228.31 per share on August 4, 2021, on very high trading volume." *Id.* ¶ 7; *accord id.* ¶ 111.

On August 3, 2021, Amgen also held a conference call with analysts to discuss the quarterly financial results announced in that day's press release, during which Griffith, as the Company's CFO, fielded questions about Amgen's tax liabilities. *Id.* ¶ 200. When asked if Amgen had run a calculation "to establish what an upper bound of liability for 2013 through" the time of the call would be, Griffith demurred, stating:

> Look, we filed a petition with the U.S. tax court, in this case, [which] could take
> several years to resolve. The IRS is also proposing significant adjustments to 2013
> to '15 related to the similar issues, as you know. We disagree — strongly disagree
> with the proposed adjustments. We're pursuing resolution with the IRS
> administrative appeals office on that. The IRS, as you noted, they're currently
> auditing years 2016 through '18. And so yes, we're sure they'll take the same
> position for the other periods under audit, and we believe that we have adequate
> reserves for that.

*Id.*

The day after the press release and analyst call, Amgen filed with the SEC its quarterly report for the quarter ended June 30, 2021. *Id.* ¶ 112; *see* Q2 2021 Form 10-Q. That report reiterated in multiple places information regarding the NOD, including the additional tax liability of $3.6 billion plus interest sought therein, and the petition Amgen filed in the Tax Court. Q2 2021 Form 10-Q at 13, 40-41, 49-50. Under "Income taxes" in "Notes to Condensed Consolidated Financial Statements," Amgen stated:

> In 2017, we received a[n RAR] and a modified RAR from the [IRS] for the years
> 2010, 2011 and 2012 proposing significant adjustments that primarily relate to the
> allocation of profits between certain of our entities in the United States and the U.S.
> territory of Puerto Rico. We disagreed with the proposed adjustments and

calculations and pursued a resolution with the IRS administrative appeals office. As previously reported, we were unable to reach resolution with the IRS appeals office. In July 2021, we filed a petition in the U.S. Tax Court to contest two duplicate [NODs] for 2010, 2011 and 2012 that we received in May and July 2021. The duplicate [NODs] seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest. Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings. In any event, we firmly believe that the IRS's positions in the Notices are without merit and we will vigorously contest the Notices through the judicial process.

In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office. We are currently under examination by the IRS for the years 2016, 2017 and 2018. We are also currently under examination by a number of other state and foreign tax jurisdictions.

Final resolution of these complex matters is not likely within the next 12 months. We believe our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements.

*Id.* at 13; *accord* Am. Compl. ¶ 114. These same disclosures also were made in this report under

"Income taxes" in "Management's Discussion and Analysis of Financial Condition and Results of

Operations," Q2 2021 Form 10-Q at 40-41, and in "Risks Related to Government Regulations and

Third-Party Policies," *id.* at 49-50.

Two days later, on August 6, 2021, Amgen "filed the prospectus for the issuance of

approximately $5 billion in notes." Am. Compl. ¶ 211; *accord id.* ¶ 141. The prospectus

incorporated by reference Amgen's Form 10-K for 2020 and Form 10-Qs for the first and second

quarters of 2021. *Id.* ¶ 141. On August 9, 2021, Amgen successfully "sold approximately $5

billion in notes pursuant to" the prospectus. *Id.* ¶ 142. Shortly after this offering, Bradway was

asked about Amgen's tax issues with the IRS at a healthcare conference.  *Id.* ¶ 212.  In response
to a question about his level of concern and his outlook on the matter, Bradway essentially
reiterated the Company's position in its SEC filings: "I think we've been very clear that we think
the [IRS's] position is without merit.  And it's as simple as that.  We think their position is without
merit.  And we think we've taken appropriate adequate reserves for the matter in question."  *Id.*

Amgen then filed two more reports with the SEC during the Class Period.  On November
3, 2021, the Company filed its report for the quarter ended September 30, 2021, *id.* ¶ 214, which
contained the same disclosures concerning the NOPAs and the RARs, the NODs, and the Tax
Court filing that were in the second quarter of 2021 report.  Q3 2021 Form 10-Q at 13, 42-43; *see
also id.* at 52 (similar).  Then, on February 16, 2022, Amgen filed its annual report for its fiscal
year ended December 31, 2021, Am. Compl. ¶ 221, which also contained those same disclosures.
2021 Form 10-K at 73, 79, 121-122; *see also id.* at 43 (similar).  The 2021 annual report also stated
that Amgen anticipated receiving an NOD for the 2013 to 2015 tax years and that it expected to
contest any such notice "through the judicial process."  *Id.* at 43, 73.

Amgen followed the 2021 Form 10-K with another debt offering.  "On or about February
18, 2022, Amgen filed with the SEC a prospectus" for the sale of additional debt, incorporating by
reference the 2021 Form 10-K.  Am. Compl. ¶ 143.  Four days later, "Amgen sold approximately
$4 billion in notes" pursuant to the prospectus.  *Id.* ¶ 144.  The Pension Fund alleges that Amgen's
creditworthiness would have been "negatively impacted" had it disclosed the proposed adjustment
amounts from the IRS prior to the debt offerings, such that Amgen would not have been able "to
raise funds on the terms as set forth in" the offerings.  *Id.* ¶ 146; *see also id.* ¶¶ 249-250.

After the market closed on April 27, 2022, the last day of the Class Period, "Amgen
announced its financial results for the first quarter of fiscal [year] 2022."  *Id.* ¶ 118.  In a press

release that accompanied the announcement, "the Company disclosed that on April 18, 2022, it received from the IRS a[n NOD] associated with the second NOPAs and second RAR for Amgen's 2013-2015 tax years." *Id.*; *accord* Woan Decl., Exh. B at 13.  The release further stated that the "[NOD] seeks to increase Amgen's U.S. taxable income for the 2013-2015 period by an amount that would result in additional federal tax of approximately $5.1 billion, plus interest" and that the "[NOD] proposes penalties of approximately $2 billion."  Woan Decl., Exh. B at 13.  Amgen expressed in the release that it "firmly believe[d] that the adjustments proposed by the IRS for the 2010-2015 period and the penalties proposed by the IRS for the 2013-2015 period are without merit," and described various reasons for that belief.  *Id.* at 13-14.

Following this disclosure, Amgen's "common stock declined $10.66 per share, or 4.3%, from $248.79 per share on April 27, 2022 to $238.13 per share on April 28, 2022, on very high trading volume."  Am. Compl. ¶ 8; *accord id.* ¶ 119.  The Company's stock price "continued to fall over the next several days as the market digested the news, reaching a low of just $227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022."  *Id.* ¶ 8.

## B.    Procedural History

Roofers Local No. 149 Pension Fund filed the original Complaint in this action on March 13, 2023.  Dkt. 1.  On July 7, 2023, the Court appointed the Asbestos Workers Pension Fund as Lead Plaintiff.  Dkt. 30.  On August 31, 2023, the Pension Fund, on behalf of itself and the class it seeks to represent, filed the operative Amended Complaint, bringing two counts.  Dkt. 34.  First, the Pension Fund alleges that Defendants made a variety of misleading statements in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R.

§ 240.10b-5.[11]   Am. Compl. ¶¶ 169-237, 263-272.   In essence, the Pension Fund argues that Amgen made material misstatements and omissions by failing to disclose the amount of the IRS's proposed adjustments.   Second, the Pension Fund alleges that by virtue of those alleged misstatements and omissions, and due to their control over Amgen, Bradway and Griffith violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Am. Compl. ¶¶ 273-278.

Defendants filed the instant motion to dismiss on November 6, 2023, Dkts. 40, 41 ("Motion"), 42.  The Pension Fund filed its opposition on January 12, 2024, Dkts. 44, 45, and Defendants replied on February 26, 2024, Dkts. 50, 51 ("Reply").  On April 15, 2024, Defendants filed a letter regarding the United States Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.,* 601 U.S. 257 (2024), Dkt. 54, and the Pension Fund responded the following day, Dkt. 56.  The Court held oral argument on Defendants' motion to dismiss on July 18, 2024.  *See* Minute Entry July 18, 2024.

## II.  Standards of Review

### A.    Federal Rule of Civil Procedure 12(b)(6)

Defendants have moved to dismiss the Pension Fund's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[11] While the Amended Complaint does not specify under which subsection of Rule 10b-5 it brings Count One, the Pension Fund's opposition brief argues only a liability theory based on material misstatements and omissions and does not advance any theory of an independent scheme to defraud, *see generally* Dkt. 44 ("Opposition").  *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) ("Unlike the better-known subsection (b), [subsections (a) and (c)] do not require the defendant to make a misstatement or omission; they require only deceptive conduct.").  At oral argument, the Pension Fund's counsel confirmed that it is not asserting any claim for scheme liability.  Dkt. 61 ("Tr.") at 3:12-13.

544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

These "[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the

complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541,

544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations,"

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## B.    Securities Fraud Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate

in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 provides,

in relevant part, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading . . . in connection with the purchase

or sale of any security."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule

10b-5(b), a plaintiff must plead "(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation

marks omitted).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under

Federal Rule of Civil Procedure 9(b).  *ATSI Commc'ns*, 493 F.3d at 99.  Accordingly, a plaintiff

alleging fraud under Section 10(b) and Rule 10b-5(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Conclusory allegations or allegations unsupported by factual assertions are insufficient. *ATSI Commc'ns*, 493 F.3d at 99.

Securities fraud claims under Section 10(b) must also satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

The Second Circuit also has cautioned that courts confronting securities fraud claims "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (internal quotation marks omitted). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313

(2d Cir. 2000).  Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

## III.  Discussion

### A.    Section 10(b) and Rule 10b-5

In Count One, the Pension Fund alleges that Defendants made material misstatements and omissions by failing to disclose the amounts of the IRS's proposed tax adjustments until Amgen filed petitions in the Tax Court and further that these misstatements and omissions were made with the requisite scienter.  *E.g.*, Am. Compl. ¶¶ 147, 169, 170(a)-(c), 177-178.  Defendants move to dismiss Count One on both falsity and scienter grounds.  Motion at 1-5.

#### 1.    Material Misstatements and Omissions

The Pension Fund identifies two categories of misstatements or omissions that it claims are actionable under Section 10(b) and Rule 10b-5.  First, the Pension Fund contends that Amgen's Class Period disclosures concerning the IRS transfer-pricing dispute were materially misleading because the Company failed to disclose that it was facing a potential liability of $10.7 billion in back taxes and penalties, plus interest on those taxes.  Opposition at 11-14.  Second, the Pension Fund argues that Amgen's statements in its Contingencies disclosures that the amounts sought by its opponents in the matters listed in those filings had not been quantified were affirmative misrepresentations given the proposed adjustment figures provided by the IRS.  *Id.* at 19-21.[12]

##### a.      Alleged Omissions

The Pension Fund's claim for omissions-based liability is that, while Defendants truthfully disclosed receiving the NOPAs and the RARs in their Class Period SEC filings, Defendants kept

---

[12] The Pension Fund's briefing does not address, or addresses only in the most cursory fashion, many additional theories of liability asserted in the Amended Complaint, and the Court therefore deems those issues forfeited or abandoned.

investors in the dark as to the full extent of the liability the Company was facing by hiding the fact that the IRS was seeking $10.7 billion in back taxes and penalties, plus interest. *Id.* at 11 (arguing that Defendants violated their duty to tell the "whole truth" by omitting the magnitude of the potential liability). The Pension Fund contends that Defendants had a duty to disclose the $10.7 billion figure under two independent theories. First, the Pension Fund asserts that the omission of the amount rendered Defendants' disclosure of the IRS dispute unclear, incomplete, and thus potentially misleading because it prevented reasonable investors from understanding the true nature of the risk Amgen was facing. *Id.* at 11-14. Second, the Pension Fund maintains that Defendants were obligated to disclose the amount of the proposed adjustments under Accounting Standards Codification 450, a Generally Accepted Accounting Principles standard addressing the recognition and disclosure of loss contingencies. *Id.* at 14-19; *see generally In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 582 (S.D.N.Y. 2020). Because the Court agrees that the Pension Fund has adequately pleaded that Defendants had a duty to disclose the $10.7 billion figure or otherwise inform investors as to the true extent of Amgen's potential liability under the first theory, it is not necessary to consider the second.[13] *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227 n.5 (S.D.N.Y. 2023).

In addition to proscribing affirmative misstatements, Section 10(b) and Rule 10b-5(b) make it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). So although the Supreme Court has long made clear that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17

---

[13] At oral argument, counsel for the Pension Fund confirmed that its two duty-to-disclose theories are alternative. Tr. at 52:4-15.

(1988), a person must supply relevant material information concerning a given subject when that person makes a statement that would otherwise "be inaccurate, incomplete, or misleading without further context," *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (internal quotation marks omitted); *see also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Thus, as the Supreme Court reaffirmed just this past term, Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp.*, 601 U.S. at 263; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts look at "context and manner of presentation." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted). The ultimate question, however, remains whether a "reasonable investor could have been [misled] to believe something in contradiction to the omitted facts." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011); *see also Macquarie Infrastructure Corp.*, 601 U.S. at 263 ("Disclosure is required under [Section 10(b) and Rule 10b-5] only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting *Siracusano*, 563 U.S. at 44)).

Defendants principally argue that their failure to tell investors that the IRS was seeking $10.7 billion could not have been misleading in light of Amgen's "timely, robust disclosures about

its dispute with the IRS and its impact on Amgen's financials." Motion at 10-11; *accord* Reply at 3-4. In its Form 10-K for the fiscal year ended December 31, 2016, for example, Amgen disclosed that it was "currently under audit by the IRS for tax years ended December 31, 2010, 2011 and 2012" and identified as a risk factor that "[t]ax authorities are becoming more aggressive in their audits and are particularly focused on the allocations of income and expense among tax jurisdictions." 2016 Form 10-K at 33, 94. Then, in its quarterly report for the first quarter of 2017, Amgen disclosed that it had received NOPAs and an RAR corresponding to tax years 2010 through 2012 and emphasized that those notices contained "significant proposed adjustments relate[d] primarily to the allocation of profits between certain of [the Company's] entities." Q1 2017 Form 10-Q at 9-10, 33. Amgen also warned investors that the IRS audit "could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably." *Id.* Amgen's SEC filings during and around the Class Period contained similar language, including with respect to its 2013 to 2015 tax years. *See, e.g.*, Q1 2020 Form 10-Q at 11, 37 (reiterating that the IRS was proposing "significant adjustments" relating to transfer pricing as to the 2010 to 2012 tax years and disclosing that the Company had received NOPAs for 2013 to 2015 that were "similar to the proposed adjustments" for 2010 to 2012); Q2 2020 Form 10-Q at 14, 43 (warning investors that the proposed adjustments were "significant," "substantial," "may result in payments substantially greater than amounts accrued," and "could have a material impact" on the Company's financial statements); 2020 Form 10-K at 43, 74, 80-81, 123 (similar).

The Court disagrees that these disclosures sufficiently informed investors as to the risks Amgen was facing from its transfer-pricing dispute with the IRS. The magnitude of the Company's potential liability to the IRS expressed in the NOPAs and RARs for the 2010 to 2015 tax years was enormous, even for a company the size of Amgen: $10.7 *billion* in back taxes and

penalties, with interest on the taxes due.  Am. Compl. ¶¶ 68, 170(c).  Put differently, as alleged, the IRS was seeking monetary relief from Amgen amounting to, for 2022, 139.4% of the Company's cash and cash equivalents, 290.6% of its stockholders' equity, 162.4% of its net income, 40.4% of the Company's revenue, and 16.3% of its assets.  *Id.* ¶ 137 (referring to Amgen's financials for fiscal year 2022).  Given the sheer size of the potential liability Amgen was facing, Defendants' vague characterizations of the amounts the IRS was seeking as "significant," "substantial," and potentially "material" rendered its disclosure of the tax dispute neither "clear" nor "complete."  *Macquarie Infrastructure Corp.*, 601 U.S. at 263.

To the contrary, "investors were left in the dark about the magnitude of that liability." *Wang*, 661 F. Supp. 3d at 226.  On an August 3, 2021 conference call, for example, Griffith referred to "a difference of opinion on the value of the significant risks" presented by the IRS dispute and emphasized the Company's "strong[] belie[f]" that the agency's position was "without merit," yet continued to describe the potential liability as merely "significant."  Am. Compl. ¶ 200.  But the Pension Fund plausibly pleads that milquetoast account of the risks involved—which could easily have referred to amounts far below Amgen's potential $10.7 billion liability—"did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks" relating to the IRS dispute and, when contrasted with the Company's repeated, forceful rejections of the agency's position, could have misled investors regarding the risks involved.  *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022) ("Having chosen to speak about their base of customers, Defendants had a duty to speak accurately, giving all material facts in addressing those issues to permit investors to evaluate the potential risks."), *vacated and remanded on other grounds by Macquarie Infrastructure Corp.*, 601 U.S. 257; *Meyer*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when

24

undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").  In other words, Defendants' omission of the $10.7 billion potential liability or other information from which investors could accurately assess the true nature of the IRS dispute concealed the extent of the risk the company was facing, making its use of vague qualifiers like "significant" and "substantial" plausibly misleading.  *See Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) ("Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." (internal quotation marks omitted, alteration in original)).

Indeed, Defendants' disclosure of the IRS dispute without revealing its true scope calls to mind the Supreme Court's example in *Macquarie* of a child telling his parents that he had "dessert" when in fact he had eaten the "whole cake"—and this Court does not believe that analogy would have come out differently had the child described his treat as merely "significant" or "substantial" instead.  *Macquarie Infrastructure Corp.*, 601 U.S. at 263.  It was therefore unsurprising that when the truth regarding the potential liability Amgen was facing finally emerged, the Company's share price declined appreciably and the analyst community noted the importance to investors of those alleged corrective disclosures.  *See* Am. Compl. ¶¶ 7-8 (alleging that the price of Amgen's common stock fell by 6.5% after the Company disclosed its $3.6 billion potential liability for tax years 2010 to 2012 and by 8.6% after it revealed the additional $7.1 billion potential liability for tax years 2013 to 2015); *id.* ¶ 162 (Jeffries analyst report stating that Amgen's disclosure of the additional potential liability for tax years 2013 to 2015 "certainly add[ed] noise to the story," observing that the IRS dispute had been "off the radar for most investors," and acknowledging the "lack of visibility" into the matter).  Drawing all reasonable inferences in the Pension Fund's favor, as the Court must on a motion to dismiss, the omission of information sufficient to quantify the

potential liability Amgen was facing could, under the circumstances alleged, plausibly have misled a reasonable investor regarding the financial risks facing the Company.

The cases Defendants rely on in their briefing do not support their contention that terms like "significant," "substantial," and "material" would have been enough to alert reasonable investors to the size of the potential $10.7 billion liability.  In one case Defendants rely on, *City of Pontiac*, the Second Circuit rejected the notion that a company being investigated by the Department of Justice for tax evasion was required to disclose, in addition to the existence of the investigation itself, that in fact the company was guilty of the alleged underlying offenses.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Explaining that "disclosure is not a rite of confession" whereby companies subject to an investigation must immediately capitulate to the government's position, the Second Circuit held that in those circumstances it was sufficient for the company to reveal the fact of the investigation and warn investors that it could be subject to "substantial monetary damages," among other relief. *Id.*  But nothing in this Court's Opinion suggests that Amgen was required to "confess" to having in fact underpaid its taxes.[14]  The Company was (and is) free to vigorously dispute the legal and factual merits of the IRS's assessments, and to tell investors that it is doing so; what it cannot do

_____

[14] As a result, to the extent that the Pension Fund seeks to hold Amgen separately liable for failing to "convey the likelihood that the IRS's determination will ultimately be affirmed in the Tax Court," Opposition at 13, that theory is rejected.  It may be that, as the Pension Fund foreshadows, Amgen will face an uphill battle in the Tax Court, but those challenges are still pending and the Company was therefore under no duty to preemptively concede to the supposed strength of the agency's position. *See City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 184.

consistent with Section 10(b) and Rule 10b-5, however, is present investors with an incomplete, unclear, and thus plausibly misleading picture of the financial risks posed by that dispute.[15]

Nor, as Defendants argue, does holding actionable Amgen's omission of the $10.7 billion figure conflict with the district court's reasoning in *In re N2K*. There, the district court held that a prospectus was not misleading where it warned investors that the company expected to incur "significant losses" despite the company's failure to contemporaneously disclose that it had suffered a net loss of $13.7 million in its then-current quarter. *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 205-06, 209-10 (S.D.N.Y. Jan. 31, 2000). Even setting aside the difference in magnitude between $13.7 million and $10.7 *billion*, in *In re N2K* the company had paired its general cautionary statements with "trends reflected by . . . graphical depictions" specifically disclosing that it had suffered net losses of $13.2 million and $5.4 million in its prior two quarters, so the $13.7 million net loss it subsequently disclosed could not have come as much of a surprise to the reasonable investor. *Id.* at 208-10 & n.7. Here, on the other hand, Amgen did not begin publishing any quantifiable information concerning the range of its potential liability to the IRS until well into the Class Period. Defendants' remaining cases are similarly inapposite.

---

[15] Defendants' reliance on *Banco Safra S.A.* is similarly misplaced. In that case, the plaintiffs alleged that a company's "Offering Memorandum" was misleading because it failed to disclose that the company and one of its executives, who were subject to claims and investigations for corruption, were in fact guilty of participating in a bid-rigging scheme. *See Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A.*, No. 16 Civ. 9997 (JMF), 2018 WL 1276847, at *1 (S.D.N.Y. Mar. 8, 2018). The court rejected that argument under the logic of *City of Pontiac* and held that the company's disclosures, which specifically warned about the possibility that it could be suspended from public bidding as a result of such corruption, were sufficient to educate investors about the nature of the risk. *Id.* at *3-4. Here, again, the defect in Amgen's disclosures is not that it failed to resign itself to the correctness of the IRS's allegations, but that its vague descriptions of the amount the IRS was seeking could plausibly have misled investors regarding the extreme magnitude of the potential liability.

While much of the parties' briefing appears to treat all of the Company's Class Period SEC filings as similarly situated for purposes of the Pension Fund's omissions theory, beginning with its Form 10-Q for the second quarter of 2021 Amgen's challenged disclosures included a statement that the IRS was specifically seeking $3.6 billion in back taxes and interest for its 2010 to 2012 tax years. *See, e.g.*, Q2 2021 Form 10-Q at 13, 40; Q3 2021 Form 10-Q at 13, 42; 2021 Form 10-K at 73, 79, 121.  Although these later filings continued to omit the size of the liability the Company was facing in connection with its 2013 to 2015 tax years, the inclusion of the $3.6 billion figure, in conjunction with Amgen's disclosures that its exposure for the later tax years was comparable to its exposure for the prior years, arguably suggests a different analysis.  Even if such an argument had been properly presented, however, the Court would not conclude that Amgen's disclosures in these later filings were sufficient to warrant dismissal.  To be sure, the $3.6 billion figure would have provided reasonable investors with at least some basis to estimate the possible exposure for the 2013 to 2015 tax years.  But in reality, the liability Amgen was facing in connection with the 2013 to 2015 tax years was almost *double* the amount the IRS was seeking in connection with the earlier three years, representing $7.1 billion in additional back taxes and penalties, plus interest on the taxes due.  Am. Compl. ¶ 63.  And far from accurately informing investors that the very worst was still to come, Amgen's filings downplayed the 2013 to 2015 amounts as "similar" to the 2010 to 2012 amounts and continued to refer to the additional $7.1 billion in potential loss as merely "significant."  *E.g.*, Q3 2021 Form 10-Q at 13.

For these reasons, the Pension Fund has adequately alleged that Defendants' Class Period disclosures regarding the IRS dispute were unclear, incomplete, and therefore plausibly misleading by virtue of omitting the fact that the liability Amgen faced was as high as $10.7 billion or otherwise disclosing facts sufficient to allow investors to assess the true extent of the risk.

b.          **Alleged Misstatements.**

As noted, the Pension Fund also proceeds on an affirmative misstatement theory.

Specifically, the Pension Fund alleges that Amgen's Class Period SEC filings contained material

misstatements regarding the status of the Company's transfer-pricing dispute with the IRS.

Opposition at 19.  As noted, each of the quarterly and annual reports that Amgen filed with the

SEC during the Class Period included a Note titled "Contingencies and commitments," found

under the report's "Notes to Condensed Consolidated Financial Statements."    Under

"Contingencies and commitments" was the subtitle, "Contingencies."    As an example, the

Contingencies section in Amgen's Form 10-Q for the second quarter of 2020, the first SEC filing

during the Class Period, included the following language:

> Our legal proceedings involve various aspects of our business and a variety of
> claims, some of which present novel factual allegations and/or unique legal
> theories. ***In each of the matters described in this filing***; in Note 19, Contingencies
> and commitments, to the consolidated financial statements in our Annual Report on
> Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies
> and commitments, to the condensed consolidated financial statements in our
> Quarterly Report on Form 10-Q for the period ended March 31, 2020, ***in which we***
> ***could incur a liability, our opponents seek an award of a not-yet-quantified***
> ***amount of damages or an amount that is not material.***  In addition, a number of
> the matters pending against us are at very early stages of the legal process, which
> in complex proceedings of the sort we face often extend for several years.  ***As a***
> ***result, none of the matters described in this filing***; in Note 19, Contingencies
> and commitments, to the consolidated financial statements in our Annual Report on
> Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies
> and commitments, to the condensed consolidated financial statements in our
> Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we
> could incur a liability, ***have progressed sufficiently through discovery and/or the***
> ***development of important factual information and legal issues to enable us to***
> ***estimate a range of possible loss***, if any, or such amounts are not material.  While
> it is not possible to accurately predict or determine the eventual outcomes of these
> matters, an adverse determination in one or more of these matters currently pending
> could have a material adverse effect on our consolidated results of operations,
> financial position or cash flows.

Q2 2020 Form 10-Q at 32 (emphasis added).  The Contingences section for the other Class Period

quarterly reports and annual reports contained similar language.  *See* Q3 2020 Form 10-Q at 31;

2020 Form 10-K at 147; Q1 2021 Form 10-Q at 23; Q2 2021 Form 10-Q at 27; Q3 2021 Form 10-Q at 30; 2021 Form 10-K at 144.  In the Pension Fund's view, Amgen's dispute with the IRS, which is indeed described in each of the relevant filings, is a "matter[] described in this filing" for which the IRS, through its NOPAs and RARs, had in fact sought a specific amount of back taxes and other relief.  Opposition at 19.  The Pension Fund therefore argues that the emphasized language in the above passage was materially false or misleading as applied to the IRS dispute because it stated that for "each of the matters described in this filing" Amgen's opponents sought "an award of a not-yet-quantified amount of damages," and that as a result the Company was unable to "estimate a range of possible loss" for those matters.  *Id.* at 19-20 (quoting Am. Compl. ¶¶ 174, 181, 195, 208) (emphasis removed).

To start, it is far from clear that, at least as to the filings prior to the Q2 2021 Form 10-Q, a reasonable investor would have understood this passage to be referring to the IRS dispute.  The Contingencies Note, where the challenged language in each filing resides, states at the outset that the purpose of the Note is to "describe [Amgen's] legal proceedings and other matters that are significant or that [the Company believes] could become significant *in this footnote*."  *E.g.*, Q2 2020 Form 10-Q at 32 (emphasis added).  Then, immediately after the challenged passage, the Note states that "[c]ertain recent developments concerning our legal proceedings and other matters are discussed below" before listing a host of pending civil litigations involving Amgen.  *Id.* at 32-34 (listing, for example, "*Genentech, Inc. v. Amgen Inc.*," "*Novartis Pharma AG v. Amgen Inc.*," and "*Humira® Biosimilar Antitrust Class Actions*").  With that context, it appears far more likely that a reasonable investor would have understood even the facially broad language, "matters described in this filing," to mean only the discrete list of "legal proceedings and other matters"

listed immediately after the quoted language in the Note itself, which list did not include the IRS dispute prior to the Q2 2021 Form 10-Q. *Id.*

But even reading "matters described in this filing" to include the IRS dispute not listed in the Note itself, the Pension Fund's argument that a reasonable investor could have understood Amgen to be saying that the IRS had not stated a quantified amount in the NOPAs and RARs is basically self-refuting. One of the defining characteristics of a NOPA—again, a Notice of Proposed Adjustment—is that it proposes an adjustment. *See* Am. Compl. ¶ 41 ("[A]ll IRS proposed adjustments are set forth on Form 5701, *Notice of Proposed Adjustment*, which is generally accompanied by Form 886-A, *Explanation of Items*. Form 5701 provides a summary of the proposed adjustments and Form 886-A provides a detailed explanation of the basis for each adjustment."). The same is essentially true of an RAR, which "shows the changes the IRS has made to the income, credits, and deductions on the taxpayer's income tax return, as well as the income tax due, and penalties and interest." *Id.* ¶ 43. Consistent with that reality, Amgen's descriptions of the NOPAs and RARs it received made clear that they sought a quantifiable amount of relief. *See, e.g.*, Q2 2020 Form 10-Q at 14 (disclosing that "[t]he RAR proposes to make significant adjustments"); *id.* (disclosing that the Company received a modified RAR that "revised the IRS's calculations but continued to propose substantial adjustments"); *id.* (stating that the Company "disagree[s] with the proposed adjustments and calculations"); *id.* (stating that the "proposed adjustments" the Company received for tax years 2013 to 2015 were similar to those it received for tax years 2010 to 2012).

Considering the full context of the relevant filings, no reasonable investor could thus have been left with the impression that the IRS was not seeking a quantifiable amount of relief through the NOPAs and RARs it sent to Amgen. *See Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471,

481 (S.D.N.Y. 2023) ("The test for whether a statement or omission is materially misleading . . . is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." (quoting *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)); *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) ("[Courts] pay particular attention to whether or not Defendants sufficiently disclosed facts and information that would render the alleged misrepresentations not misleading.").  And although, as previewed above, certain of Amgen's Class Period filings beginning with the Q2 2021 Form 10-Q did in fact list the IRS dispute as a matter to which the "not yet quantified" statement and similar language applied, those filings each expressly referred the reader to a separate portion of the filing containing more specific information regarding the dispute, which made clear both that the overall dispute involved quantifiable amounts and that the listed Tax Court matter in particular involved a claim for additional taxes of $3.6 billion.  *See, e.g.*, Q2 2021 Form 10-Q at 13, 28; 2021 Form 10-K at 121, 151.  So while the Court concludes that the Amended Complaint plausibly alleges that Amgen's disclosures failed to inform investors as to the true extent of the liability the Company was facing, it does not plausibly allege that Amgen made a material misstatement as to whether it was facing a quantifiable loss at all.

Accordingly, the Pension Fund has failed to adequately plead falsity on an affirmative misstatement theory based on the "not yet quantified" statement and similar language in Amgen's Class Period SEC filings.

### 2.    Scienter

Defendants also move to dismiss the Amended Complaint for failure to adequately allege scienter.  Motion at 26-30; Reply at 10-12.  Because the Court finds that the Pension Fund has

only pleaded falsity with respect to Defendants' failure to adequately inform investors regarding the extent of the liability it was facing in the IRS dispute, the Court limits its analysis of scienter to that theory.  For the following reasons, the Court concludes that the Pension Fund has sufficiently alleged that Defendants acted at least recklessly in withholding from investors the true scope of that potential liability, thereby satisfying their obligation to plead scienter.

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The Second Circuit has recognized two ways that a securities fraud plaintiff can plead a strong inference of scienter under the PSLRA, either "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (internal quotation marks omitted).  Whichever path the plaintiff takes, the "complaint will survive 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *Tellabs*, 551 U.S. at 324).

The Pension Fund primarily argues that the Amended Complaint has alleged a strong inference of scienter based on recklessness.  To prevail on a recklessness approach in the context of a case based on an omissions theory of falsity, a plaintiff in this Circuit must establish both that the defendant breached a "clear duty to disclose" the omitted facts and that the breach involved "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Setzer*, 968 F.3d at 213 (internal quotation

marks omitted); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (requiring allegations of "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence").

As an initial matter, the Amended Complaint adequately alleges that Defendants were aware of the full extent of the liability Amgen was potentially facing from the IRS dispute. By the time the Class Period began, the IRS had notified the Company that the agency was seeking "approximately $3.6 billion in back taxes for its 2010-12 tax years, at least approximately $5.1 billion in back taxes for its 2013-15 tax years, and approximately $2 billion in penalties for its 2013-15 tax years." Am. Compl. ¶ 63. Amgen's Class Period filings with the SEC, which repeatedly referred to the Company's receipt of NOPAs and RARs from the IRS, confirm that it was aware of the extent of the relief being sought by the agency. *See, e.g.*, Q2 2020 Form 10-Q at 14 (stating that Amgen received NOPAs and RARs for the 2010 to 2015 tax years that proposed adjustments to the Company's taxes). Many of those filings were signed by Bradway and/or Griffith, *see, e.g.*, Am. Compl. ¶ 176, both of whom also addressed the IRS disputes publicly, *id.* ¶¶ 200, 212, 214, 242, and Defendants do not appear to dispute that Bradway and Griffith were aware of the magnitude of the IRS's proposed adjustments and penalties.

The Court therefore agrees with the Pension Fund that it has plausibly alleged that, once Defendants chose to speak on the subject of the IRS dispute, their failure to adequately inform investors regarding the true extent of Amgen's potential liability violated a clear duty to disclose. That duty arises directly from Rule 10b-5, which "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp.*, 601 U.S. at 263; *accord* 17 C.F.R. § 240.10b-5(b). The Amended Complaint plausibly alleges that Defendants' omission of any indication as to the true scope of the tax-related liability Amgen was

facing prevented investors from being able to accurately assess the degree of the risk that the IRS's audits entailed.  And, as alleged, it should have been obvious to Defendants that withholding from investors any indication that the size of the potential liability was as high as $10.7 billion—more than a full year's net-income for the company and approximately 40% of its annual revenues— would make its disclosure of the IRS dispute unclear and incomplete.  *See In re Perrigo*, 435 F. Supp. 3d at 588 ("The magnitude of a loss remains a relevant factor in assessing scienter." (internal quotation marks omitted)); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96-97 (2d Cir. 2016) (similar); *cf. Denny v. Canaan Inc.*, No. 21 Civ. 3299 (JPC), 2023 WL 2647855, at *14 (S.D.N.Y. Mar. 27, 2023) (holding that the magnitude of the loss did not raise an inference of scienter where "there [was] no indication that Defendants had access to [the relevant] information at the time of the [challenged statements]").  Griffith, for example, was asked by analysts on the August 3, 2021 conference call to quantify the potential liability the Company was facing for its later tax years, clearly communicating to Defendants that the market considered that information important in assessing the financial risks posed by the audit.  *See* Am. Compl. ¶ 200 (asking Griffith whether Amgen had "establish[ed] what an upper bound of liability" would be).  Accordingly, the Court holds that the Amended Complaint plausibly alleges that Defendants were under a clear duty to disclose, whether by stating the specific amount sought by the IRS or disclosing other facts sufficient to inform investors as to the true extent of the liability the Company was facing.

The Court also agrees that the Pension Fund plausibly pleads that Defendants' failure to do so was reckless under the circumstances.  Despite Amgen's size, a potential tax liability of up to $10.7 billion was "plainly" material to the Company's financial health and therefore Defendants "had to know that revealing the full extent of [the potential liability] would have been troubling

news to its investors." *Setzer*, 968 F.3d at 215.[16]  Given the sheer size of the potential liability, investors were entitled to a greater degree of clarity once Defendants chose to speak on the matter. But, as alleged, instead of providing investors with candid information regarding the extent of the financial risks posed by the IRS dispute, Defendants hid the enormous liability Amgen was facing behind a wall of opaque adjectives like "significant" and "substantial."  As alleged in the Amended Complaint, Defendants "made a conscious decision" not to reveal the extent of the potential liability for several years, and in so doing understated and obfuscated the true nature of the IRS dispute.  *Id.*  The Court therefore agrees that the Pension Fund adequately alleges that Defendants' failure to disclose these facts "constituted conscious misbehavior, or, at the very least, highly unreasonable conduct that represents an extreme departure from the standards of ordinary care." *Id.* at 216 (cleaned up).  And, while discovery may very well turn up an innocent explanation for that failure, at this stage of the litigation the Amended Complaint supports an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

Accordingly, the Court holds that the Pension Fund has adequately alleged scienter with respect to Defendants' failure to disclose the extent of Amgen's potential liability to the IRS.

---

[16] Defendants argue that they lacked a clear duty to disclose facts regarding the potential liability reflected in the IRS's NOPAs and RARs because those amounts were "non-final."  Reply at 11.  That is not dispositive.  Through the NOPAs and RARs, the IRS sought $10.7 billion in back taxes and penalties, plus interest on the taxes, following what the Amended Complaint describes as a lengthy and painstaking investigation.  *See* Am. Compl. ¶¶ 44-72.  Under those circumstances, the Pension Fund plausibly alleges that disclosure of information sufficient to enable investors to understand the extent of the possible loss that Amgen was facing was necessary to make the Company's disclosures regarding the IRS dispute both clear and complete.  *See Macquarie Infrastructure Corp.*, 601 U.S. at 263.

**B.**    **Section 20(a)**

The Amended Complaint also alleges a control-person claim against Bradway and Griffith under Section 20(a), 15 U.S.C. § 78t(a).  Defendants do not develop any distinct arguments for dismissal of this claim.  *See* Motion at 30; Reply at 12 n.19.  Because the Court concludes that the Pension Fund has adequately alleged an underlying claim pursuant to Section 10(b) and Rule 10b-5, the Court denies Defendants' motion to dismiss the Section 20(a) claim as well.  *See, e.g.*, *Setzer*, 968 F.3d at 216.

**C.**    **Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Pension Fund has asked the Court for leave to further amend its pleading "[s]hould the Court find the [Amended Complaint] to be deficient in any respect."  Opposition at 30 n.29.  But that cursory footnote gives no indication as to how the deficiencies identified in the Pension Fund's affirmative-misstatement theory could be cured through further amendment.  The request for leave to amend is therefore denied.  *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) ("[D]enial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." (internal quotation marks omitted)).

## IV.  Conclusion

For these reasons, the Court denies Defendants' motion to dismiss.  Defendants are ordered to answer the Amended Complaint on or before October 21, 2024.

The Clerk of Court is respectfully directed to change the caption of this case to "*In re Amgen Inc. Securities Litigation*."  The Clerk of Court also is respectfully directed to close the motion pending at Docket Number 40.

        SO ORDERED.

Dated: September 30, 2024
      New York, New York

                              JOHN P. CRONAN
                        United States District Judge